STEPHEN R. BASSER (121590)
SAMUEL M. WARD (216562)
**BARRACK, RODOS & BACINE**
One America Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874
sbasser@barrack.com
sward@barrack.com

JEFFREY A. BARRACK*
DANIELLE M. WEISS*
ANDREW J. HEO*
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jbarrack@barrack.com

**Admitted Pro Hac Vice*

*Counsel for Lead Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE BIOAGE LABS, INC., SECURITIES LITIGATION | CASE NO. 3:25-CV-00196-RS<br><br>**LEAD PLAINTIFF'S CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933** |

Lead Plaintiff, the Southeastern Pennsylvania Transportation Authority ("SEPTA" or "Lead Plaintiff"), alleges the following upon information and belief, except as to those allegations concerning itself, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based on the investigation of their undersigned counsel, which included, among other things, review and analysis of: a) public statements made by or on behalf of BioAge Labs, Inc. ("BioAge" or the "Company"), public filings with the U.S. Securities and Exchange Commission ("SEC"); b) Company press releases; and c) news articles. Lead Plaintiff believes that a reasonable opportunity for discovery will uncover substantial additional evidentiary support for the allegations set forth below in this Complaint.

## I. INTRODUCTION AND OVERVIEW OF THE ACTION

1. Lead Plaintiff brings this action pursuant to Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77(k) and 77(o), on behalf of itself and all other persons or entities that purchased or otherwise acquired BioAge stock pursuant and/or traceable to BioAge's Registration Statement and Prospectus for its Initial Public Offering ("IPO") held on or about September 26, 2026.

2. In the Registration Statement, dated September 25, 2024 and related Prospectus, dated September 26, 2024 (collectively, "Offering Documents"), filed in connection with the IPO, the Company billed itself as a "clinical-stage biopharmaceutical company" that develops "therapeutic product candidates for metabolic diseases, such as obesity, by targeting the biology of human aging." BioAge further stated that its lead product candidate, azelaprag, is an orally available small molecule agonist of the apelin receptor APJ, noting that "[a]pelin is a type of signaling molecule released in response to exercise known as an exerkine, which, as shown in preclinical studies and clinical trials, has the potential to recapitulate many of the downstream benefits of exercise." As such, azelaprag is part of a class of agents known as apelin receptor agonists.

3. Obesity is a serious health condition that dramatically increases the risk of developing serious cardiovascular, metabolic, musculoskeletal, and/or respiratory diseases, including, among other things, heart disease, stroke, hypertension, dangerously high cholesterol, type-2 diabetes, insulin resistance, metabolic syndrome, fatty liver, gallstones, kidney disease, liver disease, some forms of cancer,

osteoporosis, joint pain, enduring back pain, sleep apnea, asthma, and bronchitis. Most seriously, obesity increases the risk of premature death.

4. Undoubtedly, an obesity treatment that induces weight loss without destroying muscle mass, would be a great benefit to society, even though such treatment may cause certain other side effects. At present, the FDA-approved medications for the treatment of obesity, including, among others, tirzepatide (marketed by Eli Lilly & Co. as Zepbound) and semaglutide (marketed by Novo Nordisk as Wegovy), induce rapid weight loss, but may also significantly reduce muscle mass.

5. Among other things, BioAge's Offering Documents discussed a collaboration with Eli Lilly & Co. ("Lilly") in an ongoing STRIDES Phase 2 clinical trial ("STRIDES trial") of azelaprag in combination with tirzepatide, a GIP/GLP-1R receptor agonist, to establish "proof of concept" for an enhanced medication regimen for the treatment of obesity that both induces weight loss and maintains body composition (*i.e.*, muscle mass). The ongoing STRIDES trial was designed to involve approximately 220 obese individuals, aged 55 and over, with a primary end point of weight loss at 24 weeks, and "top line results" anticipated in the third quarter of 2025.[1] For purposes of the STRIDES trial, in addition to providing tirzepatide, Lilly, through its Chorus division, provided clinical trial design and execution advice.

6. According to the Offering Documents, BioAge ultimately intended to create an oral therapy for the treatment of obesity to make it more appealing than currently available GLP-1 treatments, like tirzepatide, which are injectables. However, the starting working hypothesis was that its drug candidate, azelaprag, when used in combination with tirzepatide, would accelerate achievable weight loss as compared to using a GLP-1 alone, without the side effect of diminished muscle mass. According to BioAge, azelaprag can recapitulate the metabolic benefits of exercise, acting almost as an exercise mimic. Azelaprag, if so developed, had "blockbuster" potential to dominate the obesity drug market, which BioAge estimated would be worth $150 billion by 2031, precisely because either as a combination therapy or a monotherapy, it could help an obese patient achieve weight loss without the downside effect of losing muscle mass, a significant benefit.

[1] As set forth in the Offering Documents, a second part of the STRIDES trial, involving a cohort of younger, obese patients to be treated with a combination of azelaprag and semaglutide was expected to start in mid-2025.

7. The IPO was a resounding success. BioAge sold 12.65 million shares of its common stock at $18.00 per share, including the full exercise by the underwriters of their option to purchase 1.65 million additional shares, raising $198 million. In October 2024, BioAge's stock rose to over $25 per share.

8. The IPO's success was fueled by numerous favorable statements in the Offering Documents, coupled with the failure to adequately disclose material information about the risks of investing in BioAge, including a consequential looming risk of a side effect – elevated liver enzymes (clinically referred to as "transaminitis") – that would occur, particularly within an obese study patient pool taking tirzepatide, a GIP/GLP-1R agonist, and an apelin receptor agonist like azelaprag, which can induce rapid weight loss and potentially mimic exercise. As a consequence of the materially false and misleading statements and omissions of the Offering Documents, Lead Plaintiff and Class Members were not adequately informed or made aware of the looming risk of elevated liver enzymes that would usher in the demise of the STRIDES trial and development of BioAge's lead drug candidate, azelaprag. The considerable, consequential risk of a transaminitis side effect occurring was not a question of "if" or "may," but "when." And, the Offering Documents failed to disclose that the occurrence of such a side effect would cause the Company to terminate the STRIDES trial and/or wholly abandon the development of its lead drug candidate, azelaprag.

9. As discussed more fully below, the "risk factors" included in the Offering Documents, which were approximately 60 pages long, both ignored and neglected to inform the investment community of this looming risk that would doom the STRIDES trial and further development of azelaprag. Despite touting favorable results of Phase 1 clinical studies of azelaprag (on humans) – even representing that they demonstrated no adverse safety events ("NOASE") "across eight Phase 1 studies" – the Offering Documents neglected to adequately and meaningfully disclose that in 2018, azelaprag's developer and licensor, Amgen, had conducted a Phase 1 study of azelaprag that resulted in a serious adverse safety event. In addition, while the Offering Documents touted the results of pre-clinical "mouse studies," they did not disclose that one such 27-week study was designed to observe, in part, the effect of azelaprag on liver enzymes in mice that are fed a high-fat diet. That study showed that, where azelaprag was used on mice that were on a "high fat diet," elevated liver enzymes levels were elevated when compared to a "lean diet" mouse control group.

10. Additionally and alternatively, without prejudice to the foregoing, and upon information and belief, the Offering Documents did not disclose that prior to the IPO, elevated liver enzyme levels – transaminitis – already existed within the STRIDES trial group whether dosed with azelaprag or azelaprag in combination with tirzepatide.

11. Much to the surprise of investors, on December 6, 2024, approximately only nine weeks after the IPO, the Company announced it was discontinuing the STRIDES trial because transaminitis was observed in some subjects receiving azelaprag. Transaminitis can arise for any number of reasons during a weight loss program and it is often transient. BioAge did not reveal whether the transaminitis observed in the STRIDES trial subjects was transient and expected to resolve once the affected patients stopped taking azelaprag, or whether the condition was deemed to be a permanent consequence of taking azelaprag.

12. On the news of the discontinuation of the STRIDES trial, the price of BioAge stock declined from $20 per share on December 6, 2024, to $4.65 per share on December 7, 2024, significantly below the $18 per share offering price. As the graph below illustrates, the stock price has never rebounded and has remained gravely depressed – signaling the importance of the development of azelaprag to investors and the materiality of information falsely represented and/or omitted about the investment risks associated with the development of azelaprag stated in the Offering Documents:



13. Thereafter, on January 28, 2025, BioAge confirmed that it had halted all development of azelaprag.

14. While BioAge secured $198 million in the IPO, Lead Plaintiff and other similarly situated investors who purchased or otherwise BioAge common stock in the IPO, or shares traceable to it, informed by the materially false and misleading statements, omissions, and risk disclosures of the Offering Documents and with regard to the STRIDES trial, sustained significant damages. Lead Plaintiff seeks to recover the damages it suffered and the damages suffered by all other similarly situated investors who purchased or acquired shares of BioAge issued in, or traceable to, the IPO and arising from Defendants' violations of the Securities Act of 1933, as more fully discussed below.

## II. JURISDICTION AND VENUE

15. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, respectively.

16. This Court has subject matter jurisdiction over this action under Section 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1331.

17. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

18. Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in this District.

## III. THE SECURITIES ACT OF 1933 PARTIES

### A. Plaintiff

19. Lead Plaintiff SEPTA is one of the largest transit systems in the United States, providing public transportation services, including regional rail, buses, trolleys, subways, and a high-speed line in five counties in the greater Philadelphia area. SEPTA purchased BioAge common stock traceable to the

September 26, 2024 Initial Public Offering, as set forth in the certification filed with its lead plaintiff papers (ECF No. 18-2), and was damaged thereby.

**B. Defendants**

***The Company***

20. Defendant BioAge, founded in 2015, is a Delaware corporation with its principal executive offices located at 1445 A South 50th Street, Richmond, California 94804. BioAge's common stock trades on the NASDAQ under the ticker symbol "BIOA." BioAge held its IPO on September 26, 2024.

***Individual Defendants***

21. Defendant Kristen Fortney, Ph.D., ("Fortney") is a co-founder of BioAge and has served as its Chief Executive Officer, President, and a member of its board of directors since the Company's founding in April 2015. Dr. Fortney holds a Ph.D. in Medical Biophysics. Dr. Fortney signed the Registration Statement of the Offering on September 25, 2024.

22. Defendant Dov Goldstein, M.D., M.B.A., ("Goldstein") has served as the Company's Chief Financial Officer since November 2021. Prior to the IPO, Dr. Goldstein received a B.S. in Biological Sciences, an M.B.A., and an M.D. degree. Dr. Goldstein signed the Registration Statement of the Offering on September 25, 2024.

23. Defendant Eric Morgen, M.D., ("Morgen") is a co-founder of BioAge, and has served as its Chief Operating Officer since May 2018, and as a member of its board of directors since June 2017. From 2018 to April 2020, Morgen served as the Company's Chief Medical Officer. Prior to the IPO, Dr. Morgen received a Bachelor of Science degree, a Master of Public Health degree, and a Medical Doctorate. Dr. Morgan signed the Registration Statement of the Offering on September 25, 2024.

24. Defendant Shane Barton ("Barton") is, and at all relevant times was, the Company's Vice President of Finance. Barton signed the Registration Statement of the Offering on September 25, 2024.

25. Defendant Jean-Pierre Garnier, Ph.D. ("Garnier") is, and at all relevant times was, the Chairman of the Company's Board of Directors. Dr. Garnier signed the Registration Statement of the Offering son September 25, 2024.

26. Defendant Michael Davidson, M.D. ("Davidson") has served as a member of the Company's Board of Directors since March 2024. Dr. Davidson signed the Registration Statement of the Offering on September 25, 2024.

27. Defendant Patrick Enright ("Enright") has served as a member of the Company's Board of Directors since February 2024 and is a member of its Audit Committee. Enright signed the Registration Statement of the Offering on September 25, 2024.

28. Defendant James Healy, M.D., Ph.D. served as the Chairman of the Company's Board of Directors until August 2024 and continues to serve on its Board. Dr. Healy executed the Registration Statement of the Offering on September 25, 2024.

29. Defendant Rekha Hemrajani ("Hemrajani") has served on the Company's Board of Directors since August 2021 and is a member of its Audit Committee. Hemrajani executed the Registration Statement of the Offering on September 25, 2024.

30. Defendant Vijay Pande, Ph.D. ("Pande") has served as a member of the Company's Board of Directors since June 2017. Dr. Pande executed the Registration Statement of the Offering on September 25, 2024.

31. Defendants Fortney, Goldstein, Barton, Garnier, Davidson, Enright, Healy, Hemrajani, Morgen, and Pande are collectively referred to herein as the "Individual Defendants."

32. The Individual Defendants, as signatories of the Offering Documents, were required to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation, to ensure that the Offering Documents were free of any materially inaccurate or misleading statements and free of any omissions of material fact or other matters that were required to be disclosed therein. During the course of their "due diligence," the Individual Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

33. In addition to having access to internal corporate documents, the Individual Defendants had access to all of the Company's other top executives, directors, and advisors to determine: (a) the strategy to best accomplish the September 25, 2024 Offering; (b) the terms of the September 25, 2024 Offering, including the price at which the Company's common shares would be sold; (c) the language to be used in

the Offering Documents; (d) what disclosures about the Company would be made in the Offering Documents; and (e) what responses would be made to the SEC in connection with its review of the Offering Documents.

## IV. BACKGROUND

### A. Obesity: A Serious Health Condition That Increases the Risk of Chronic Diseases

34. Obesity is a serious health condition that increases the risk of several chronic diseases or health conditions affecting almost every major organ system, including: heart disease, stroke, hypertension, hyperlipidemia, high cholesterol, type-2 diabetes, insulin resistance, metabolic syndrome, osteoarthritis, joint pain, back pain, sleep apnea, asthma, bronchitis, infertility, pregnancy complications, kidney disease, liver disease, gallstones, increased risk of depression and anxiety, and has been associated with an increased risk of several cancers.

35. This explains the high degree of scientific, medical, and commercial interest in understanding obesity as a medical condition, and in finding therapies and/or drugs to reduce the incidence of obesity or to ameliorate its effects. Currently available FDA-approved medications for the treatment of obesity may have a significant side effect, a disturbing reduction in muscle mass, which can lead to loss of strength or physical impairment, particularly in older adults. Development of a drug that can help an obese patient achieve significant weight loss while maintaining muscle mass or reducing muscle loss or deterioration during treatment would be a blockbuster feat that could dominate the GLP-1R agonist market for the treatment of diabetes and obesity, which BioAge claimed was expected to reach $150 billion by 2031.

36. Notably, many of the conditions linked to obesity can affect the liver, either directly or through the daily medications needed for treatment of hypertension, high cholesterol, or type-2 diabetes. Obesity seems to significantly increase the risk of developing non-alcoholic fatty liver disease ("NAFLD" and sometimes called "NASH" or "MASH," which also denote advanced subtypes of NALFD, which includes inflammation and fibrosis), in which fat builds up in the liver causing a disruption to optimal liver function and an **elevation of liver enzymes**.[2] NAFLD is the most common chronic liver disease in the

[2] Liver enzymes include Alanine transaminase (ALT), Aspartate transaminase (AST), Alkaline phosphatase (ALP), and Gamma-glutamyl transferase (GGT).

United States.[3] Although the exact cause of NAFLD is unknown, scientists have determined that the condition is most prevalent in middle aged or older people who have type 2 diabetes, obesity, high blood pressure, metabolic disorders or metabolic syndrome, certain infections such as hepatitis C, high cholesterol and/or triglycerides, take corticosteroids or some cancer drugs, or have been exposed to certain toxins.

37. Elevated liver enzymes or transaminitis has various causes – some more serious and some quite benign, including: viral hepatitis, hemochromatosis, certain medications, including cholesterol lowering drugs (statins), acetaminophen, vitamins, herbal supplements, fatty liver disease (both alcohol related and non-alcohol related), cancer, celiac disease, thyroid disease, Wilson's disease, cirrhosis, metabolic syndrome, or polymyositis. Elevated liver enzymes may also be caused by physical exercise and by significant or rapid weight loss. In many instances, once the cause is identified, and if necessary, treated, the damage or inflammation will reverse, and liver enzymes will return to normal levels. In such cases, it is said the patient suffered transient transaminitis. Medication-induced transaminitis is often transient.

38. Several factors have spurred the biopharmaceutical industry to develop new product candidates for treatment of obesity, including the large and rapidly growing market created by injectable GLP-1R agonists in treating obesity; the high prevalence of the disease; the impact of obesity on overall health and healthcare spending; and the limitations of currently prescribed drugs.

**B. BioAge: Clinical Stage Pharmaceutical Company Developing a Therapeutic Product Candidate for Obesity**

39. BioAge is a clinical-stage biopharmaceutical company that, as set forth in the Offering Documents, was "developing therapeutic product candidates for metabolic diseases, such as obesity, by targeting the biology of human aging." At all material times, BioAge's so-called lead product candidate, azelaprag, an orally available small molecule apelin receptor agonist, was being advanced "as a treatment for obesity." The Offering Documents, in describing the market for azelaprag, stated that "over 875 million adults age 20+ are obese," "[a]mong obese patients, the prevalence of cardiometabolic morbidities is high,"

---

[3] NAFLD is distinguishable from alcoholic fatty liver disease, or alcoholic steatohepatitis, which similarly is a condition affecting liver health, but is caused by excessive alcohol consumption.

and "[o]besity itself … increases the risk of both morbidity and mortality from age-related chronic disease." The Offering Documents represented that BioAge had "discovered key pathways and targets, such as apelin signaling, which is targeted by our lead product candidate azelaprag, with the potential to preserve metabolic health over the course of aging."

40. Apelin receptors agents, like azelaprag, are linked to, *inter alia*, metabolic function. As explained in the Offering Documents "apelin is a peptide hormone referred to as an exerkine, a signaling molecule released by skeletal muscle in response to exercise that mediates many of the beneficial metabolic and functional adaptations to physical activity." The Offering Documents further explained that "[t]his striking congruence between the actions of apelin and exercise suggests that this peptide acts as a key molecular transducer of the systemic exercise response, and that targeting the apelin/APJ axis may be able to mimic many of the benefits of physical activity sometimes referred to as 'exercise in a pill,'" and later stating, "exercise ameliorates many of the negative health outcomes associated with aging. Circulating apelin levels increase acutely after exercise, with the magnitude of this response strongly predicting physical performance in older adults." As further noted in the Offering Documents, "subjects with higher apelin levels lived longer, with improved health[.]"[4]

41. BioAge represented that its ultimate "goal" was to produce a safe, well-tolerated, "highly competitive oral product [that] would achieve weight loss of approximately 20% after one year of treatment," "on par with injectables," like "Zepbound (tirzepatide 15 mg), which is a dual GIP-1R and GIP, agonist and has the highest percentage of weight loss among approved injectables." BioAge noted, "[c]ertain injectable GLP-1R agonists have recently been approved for the treatment of diabetes and obesity. However, there continues to be significant interest by pharmaceutical companies in oral obesity medications given strong patient preference and fewer supply chain challenges compared to injectables, including cold-chain requirements and high manufacturing costs;" adding, "[d]espite the recent approvals

[4] While the Offering Documents characterize azelaprag as an apelin receptor agonist, nowhere do the Offering Documents, or the risk factors therein, disclose that in mouse models, apelin receptor activation has been implicated in liver fibrogenesis, cirrhosis, and injury. Specifically, apelin receptor activation promotes hepatic stellate cell (HSC) activation, angiogenesis, and collagen production—all of which contribute to fibrotic remodeling and hepatocellular stress. Furthermore, apelin has a known role in promoting hepatic stress in obesity and metabolic liver disease.

of such injectable GLP-1R agonists, there remain important unmet needs for people struggling with obesity, including improved oral efficacy, tolerability and body composition." Importantly, the Offering Documents represented that "Azelaprag also has a favorable preclinical safety profile: the no observed adverse effect level (NOAEL) in good laboratory practice (GLP) toxicology studies was the highest dose tested in both species (*i.e.*, no dose-limiting toxicity was observed in preclinical studies). These findings are consistent with its clinical tolerability profile, as no treatment-related trends in adverse events have been observed."

42. According to BioAge, in a series of preclinical Phase 1 and Phase 1b studies, "azelaprag demonstrated the ability to more than double the weight loss induced by a glucagon-like-peptide-1 receptor (GLP-1R) agonist while also restoring healthy body composition and improving muscle function," with "older adults on bed rest" treated with azelaprag over a 10-day period demonstrating "decreased muscle atrophy, preservation of muscle quality and improved metabolism…"

### C. The STRIDES Trial

43. Armed with the results of these preclinical and Phase 1 and 1b studies, BioAge, in collaboration with Lilly, designed and began to implement a Phase 2 clinical trial to assess azelaprag's potential to drive significant improvements in weight loss when combined with a GLP-1R agonist– the STRIDES trial, which began before the BioAge IPO. In the Offering Documents, BioAge represented that "the ongoing STRIDES clinical trial will assess Azelaprag in combination with tirzepatide, marketed as Zepbound by Eli Lilly and Company, with topline results anticipated in the third quarter of 2025." The Company also described a planned second Phase 2 clinical trial, which would assess azelaprag in combination with semaglutide, marketed as Wegovy® by Novo Nordisk, in a younger patient population, with initiation expected in the first half of 2025 and topline results expected in the second half of 2026.

44. On October 26, 2023, BioAge issued a press release announcing plans, in collaboration with Lilly's Chorus Organization, for a Phase 2 trial of azelaprag as a combination therapy with tirzepatide as an enhanced treatment for obesity to begin in mid-2024. The press release provided a detailed overview of the planned trial.

45. On July 29, 2024, BioAge issued a press release announcing that the STRIDES trial was underway and that the first trial participant had been dosed. Among other things, the press release quoted Defendant Fortney as stating:

> We believe combining azelaprag, an exercise mimetic, with tirzepatide, a GLP-1/GIP receptor agonist that decreases food intake, could provide a powerful pharmacological parallel to the exercise and diet interventions that form the foundation of obesity management… The STRIDES trial aims to demonstrate that activating apelin signaling with azelaprag is a potent complementary mechanism that can deliver increased weight loss efficacy in patients on incretins. In addition, this trial will provide a direct read-through to azelaprag's potential as an orally available small molecule to achieve efficacy on par with injectable weight loss drugs when combined with incretins in an all-oral regimen.

46. The press releases issued on October 26, 2023, and July 29, 2024, both described the structure of the STRIDES trial.

47. On September 26, 2024, BioAge filed its Form 424B4 prospectus for the Company's IPO, which was incorporated into the Form S-1/A registration statement Defendants filed after the market closed on September 25, 2024, listing 11 million shares of BioAge common stock for sale at an offering price of $18 per share. The Offering Documents detailed the STRIDES trial as follows:

> *Our azelaprag clinical development strategy*
>
> We are initiating two Phase 2 clinical trials of azelaprag in combination with GLP-1R agonists. The first of these trials, STRIDES, is an ongoing clinical trial of azelaprag in combination with tirzepatide in approximately 220 obese individuals aged 55 and over, an age group that represents 35-40% of the adult obese population in the U.S. We are initially focusing on these older patients because the muscle and metabolic benefits of azelaprag observed in our Phase 1b clinical trial were achieved in older patients. The goal of the STRIDES clinical trial is to establish proof of concept for enhanced weight loss. The primary endpoint of this trial will be weight loss at 24 weeks. In addition, biomarkers, changes in body composition and glucose control will be assessed as exploratory endpoints. We anticipate topline results in the third quarter of 2025.
>
> We have a material transfer agreement with Lilly, under which Lilly has agreed to provide us with tirzepatide in connection with our STRIDES clinical trial of azelaprag in obesity. Lilly's Chorus clinical development organization is advising and assisting on all aspects of the Phase 2 STRIDES clinical trial design and execution, enabling us to benefit from Lilly's extensive clinical experience in this space, while retaining all rights to azelaprag.
>
> The goals of our second Phase 2 clinical trial are to demonstrate:
>
> • A GLP-1R-like agonist class effect.
>
> • Efficacy in a wider population that includes younger patients.

> • Overall weight loss achieved after 52 weeks of treatment.
>
> To that end, we intend to combine azelaprag with semaglutide in our second Phase 2 clinical trial and enroll approximately 300 obese individuals ages 18 and older. Trial initiation is anticipated in the first half of 2025 with topline results expected in the second half of 2026. The primary endpoint of this Phase 2 clinical trial will be weight loss at 52 weeks, with similar exploratory endpoints to the tirzepatide combination trial.
>
> While we are currently planning Phase 2 clinical trials with azelaprag in combination with injectable GLP-1R agonists, as these drugs are already approved, our ultimate objective is to develop an all-oral weight loss combination with an oral incretin.
>
> In parallel, we intend to initiate an insulin sensitivity proof-of-concept trial of azelaprag monotherapy in the first half of 2025 to support potential indication expansion. We expect to report topline results from this proof-of-concept trial in the second half of 2025. The goal of this clinical trial is to assess the potential direct benefits of azelaprag, informing potential subsequent development for treatment of obesity with comorbid type 2 diabetes in combination with a GLP-1R agonist.
>
> *Our Strategy*
>
> • Efficiently advance the clinical development of azelaprag as a novel exercise mimetic for the treatment of obesity.
>
> • Establish azelaprag as a key component of all-oral obesity therapy.
>
> • Maximize the potential of azelaprag in adjacent indications, including diabetes.

48. The Offering Documents also provided additional details regarding dosing, the research-driven reasons for selecting such doses, and some expected outcomes:

> We plan to investigate two doses of azelaprag, 300 mg QD and 300 mg BID (which has potential for 600 mg QD dose formulation) in combination with tirzepatide as compared to tirzepatide alone. The doses were selected based on a completed Phase 1 oral pharmacokinetic trial; they are intended to result in azelaprag exposures (area under the curve) that bracket the similar exposure achieved in the Phase 1b bed rest trial and diet-induced obesity preclinical studies. These doses will be administered orally in combination with weekly subcutaneous tirzepatide. We are collaborating with Lilly's Chorus clinical development organization, which will provide clinical trial design and execution expertise, and Lilly, which is supplying tirzepatide. We retain all rights to azelaprag.
>
> The primary endpoint of the STRIDES clinical trial is mean percent weight loss at 24 weeks with exploratory endpoints focused on body composition, glycemic control, patient-reported outcomes / quality of life, biomarkers, and rebound weight gain. We set the primary endpoint at 24 weeks because there is lower variability in tirzepatide monotherapy weight loss compared to later time points in clinical trials, and because Lilly has found weight loss at 24 weeks to be predictive for weight loss at 72 weeks (one year of treatment once the maintenance dose is reached). The trial has 90% power to detect a 3.3% difference between treatment groups (azelaprag plus tirzepatide versus tirzepatide alone) in weight loss at 24 weeks of treatment, which is expected to correspond to 5% at one year of treatment. FDA's 2007 draft guidance for development of weight management products states that a 5% treatment difference compared to placebo can be evidence of effectiveness in Phase 3 trials. A 5%+ benefit in weight loss

for azelaprag could also translate into potential 20%+ overall weight loss in an oral combination, a competitive efficacy benchmark; for reference, the most advanced oral incretin in development, oral semaglutide, achieves 15.1% overall weight loss at 68 weeks.

We anticipate topline results from this trial in the third quarter of 2025.




49. The Prospectus represented the significance and benefits of azelaprag for the treatment of obesity by itself and as a combination therapy. In pertinent part, the Company detailed the underlying research studies that led into the initiation of the STRIDES trial and the expected contribution of the STRIDES trial to this growing cannon of obesity treatment knowledge and the ultimate commercial goals BioAge hoped to achieve:

> Azelaprag, our lead product candidate, is an orally available small molecule that has been well-tolerated in 265 individuals across eight Phase 1 clinical trials. In preclinical obesity models, azelaprag demonstrated the ability to more than double the weight loss induced by a glucagon-like-peptide-1 receptor (GLP-1R) agonist while also restoring healthy body composition and improving muscle function. These preclinical results are supported by our Phase 1b clinical trial in older adults on bed rest where we observed decreased muscle atrophy, preservation of muscle quality and improved metabolism in subjects treated with azelaprag over a 10-day period. We plan to assess azelaprag's potential to drive significant improvements in weight loss when combined with a GLP-1R agonist in two Phase 2 clinical trials. While the results of these preclinical studies and early clinical trials have demonstrated the potential use of azelaprag for the treatment of metabolic disease, they may not be predictive of the results of later-stage clinical trials. The ongoing STRIDES clinical trial will assess azelaprag in combination with tirzepatide, marketed as Zepbound® by Eli Lilly (Lilly), with topline results anticipated in the third quarter of 2025.
>
> We are building a pipeline of platform-derived therapeutics targeting chronic metabolic disease. Our lead product candidate, azelaprag, is an orally available small molecule agonist of the apelin receptor (APJ) where activation has the potential to recapitulate many of the benefits of exercise. We are developing azelaprag for the treatment of obesity in combination with GLP-1R agonists with the goal of increasing overall weight loss, with the potential to also improve tolerability and body composition. We have initiated one Phase 2 clinical trial of azelaprag in combination with tirzepatide and plan

> to initiate a second Phase 2 clinical trial of azelaprag in combination with semaglutide in the first half of 2025 and topline results expected in the second half of 2026.
>
> ***
>
> Ultimately, the treatment goal for patients is to achieve not just weight loss – but also a healthy body composition and physical function. As a result, there is substantial interest from both physicians and pharmaceutical companies in mechanisms that improve the quality of body composition in connection with weight loss in addition to the quantity of weight loss.

50. BioAge's Offering Documents made clear that the Company was "planning Phase 2 clinical trials with azelaprag in combination with injectable GLP-1R agonists, as ***these drugs are approved,"*** however ***"our ultimate objective [elsewhere described as a "key therapeutic goal"] is to develop an all-oral weight loss combination with an oral incretin***. (Emphasis supplied). Dosing oral incretin drugs in combination with orally administered azelaprag could provide well-tolerated weight loss in line with that achieved by injectable agonists alone, as well as superior body composition[.]" To that end, BioAge stated, "[w]e have selected a 5 mg dose of tirzepatide in the STRIDES clinical trial given it approximates oral efficacy. Our ultimate goal is to develop azelaprag as part of an all-oral obesity combination therapy. The 5 mg dose of tirzepatide achieves similar weight loss as the most advanced oral in development, oral semaglutide. Tirzepatide 5 mg achieved 15.0% overall weight loss at 72 weeks; oral semaglutide 50 mg, achieved 15.1% weight loss after 68 weeks."

51. The Offering Documents further noted that "combination therapies" are an important trend in obesity drug development because "[c]ombining multiple therapeutics with different mechanisms of action has the potential to improve weight loss while reducing side effects, improving body composition, and/or improving comorbidities."

52. As part of its discussion of its developmental strategy of azelaprag to treat obesity with added benefit of retaining muscle mass, a section of the Offering Documents titled "obesity treatment landscape: incretin drugs are transforming care, creating an important clinical and commercial opportunity," stated, in pertinent part, as follows:

> The market for GLP-1R agonists, including those used to treat diabetes, was $35 billion in 2023. According to third-party estimates, the global market is expected to grow to $150 billion by 2031 … Several factors have spurred the biopharmaceutical industry to develop new product candidates for obesity. These include the large and rapidly growing market created by injectable GLP-1R agonists in treating obesity; the high prevalence of

> the disease; the impact of obesity on overall health and healthcare spending; and the limitations of currently prescribed drugs…

## D. Pre-Clinical Mouse Studies and Phase 1 and Phase 1b Studies

### 1. Phase 1 and Phase 1b Human Studies Discussed in the Offering Documents

53. Azelaprag was first developed by pharmaceutical company, Amgen Inc. ("Amgen"). On April 5, 2021, BioAge entered into an exclusive license agreement with Amgen to research, develop, and commercialize AMG 986 (azelaprag) in all diagnostic, preventative, or therapeutic uses. BioAge reported in the Offering Documents that "across eight Phase 1 clinical trials conducted between us and Amgen, Azelaprag has been well-tolerated in 265 individuals, with an adverse event rate similar to placebo." Some of these Phase 1 and Phase 1b studies were performed by Amgen and some by BioAge, and the Offering Documents identify which company undertook each study. Thus, BioAge's development of azelaprag was built or premised on the earlier Amgen research.

54. The Offering Documents touted the general safety and tolerability of the Phase 1 protocols across the studies, reporting, "The overall adverse event profile of azelaprag was comparable to placebo, with no treatment-related trends in adverse events observed, with the exception of mild, self-limited headaches. No serious adverse events have been reported."

55. The Offering Documents also contained a detailed discussion of the results of a Phase 1b trial that BioAge had previously announced in a December 2022 press release, noting that the study showed "statistically significant results on pharmacodynamic measures of maintenance of muscle size and quality in participants administered 240 mg of Azelaprag as compared to placebo from our Phase 1b trial in 21 healthy volunteers ≥65 years old over 10 days of bed rest, of which 10 received placebo." According to the Offering Documents, this study also showed that "Azelaprag was also observed to shift the levels of circulating proteins in a way that is highly overlapping with endurance exercise, further supporting that it may be able to mimic some global effects of exercise at the protein level." The Offering Documents did not disclose any observed adverse events in either the BioAge or Amgen Phase 1 clinical tests even though, in 2018, Amgen conducted a series of studies of Azelaprag on humans that observed a serious adverse stage 1 side effect relating to the liver, as more fully discussed in § B, above.

**2. Mouse Studies: BioAge conducted preclinical studies on mice that at least in part looked at the potential impact of azelaprag on liver enzyme elevation, but did not refer to or report on the outcome in the Offering Documents**

56. In addition to Phase 1 clinical trials using human subjects, pre-clinical studies also were performed on mice. As the Offering Documents explained, "[h]uman genetics are consistent with findings in interventional genetic studies in mice. Significant genome-wide associations have been reported at the apelin receptor, APJ, and body mass index, lean body mass and serum lipid levels across diverse populations."

57. As set forth in the Offering Documents, the azelaprag development process was cumulative and was based at least in part on research performed outside of BioAge. The Offering Documents stated, "studies of apelin in mice published by other groups provide support for the potential role of Azelaprag in the treatment of obesity."

58. The Offering Documents reported findings from a BioAge-led mouse study of azelaprag as a monotherapy:

> *Azelaprag monotherapy treatment resulted in significantly improved body composition (% lean, % fat) in mice challenged with a high-fat diet, similar to transgenic mice overexpressing apelin. Mice were treated with azelaprag for 22 weeks, starting at 5 weeks of age. Mice treated with the highest dose of azelaprag (3.3g/L) showed a 3.5% increase in lean mass and a 3.9% decrease in fat mass. For reference, lean controls mice were 73.6% lean mass and 22.9% fat mass.*

59. According to the Offering Documents, another BioAge-led mouse study that evaluated azelaprag in combination with tirzepatide found that, in combination, the drugs restored body weight and body composition of obese mice to lean control levels. In that study, mice were fed a high fat diet, then treated with tirzepatide, azelaprag, or a combination of the two for three weeks while maintaining the same diet. BioAge reported, "all treatments were well-tolerated, with normal serum chemistries and normal behaviors observed in all animal groups," adding, "as expected[,]" the "tirzepatide monotherapy led to a reduction in body weight of approximately 15% at the dose tested," and "the addition of azelaprag to tirzepatide treatment led to further significant, dose-dependent decreases in body weight, with 40% weight reduction by three weeks in the highest dose group."[5] BioAge also represented that at the highest dose of

[5] In the Offering Documents, BioAge reported that monotherapy azelaprag had no notable effect, positive or negative, on body weight in this study.

azelaprag, the weight of mice receiving the combination of azelaprag and tirzepatide was restored to that of lean controls (mice fed a regular diet, not a high fat diet). The results are summarized in this table:




60. In the Offering Documents, BioAge hypothesized that "azelaprag should show similar benefits in preclinical models when combined with other similar incretins that are GLP-1R agonists, beyond tirzepatide," adding, in "the same diet-induced obesity mouse model as our tirzepatide experiments, we observed comparable weight loss and other benefits when we administered azelaprag in combination with semaglutide, suggesting a class effect in incretins, as well as the potential for additivity with other appetite-suppressing weight loss therapies." In summary, the Offering Documents reported, "*we observed similar weight loss synergy when azelaprag was combined with semaglutide.*"

61. While the Offering Documents discussed the findings of multiple mouse studies, there was no reference to the fact that, during a 27-week mouse study, BioAge tracked, among other things, liver enzyme levels of a lean control group, a cohort of mice fed a high-fat diet, and group of mice fed a high-fat diet while taking azelaprag as a monotherapy. In that study, and as expected, liver enzymes increased to elevated high levels in both cohorts fed a high-fat diet, particularly as compared to the mice in the lean

diet cohort. The cohort that was fed a high fat diet and received azelaprag showed higher elevated liver enzyme levels when compared to the "lean diet" mouse control group without azelaprag. However, while the liver enzyme levels did not rise as high in the high-fat diet plus azelaprag cohort as did the liver enzyme levels in the untreated high-fat diet cohort, the mouse study results demonstrate that elevated liver enzymes are a typical or expected result or concern.

62. BioAge disclosed the results of this 27-week monotherapy mouse study ***after*** the IPO, at the Obesity Week conference on November 6-7, 2024. Given the duration of the mouse study and the proximity of the presentation date to the IPO date, upon information and belief, this study was initiated – and completed – before the Offering Documents were filed. Yet, despite the fact that BioAge had developed a mouse study concerning and examining, among other things, the potential impact of azelaprag on liver enzyme levels, there are no risk warnings or any meaningful discussion of concern for any negative impact of azelaprag on liver health in the Offering Documents.

63. However, on December 6, 2024, just one month after the results of the 27-week mouse study showing the impact of azelaprag on liver enzymes on mice fed a high-fat diet were presented at the Obesity Week conference, and roughly 9 weeks following the IPO, BioAge issued a press release announcing that the STRIDES trial had been discontinued "after liver transaminitis without clinically significant symptoms was observed in some [eleven] subjects receiving azelaprag."

## V. THE OFFERING DOCUMENTS CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMITTED NECESSARY MATERIAL FACTS

### A. The Failure to Warn of the Looming and Consequential Risk of Transaminitis was a Material Omission

64. By way of background, elevated liver enzymes is considered a common health condition that affects as much as 23% of all Americans. There are a number of causes of elevated liver enzymes, including among them: celiac disease; fatty liver; alcoholism; unhealthy diet; certain types of prescription medications (including obesity drugs and apelin receptor agonists and GLP-1 agonists as more fully discussed below); viral infections which affect the liver, including hepatitis C, B, and A; physical trauma; caffeine consumption; obesity; metabolic syndrome; cirrhosis; hemochromatosis (genetic condition

causing absorption of excess amounts of iron); and heart failure (leading to decreased blood flow to the liver).

65. Weight loss, particularly rapid or substantial weight loss, can cause a temporary increase in liver enzymes, specifically AST (aspartate aminotransferase) and ALT (¶ aminotransferase). This elevation of liver enzymes typically returns to normal within a few weeks.

66. A transient increase in liver enzyme levels can occur after dietary-induced weight loss, even absent taking an obesity drug.

67. Exercise can temporarily elevate liver enzymes, particularly AST and ALT. This transaminitis effect is frequently transient.

68. An increase in liver enzymes has been associated with certain drugs, even including over-the-counter drugs like acetaminophen (Tylenol) and non-steroidal anti-inflammatory drugs (NSAID) such naproxen (Aleve).

69. Despite all of these causes of transaminitis, in the over 220 pages of the Offering Documents, disseminated by the Defendants in the effort to reap $198 million from investors in the IPO and enable BioAge to tap into the lucrative public market for the trading of its common stock, the word "transaminitis," or the phrase "elevated liver enzymes" (or even "liver damage"), never appear.

**B. The Discussion of the Phase 1 Studies Set Forth in the Offering Documents Was False and Misleading**

70. As part of the IPO, the prospectus stated in relevant part:

> **Completed Clinical Trials**
>
> In the eight Phase 1 clinical trials of azelaprag completed to date by us and Amgen, azelaprag was well-tolerated in 265 individuals who received a daily dose of up to 1,440 mg for up to 21 days. Below is a summary of clinical trials completed to date:

**Azelaprag has been studied in eight Phase 1 trials**

| Sponsor | Study goal | Participants | Years conducted | Admin | Azelaprag dosing | Primary endpoint | Secondary endpoints | Publication (PMID) |
|---|---|---|---|---|---|---|---|---|
| BioAge | Evaluate the effect of azelaprag on midazolam pharmacokinetics (PK) | HVs | 2024 | Oral | 300 mg BID x 14 days (N=22) | Midazolam PK | Safety & tolerability | - |
| | Characterize safety & PK after oral administration | Older HVs | 2023 - 2024 | | Part 1: Single dose crossover (N=16)<br>• 300 mg, 600 mg<br>Part 2: Multiple dose (N=9 – all subjects also participated in Part 1)<br>• 300 mg oral BID x 14 days | PK | | - |
| | Characterize safety, PK, and pharmacodynamics (PD) after IV administration | | 2022 | IV | Part A: Single ascending dose<br>• 60 mg LD + 360 mg MD (N=6)<br>• 120 mg LD + 720 mg MD (N=6)<br>• 240 mg LD + 1440 mg MD (N=6)<br>Part B: Multiple Dose<br>• 240 mg x 10 days (N=11) | Safety & tolerability | PK, PD | - |
| Amgen | Characterize safety, PK, PD | HVs<br>Heart failure patients | 2016 - 2019 | Oral, IV | Part A: Single ascending dose in healthy volunteers<br>• Oral: 5, 30, 100, 200, 400, or 650 mg (N=36)<br>• IV: 0.5 mg LD, 3 mg LD, 6 mg LD + 36 mg MD, 20 mg LD + 120 mg MD, 60 mg LD + 360 mg MD (N=30)<br>Part B: Multiple dose in healthy volunteers<br>• Oral: 5, 30, 100, 200, 400, or 650 mg x 7 days (N=37)<br>• IV: 6 mg LD + 36/38 mg MD or 60 mg LD + 360/376 mg MD (N=13)<br>Part C: Subjects with heart failure<br>• 21 days of PO QD treatment: 10 mg × 7 days >> 30 mg × 7 days >> 100 mg × 7 days (N=19) | Safety & tolerability | PK, PD | 35460392 |
| | Compare oral tablet and capsule formulations | HVs | 2018 | Oral | 200 mg (N=12) | PK | Safety & tolerability | 35412220 |
| | Characterize PK with renal impairment | HVs<br>Subjects with severe renal impairment | 2017 - 2018 | | 200 mg (N=12) | | | 35092583 |
| | Characterize safety, tolerability, and PK in Japanese subjects | HVs | 2017 - 2018 | | 200 mg (N=6)<br>400 mg (N=6) | | | 35279815 |
| | Characterize effect of food and itraconazole on PK | | 2017 | | Food effect crossover (N=12)<br>• 2x 200 mg<br>Itraconazole (N=15)<br>• 2x 10 mg | | | 35247290 |

*Azelaprag has been studied in eight Phase 1 trials to date, conducted by BioAge and Amgen. HVs = healthy volunteers. LD = loading dose & MD = maintenance dose, used in the IV administration setting. In all trials, primary and secondary objectives were met.*

> The overall adverse event profile of azelaprag was comparable to placebo, with no treatment-related trends in adverse events observed, with the exception of mild, self-limited headaches. No serious adverse events have been reported. Furthermore, no adverse cardiac effects have been observed in any clinical or preclinical setting.

71. The statements in the excerpt contained in the prior paragraph are misleading because, as framed, an investor would believe the only reported side effects from the Phase 1 and Phase 1b studies of azelaprag were headache, dizziness, and back pain. Even in isolation, the following summary statement is also misleading: "[t]he overall adverse event profile of azelaprag was comparable to placebo with no treatment-related trends in adverse events observed, with the exception of mild, self-limited headaches."

72. Side effects observed in drug clinical trials are designated with a Common Terminology for Adverse Events ("CTCAE") grade level, ranging in severity from Grade 1 (causes mild effects)- Grade 5 (caused death). The National Institute of Health describes a CTCAE grade 1 event is described as "Mild,

asymptomatic or mild symptoms; clinical or diagnostic observations only; intervention not indicated" and a CTCAE grade 2 event as "Moderate; minimal, local or noninvasive intervention indicated."

73. The Offering Documents failed to disclose adverse events occurring in a Phase 1 trial Amgen had conducted in 2018 that were more serious in nature than mere "mild, self-limited headaches." According to that Amgen Phase 1 azelaprag study, seven study participants experienced CTCAE grade 2 events, with several experiencing toothaches as a result of the treatment.

74. In describing the Phase 1 trials, the Offering Documents falsely stated, "azelaprag was well-tolerated in 265 individuals" participants in the eight Phase 1 and Phase 1b trials conducted by BioAge and Amgen, insinuating, as discussed above, that the only reported side effects were headaches, dizziness, and back pain. Not only was this statement misleading for the reasons set forth above, it was false. The Offering Documents failed to disclose a liver-related event that arose in the phase 1 trial respecting azelaprag conducted by Amgen.

75. Buried deep within Amgen's clinical trial NCT03276728,[6] a narrative of its Phase 1 Trial states, in relevant part:

> One CTCAE grade 4 event was reported; this event (blood creatine phosphokinase increased as high as 9927 U/L) occurred in a [ ]-year-old subject in the 650 mg PO multiple dose cohort on study day 5, was nonserious, resulted in no action/change to the investigational product administration, was not associated with clinical symptoms (eg, myalgia) or worsening renal function tests, ***occurred concurrently with a CTCAE grade 2 event of aspartate aminotransferase*** [AST] ***increased and a grade 1 event of alanine aminotransferase*** [ALT] ***increased, did not require any treatment, and was reported as resolved on study day 29*** (22 days after the last dose of investigational product).

(Emphasis supplied).

76. A CTCAE grade 4 event is the most serious level of adverse event and indicates "life-threatening consequences; urgent intervention indicated." A CTCAE 5 grade event indicates that a death occurred related to the adverse event.

---

[6] To locate this document, one must conduct a sufficient investigation to locate the clinical trial ID, which is not listed in the BioAge Offering Documents, although the study itself is contained in the summary chart, above, in ¶ 70. Then one must go to the NIH website (clinicaltrials.gov), input the clinical trial ID and navigate to the Record History tab, and click on version #23. Once V23 is selected, one must then go to the Document Section, where there is a Study Protocol link, which must then be clicked on to locate this narrative. The Offering Documents did not within their four corners discuss or adequately disclose this adverse liver-related side effect.

77. The Amgen narrative reveals that one patient who took 650 mg of azelaprag experienced a CTCAE grade 4 event with a blood creatine phosphokinase of 9927 U/L, alongside a CTCAE grade 2 event of AST, and a grade 1 event of ALT. Blood creatine phosphokinase is an enzyme that indicates muscle tissue damage or injury. AST and ALT are both liver enzymes which increase when the liver is injured.

78. Risk of side effects associated with azelaprag was information material to investors. If it were not, there would be no reason for BioAge to include any such discussion at all, let alone to stress within the Offering Documents that "all events were mild except for a single moderate headache event reported in both the active and placebo group."

79. The Offering Documents falsely represented that "all events were mild," and it was misleading because BioAge did not disclose that side effects were not limited to headaches, dizziness, and back pain.

### C. Reference to Mouse Studies Were False and Misleading By Omitting Reference to the Occurrence of Elevated Liver Enzymes in a 27-Week Study Cohort Receiving Azelaprag

80. While, as discussed in detail in § IV. D. 2, above, the Offering Documents included lengthy discussion of pre-clinical mouse studies of azelaprag (both as monotherapy and azelaprag in combination with tirzepatide), the Offering Documents omitted any reference to the fact that during a 27-week mouse study, BioAge tracked liver enzyme levels in mice being dosed with azelaprag as a monotherapy and, in the course of doing so, identified elevated liver enzymes in the cohort of "high fact diet" mice receiving azelaprag.

81. After the IPO, during a presentation at the Obesity Week conference on November 6-7, 2024, the Company presented results from the 27-week mouse study indicating BioAge had tracked liver enzyme levels in two cohorts of the 27-week study, a cohort of mice fed a high-fat diet, and group of mice fed a high-fat diet while taking azelaprag as a monotherapy. In that study, and as expected, liver enzymes increased to elevated levels in both cohorts fed a high-fat diet, particularly as compared to the mice in the lean diet cohort. The cohort that was fed a high-fat diet and received azelaprag showed higher elevated liver enzyme level than the mice on the lean diet without azelaprag.

82. This data was omitted from the Offering Documents, as were any risk warnings or meaningful discussion of any transaminitis side effect. These omissions, coupled with the further failure to disclose that the incidence of transaminitis, even absent clinically significant symptomatology, would trigger the cancellation of the STRIDES study and the termination of further development of azelaprag, rendered the Offering Documents false and misleading.

**D. Reference to the STRIDES Trial Design Was False and Misleading by Failing to Disclose its Deficiency With Respect to Excluding Participants with Potential Elevated Liver Enzymes**

83. The Offering Documents referred to the STRIDES trial of azelaprag, and the fact that Eli Lilly's CHORUS division was providing the design of the clinical trial study of that drug candidate. While the reference to pharmaceutical giant Eli Lilly designing the STRIDES trial through its CHORUS arm was both favorable and comforting, nowhere did the Offering Documents include a recitation of the design or ever mention that the designed participant criteria only addressed two liver-specific exclusions: those with "biopsy-confirmed nonalcoholic steatohepatitis" (NASH), also known as metabolic dysfunction-associated steatohepatitis (MASH) and patients who "[h]ave a known history or presence of severe active acute or chronic livers disease..." Persons with unknown or undiagnosed fatty liver disease – NAFLD (or MASH) – were not excluded and could wind up participating. Nor did the exclusion criteria make sure that participants refrain from physical exercise, take over-the-counter products such as acetaminophen (Tylenol) or naproxen (Aleve) which can elevate liver enzymes, or adequately guard against the Study participants' consumption of alcohol. Critically absent from even the two aforementioned liver-related exclusions from the study is any specific mention of transaminitis or any express reference to liver enzymes. Hence, the Offering Documents failed to disclose, and omitted, that the study design itself created a risk of elevated liver enzymes – transaminitis, in the study population, thus potentially tainting the results which, in turn, could disrupt the development of azelaprag as a weight loss drug.

**E. Discussion of GLP-1 Agonists or tirzepatide (Zepbound), an FDA Approved Weight Loss Drug, Without Disclosure of a Pre-IPO Clinical Study Associating it with Liver Injury Rendered the Offering Documents False and Misleading**

84. BioAge did not disclose that beyond the linkage of obesity drugs, GLP-1 agonists, and apelin receptor agonists to elevated liver enzymes, the STRIDES trial combined drug tirzepatide was

previously linked to liver damage when studied prior to the IPO. Nor did the Offering Documents adequately disclose the risk of combining azelaprag with GLP-1 agonists or FDA approved tirzepatide, given the linkage to elevated liver enzymes – transaminitis – or liver injury, which occurrence would trigger the termination of the ongoing STRIDES trial. This was a serious investment risk that BioAge simply did not adequately express or disclose in its Offering Documents, as more fully discussed below.

### F. The Offering Documents Failed to Disclose that the STRIDES Trial's Combination of Azelaprag and Tirzepatide – and End Points of Significant Weight Loss while Maintaining Muscle Mass – Carried the Consequential Side Effect Risk of Elevated Liver Enzymes – Transaminitis

85. The Offering Documents referred to the fact that azelaprag was being studied in combination with an FDA approved drug called tirzepatide, otherwise known as the obesity drug Zepbound. Defendants' Offering Documents referenced agents such as "apelin receptor agonist," GLP-1 or GLP-1R, agonist, and incretins. In the context of each of those references respecting FDA approved drugs or agents associated with the treatment of obesity, not once did the Offering Documents expressly mention, or discuss any issue with respect to elevated liver enzymes or liver injury associated with those approved drug products or agents.

86. Tirzepatide is an agonist of the receptors of two insulin sensitizing polypeptides, GIP (glucose insulinotropic polypeptide) and GLP-1 (glucagon-like peptide 1). Elevations in serum aminotransferase levels during therapy using GLP-1 agonists have occurred, as well as episodes of clinically apparent liver injury. And drug package inserts for drugs using GLP-1 agonists have cautionary language not to use the drug if the individual taking them has known advanced liver disease, cirrhosis, or liver failure given their potential liver toxicity side effect.

87. Prior to the IPO, obesity drug products and GLP-1 agonists, including tirzepatide, were linked to liver injury, or elevated liver enzymes. The Offering Documents referenced Zepbound and the aforesaid agents and agonists without referencing liver injury or transaminitis with which they were linked. The Offering Documents failed to disclose this transaminitis side effect and failed to disclose that its occurrence would doom the STRIDES trial and further development of azelaprag by BioAge. The absence of an express disclosure that transaminitis was a side effect that presented itself as a serious enough issue

to completely shut down the development of azelaprag as a drug candidate was a material omission that rendered the Offering Statements false and misleading.

88. The Offering Documents referred to the intended endpoints of the STRIDES trial of azelaprag: achievement of weight loss and the maintenance of muscle mass. To that end, BioAge represented that azelaprag was an "exercise-induced signaling molecule (exerkine) and agonist of the apelin receptor APJ," with the "potential to recapitulate many of the metabolic benefits of exercise." Yet, despite discussing the fact the azelaprag was part of a class of agents known as apelins that had the potential to recapitulate the metabolic benefits of exercise, nowhere in the Offering Documents was it disclosed that exercise itself can cause elevated liver enzymes – transaminitis.

89. While the Offering Documents referred to the STRIDES trial of azelaprag in combination with tirzepatide in order to achieve weight loss, and referred to GLP-1 or GLP-1R agonist, nowhere in the Offering Documents was it disclosed that significant or rapid weight loss can also elevate liver enzymes. Hence, the combination of azelaprag with tirzepatide in order to both achieve significant weight loss – perhaps rapidly – while mimicking exercise and thereby maintain muscle mass by virtue of exercise recapitulation undoubtedly harbored the risk of elevated liver enzymes.

90. The Offering Documents touted the positive results of the small "mouse" and Phase 1 and 1b studies, referred to already FDA approved drugs using tirzepatide, and expressly noted that side effects such as headaches, back pain, or dizziness can arise. But nowhere did the Offering Documents expressly or adequately discuss, mention, or otherwise disclose or reference human liver-related side effects arising from exercise, rapid weight loss, tirzepatide alone or in combination with azelaprag, incretins, GLP-1 or apelin receptor agonist agents relied upon in the STRIDES trial, or those arising from the condition of obesity itself, and/or fatty liver disease, alcohol consumption, or diet.

91. The Offering Documents failed to disclose or adequately warn investors that combining tirzepatide with azelaprag to mimic exercise and cause weight loss was a consequential combination respecting the risk of elevated liver enzymes, and that such a side effect – even absent clinically significant symptomatology or merely transitory – would cause BioAge to discontinue the STRIDES trial and abandon development of azelaprag.

92. Alternatively, insofar as the risk of developing transaminitis or even generalized liver damage was entirely ignored, the Offering Documents created the false impression that there was no such investment risk presented by the STRIDES trial.

93. Since the occurrence of elevated liver enzymes – even transitory, without clinically significant symptomatology – would cause termination of the STRIDES trial, it was effectively destined to fail from the beginning, and certainly prior to and up to the time of the Offering. However, this was not disclosed within the discussion of the Phase 2 Study in the Offering Documents, nor was any adequate warning given to or otherwise adequately imparted to investors in the common stock issued in the Offering.

94. Indeed, the Offering Documents, covering over 220 pages, wholly ignored mentioning or discussing the subject of liver related side effects or elevated liver enzymes – a serious and material omission, despite the fact that such a side effect, unbeknown to investors, was considered by BioAge as a basis to halt and terminate the STRIDES trial, and abandon azelaprag, its potentially blockbuster lead drug candidate, ostensibly addressing an over $150 billion weight loss market.

### G. The Risk Disclosures Stated in the Offering Documents Were Inadequate, False, and Misleading

95. Although the Offering Documents warned that success of the ongoing STRIDES trial was not guaranteed, the Offering Documents failed to adequately provide sufficiently specific or detailed warnings of the risks of failure or the investment risk. Instead, the Offering Documents largely gave boilerplate warnings associated with the general risks that face the pharmaceutical industry. Taken together with the statements in the Offering Documents regarding the results of several prior Phase I and Phase 1b trials, and that azelaprag was well tolerated without any serious adverse side effects, or any mention of transaminitis, or even liver injury, the risk warnings contained in the Offering Documents did not fully or adequately disclose the risk that occurrence of transaminitis would result in the discontinuation of the STRIDES trial and the abandonment of azelaprag as the Company's lead drug product candidate.

96. The risk warnings stated in the Offering Documents also misled investors by creating the false impression that the STRIDES trial would be discontinued only if an "unexpected" or "atypical" side effect were to occur, which in the context of obesity, and the effort to lose significant weight, whether by

diet and exercise, or with medication, transaminitis clearly should have been a risk that BioAge identified, discussed and provided clear and specific warning. By failing to even mention liver injury or transaminitis within the stated risk warnings, Defendants created a false impression about the true risks of investing in BioAge. The failure is starker yet, when the utter lack of any mention of harm to the liver is compared with some of the more specific risk warnings contained in the Offering Documents.

97. For example, the Offering Documents warned that "[c]urrent **GLP-1R agonists** are not well-tolerated by all patients. Across obesity trials of injectable **semaglutide** and **tirzepatide**, up to 44% of **subjects experienced gastrointestinal side effects such as nausea, diarrhea, and vomiting**, which contributed to a discontinuation rate of up to 17%. The incidence of **gastrointestinal adverse events** is even higher with other oral GLP-1R agonists in late-stage third-party clinical trials. Because these adverse effects appear to be dose-dependent, we believe combination approaches with APJ agonists may provide an opportunity to achieve weight reduction goals using a lower and therefore potentially more tolerable dose of GLP-1R agonists." (Emphasis supplied).

98. BioAge also disclosed that "[i]njectable GLP-1R agonists are peptides that are associated with a high rate of gastrointestinal side effects such as nausea, diarrhea, vomiting, constipation, and abdominal pain. For example, in the STEP-1 and SURMOUNT-1 clinical trials, 44% of patients treated with semaglutide (2.4 mg) and 31% of patients treated with tirzepatide (15 mg) experienced nausea, respectively. These side effects contributed to discontinuation rates of 17% for patients on semaglutide (2.4 mg) and 15% for patients on tirzepatide (15 mg) in these clinical trials. In the real world, discontinuation has been reported at up to 68% at one year, of which up to 64% has been ascribed to tolerability based on patient reports."

99. The Offering Documents further disclosed that "[O]ral GLP-1R agonists in development have generally reported an equivalent or inferior tolerability profile compared to injectable agonists, with higher rates of gastrointestinal side effects and subsequent trial discontinuation. In Phase 2–3 obesity trials of oral GLP-1R agonists, 58% (orforglipron, 24 mg) to 87% (GSBR-1290, 120 mg) of patients reported gastrointestinal side effects such as nausea, diarrhea, vomiting, constipation, and abdominal pain; by contrast, 31% (tirzepatide, 15 mg) to 44% (semaglutide, 2.4 mg) reported such adverse events with approved injectable agonists."

100. The Offering Documents informed investors that "*Suboptimal body composition can be a key limitation of incretins currently used to treat obesity*."

101. In all of this, there is a notable lack of any mention of the risk or occurrence of liver injury or transaminitis. The focus of these warnings is on gastrointestinal side effects. As such, even the "risk factors [,]" "risk warnings[,]" or "risk disclosures" (collectively "risk disclosures") portions of the Offering Documents also created a false impression of the true risks of investing in BioAge in the IPO.

102. The "risk disclosures" of the Offering Documents included, in salient part, the following discussions:

> **Risks Associated with Our Business**
>
> ***
>
> - Drug development is a lengthy and expensive process, the outcome of clinical testing is inherently uncertain, and results of earlier studies and trials may not be predictive of future trial results. We may incur additional costs or experience delays in completing, or ultimately be unable to complete, the development and commercialization of azelaprag and any future product candidates for many reasons, including a failure to replicate positive results from earlier preclinical studies or clinical trials in ongoing or future preclinical studies or clinical trials.
> - We are developing our lead product candidate, azelaprag, and may develop future product candidates, in combination with other therapies, which would expose us to additional risks.
>
> ***
>
> **Risk Related to Research, Discovery, Development, Regulatory Approval and Commercialization of our Product Candidates**
>
> ***We are substantially dependent on the success of our lead product candidate, azelaprag, which is currently in clinical development, and for which we have not completed a Phase 2 efficacy trial and any future product candidates we may develop. If we are unable to advance the development of, receive regulatory approval for and ultimately successfully commercialize azelaprag or any future product candidates we may develop, or experience significant delays in doing so, our business will be materially harmed.***
>
> Our future success is highly dependent on our ability to timely complete successful clinical trials, obtain regulatory approval for, and then successfully commercialize our lead product candidate azelaprag and any future product candidates, which may never occur. We are early in our development efforts with respect to azelaprag, for which we recently completed our Phase 1 and Phase 1b clinical trials … There can be no assurance that azelaprag … will achieve success in its respective clinical trials or obtain regulatory approval … our early stage of development, it may be several years, if at all, before we have demonstrated the safety and efficacy of a product candidate sufficient to warrant approval for commercialization.

***

The success of azelaprag … will be dependent on several factors, including the following:

***

demonstration of safety, efficacy and acceptable risk-benefit profiles of our product candidates to the satisfaction of the FDA and other comparable foreign regulatory agencies;

***

- demonstration of product characteristics attractive to physicians, patients, advocates, payors and caregivers;
- acceptance of our products, if and when approved, by patients, the medical community and third-party payors underpinned by adequate health economic data and a meaningful value proposition;
- effectively competing with other therapies, including those that have not yet entered the market;

***

- maintaining a continued acceptable safety profile of the products following approval.

Many of these factors are beyond our control, and it is possible that none of our product candidates will ever obtain regulatory approval even if we expend substantial time and resources seeking such approval. If we do not achieve one or more of these factors in a timely manner or at all, we could experience significant delays or an inability to successfully commercialize our product candidates, which would materially harm our business. For example, our business could be harmed if results of our ongoing or planned clinical trials of azelaprag show ***unexpected*** adverse events or a lack of efficacy in the indications we intend to treat or do not meet the clinical endpoints, or if we experience other regulatory or developmental issues. (Emphasis supplied).

***

***Drug development is a lengthy and expensive process, the outcome of clinical testing is inherently uncertain, and results of earlier studies and trials may not be predictive of future trial results. We may incur additional costs or experience delays in completing, or ultimately be unable to complete, the development and commercialization of azelaprag and any future product candidates for many reasons, including a failure to replicate positive results from earlier preclinical studies or clinical trials in ongoing or future preclinical studies or clinical trials.***

***

Our lead product candidate, azelaprag, is in clinical development, and the risk of failure is high. It is impossible to predict when or if azelaprag or any future product candidates will prove effective and safe in humans or will receive regulatory approval. To obtain the requisite regulatory approvals to commercialize any product candidate, we must demonstrate through extensive preclinical studies and lengthy, complex and expensive clinical trials that our product candidates are safe and effective in humans … outcome is inherently uncertain. Failure can occur at any time during the clinical trial process. The results of preclinical studies and early clinical trials of azelaprag … or a competitor's product candidate in the same class, may not be predictive of the results of later-stage clinical trials. For example, as is common in early-stage clinical trials, our Phase 1b bed rest atrophy clinical trial of azelaprag, conducted in a small number of healthy older individuals, evaluated a number of pharmacodynamic endpoints and biomarkers without correction for multiplicity. These results on measures of muscle size, quality and metabolism may not be replicated in later-stage clinical trials with different trial designs and patient populations … a clinical trial can fail at any stage of testing. Differences in trial design between early-stage clinical trials and later-stage clinical trials make it difficult to extrapolate the results of earlier clinical trials to later clinical trials.

***

We may experience delays in initiating or completing clinical trials. We also may experience numerous unforeseen events during, or as a result of, any future clinical trials

that we could conduct that could delay or prevent our ability to receive regulatory approval or commercialize Azelaprag or any future product candidates, including:

***

- clinical trials of any product candidates may fail to show safety or efficacy, produce negative or inconclusive results and we may decide, or regulators may require us, to conduct additional preclinical studies or clinical trials or we may decide to abandon product development programs;

***

- reports from clinical testing of other therapies may raise safety or efficacy concerns about azelaprag…

***

- our failure to establish an appropriate safety profile for a product candidate based on clinical or preclinical data for such product candidate as well as data emerging from other molecules in the same class as azelaprag…

***

A suspension or termination may be imposed due to a number of factors, including … unforeseen safety issues or adverse side effects, failure to demonstrate a benefit from using a product or treatment, failure to establish or achieve clinically meaningful trial endpoints …

***

Additionally, if the results of our clinical trials are inconclusive or if there are safety concerns or serious adverse events associated with our product candidates, we may:

- be delayed in obtaining regulatory approval, if at all;
- obtain approval for indications or patient populations that are not as broad as intended or desired or may have restricted duration expectations or guidance;
- obtain approval with labeling that includes significant use or distribution restrictions or safety warnings;
- be subject to additional post-marketing testing requirements;
- be required to perform additional clinical trials to support approval or be subject to additional post-marketing testing requirements;
- have regulatory authorities withdraw, or suspend, their approval of the drug or impose restrictions on its distribution in the form of a Risk Evaluation and Mitigation Strategy (REMS);
- be subject to the addition of labeling statements, such as warnings or contraindications.

***We are developing our lead product candidate, azelaprag, and may develop future product candidates, in combination with other therapies, which would expose us to additional risks.***

We are currently developing our lead product candidate, azelaprag, for use in combination with certain incretins for the treatment of obesity, … For example, our ongoing and planned Phase 2 trials of azelaprag are in combination with tirzepatide and semaglutide. The development of product candidates for use in combination with another product may present challenges that are not faced for single agent product candidates. Each of our Phase 2 trials of azelaprag in combination with tirzepatide and semaglutide, respectively, are designed to evaluate efficacy and it is possible that the results of these trials or future trials of azelaprag in combination with tirzepatide or semaglutide could show that azelaprag does not sufficiently contribute to the observed effects of individuals who participate in these trials …

***

***We face substantial competition, which may result in others discovering, developing or commercializing products before or more successfully than we do, if at all.***

***

Our lead product candidate, azelaprag, initially under development as a combination therapy for the treatment of obesity, if approved, would face competition from other approved treatments, some of which have already achieved commercial success. To compete successfully, we will need to differentiate our combination therapy, if approved, from currently marketed drugs as well as those that may be approved in the future, meaning that we will have to demonstrate that the relative cost, method of administration, safety, tolerability or efficacy of our combination therapy provides a better alternative or complement to existing and new therapies. Our commercial opportunity and likelihood of success will be reduced or eliminated if our azelaprag combination therapy is not ultimately demonstrated to be safer, more effective, more conveniently administered, or less expensive than the current standards of care.

… Competing products could present superior treatment alternatives, including by being more effective, safer, less expensive or marketed and sold more effectively than any products we may develop. Competitive products may make any products we develop obsolete or noncompetitive before we recover the expense of developing and commercializing our current or any future product candidates…

***

***Negative results or publicity for one obesity drug could have a substantial impact on all drugs and product candidates for the treatment of obesity, including ours.***

Our business can be affected by adverse publicity or negative public perception about us, our competitors, our product candidates or products, if approved, or our industry or competitors generally. Adverse publicity may include publicity about metabolic disease treatments or GLP-1R agonists generally, the efficacy, safety and quality of azelaprag, as well as of the broader category of obesity products, including any products that azelaprag are intended to be used in combination with, … Any adverse publicity or negative public perception could have a material adverse effect on our business, financial condition and results of operations. Further, any adverse effects in our clinical trials, even if not ultimately attributable to our product candidates, and the resulting publicity could result in withdrawal of clinical trial participants, and a decrease in demand for any such product candidates. Our business, financial condition and results of operations could be adversely affected if any of our product candidates or products, if approved, or any similar products distributed by other companies are alleged to be or are proved to be harmful to consumers or to have ***unanticipated*** and unwanted health consequences. (Emphasis supplied).

***Adverse side effects or other safety risks associated with azelaprag or any future product candidates we may develop could delay or preclude approval, cause us to suspend or discontinue clinical trials or abandon further development, change the design of our clinical trials, limit the commercial profile of an approved product, or result in significant negative consequences following regulatory approval, if any.***

As is the case with small molecules generally, it is **likely** that there may **be adverse side effects** associated with the use of azelaprag or any future product candidates. ***For example, we have observed certain adverse events such as mild headaches and back pain and dizziness, which were higher in our placebo patients than in our active patients, in our clinical trials of azelaprag. Our clinical trials may reveal significant adverse events not seen in our preclinical studies or prior clinical trials and may result in a safety or tolerability profile that could delay or prevent regulatory approval or market acceptance of azelaprag or any future product candidates. Undesirable or clinically unmanageable side effects observed in our clinical trials for our product candidates could occur and cause us or regulatory authorities to interrupt, delay or halt our clinical trials*** and could result in more restrictive labeling than anticipated or the delay or denial of regulatory approval by the FDA or other regulatory authorities. ***If additional adverse events, serious adverse events (SAEs) or other side effects are observed in any of our clinical trials that are atypical of, or more severe than, the known side effects of the respective class of***

> ***agents that each of our product candidates are a part of, we may have difficulty recruiting participants to our clinical trials, participants may drop out of our trials, or we may be required to abandon those trials or our development efforts of one or more product candidates altogether***. Furthermore, clinical trials by their nature utilize a sample of the potential patient population. With a limited number of subjects and limited duration of exposure, rare and severe side effects of our product candidates or those of our competitors may only be uncovered with a significantly larger number of patients exposed to the drug. … If such effects are more severe, less reversible than we expect or not reversible at all, we may decide or be required to perform additional studies or to halt or delay further clinical development of azelaprag, which could result in the delay or denial of regulatory approval by the FDA or other regulatory authorities. Adverse events and SAEs that emerge during clinical investigation of or treatment with azelaprag or any future product candidates may be deemed to be related to our product candidates. Moreover, if our product candidates are associated with ***undesirable side effects*** in clinical trials or ***have characteristics that are unexpected***, we may elect to abandon or limit their development to more narrow uses or subpopulations in which the undesirable side effects or other characteristics are less prevalent, less severe or more acceptable from a risk-benefit perspective, which may limit the commercial expectations for our product candidates, if approved. … could result in warnings and precautions in our product labeling or a restrictive REMS. This may also result in an inability to obtain approval of azelaprag or any future product candidates. We, the FDA or other regulatory authorities or an IRB or ethics committee may suspend clinical trials of a product candidate at any time for various reasons, including a belief that participants in such trials are being exposed to unacceptable health risks or adverse side effects. Even if the side effects do not preclude the product candidate from obtaining or maintaining regulatory approval, undesirable side effects may inhibit market acceptance of the approved product due to its tolerability versus other therapies … Any of these developments could materially harm our business, financial condition, results of operations and prospects. (Emphasis supplied).
>
> ***
>
> We may elect, or regulators, IRBs, or ethics committees may require, that we or our investigators suspend or terminate clinical research or trials for various reasons, including noncompliance with regulatory requirements or a finding that the ***participants in our trials are being exposed to unacceptable health risks***;
>
> ***
>
> We could also encounter delays if a ***clinical trial is suspended or terminated by us***, the IRBs of the institutions in which such trials are being conducted, or the FDA or other regulatory authorities, or if a clinical trial is recommended for suspension or termination by the Data Safety Monitoring Board for such trial. ***A suspension or termination may be imposed due to a number of factors***, including failure to conduct the clinical trial in accordance with regulatory requirements, including the FDA's Good Clinical Practice (GCP) regulations, or our clinical protocols, inspection of the clinical trial operations or trial site by the FDA or other regulatory authorities resulting in the imposition of a clinical hold, ***unforeseen safety issues or adverse side effects***,…

**1. The risk disclosures failed to disclose or otherwise warn of the looming risk of transaminitis, without clinically significant symptoms, and that its occurrence would cause BioAge to terminate the trial and abandon azelaprag**

103. The foregoing risk disclosures, set forth in the Offering Documents, were highly misleading and failed to adequately inform or otherwise warn investors that elevated liver enzymes – transaminitis – was a consequential risk of the STRIDES trial, given the patient population, study design and end points,

using a GLP-1 agonist, an apelin receptor agonist, and an exercise related incretin. And the Offering Documents provided no warning to potential investors that if participants of the cohort receiving azelaprag, either alone, or in combination with tirzepatide, experienced such an occurrence, the STRIDES trial was destined to fail and would cause BioAge to abandon the development of azelaprag.

104. The use of the words "if," "may," "unexpected," "atypical," "not seen in prior studies" without disclosing or informing investors of a transaminitis side effect – such that it was not a question of "if" or "may," but "when" it would occur – rendered the Offering Documents false and misleading. The foregoing risk disclosures were wholly inadequate and misleading given the absence of disclosing the consequential transaminitis side effect.

105. The Offering Documents' references to "observed certain adverse side effects such as mild headaches and back pain, and dizziness, which were higher in our placebo patients than in our active patients" and "significant adverse events not seen in our preclinical studies or prior clinical trials" and reference to "undesirable or clinically unmanageable side effects observed in our clinical trials" that "could occur" "cause us" to "interrupt, delay, or halt" the STRIDES trial, did not adequately warn investors that transaminitis was a looming risk for some study participants receiving azelaprag alone or in combination with tirzepatide.

106. The aforesaid risk disclosure was rendered even more false and misleading by stating that, with respect to "additional adverse events, serious adverse events (SAEs) or other side effects are observed" that are "atypical of, or more severe than, the known side effects of the respective class of agents that each of our product candidates are a part of," we "may be required to abandon" the "trials" or "our development efforts." This warning in no way alerted investors to the risk of abandonment of azelaprag in the event transaminitis was observed in STRIDES trial participants, let alone did it warn that it was highly probable that some participants in STRIDES trial who were receiving azelaprag, alone or in combination with tirzepatide, would develop asymptomatic transaminitis. Indeed, this warning created the opposite market impression, because elevated liver enzymes are not "atypical" or "more severe than" the "side effects" that have been associated with the respective class of agents that "each of our product candidates are a part of, as discussed above.

107. At bottom, the Offering Documents failed to adequately warn of or alert investors to the truth: elevated liver enzymes – even without clinically significant symptomatology – was looming and its occurrence among the study participants destined the termination of the STRIDES trial and the development of azelaprag. As such, the risk factor disclosures themselves were false and misleading.

**2. BioAge Failed to Disclose that Even Before the IPO Elevated Liver Enzymes had Occurred in the STRIDES Trial**

108. Upon information and belief, a transaminitis side effect occurred within the trial participants receiving azelaprag alone or in combination with tirzepatide prior to the Offering. In accordance with standard practice, the design protocol for the STRIDES trial necessarily included periodic testing of blood and enzyme levels from commencement of the STRIDES trial, thereby providing information regarding elevated liver enzyme levels – transaminitis – prior to the Offering. Some of the participants reportedly developing transaminitis would have developed the elevated liver enzyme levels within weeks of initial dosing, if not soon after the first dosing, and prior to the date of the IPO.

109. An incident wherein the fact that transaminitis occurred in the trial arm receiving either or both drugs was highly material and was required to be disclosed. It would be absurd and suspect for BioAge to contend that the incidence of transaminitis occurred in what Defendants claim to be 11 participants out of 204 with no clinically significant symptomatology, *only* after September 25, 2024, given these medically existing facts. This allegation made on information and belief is further based on the heightened risk of transaminitis – whether transient or not – as aforesaid, the proximity of BioAge's disclosure of elevated liver enzymes to the commencement of the IPO, the sheer number of trial participants, the commencement of trial dosing no later than July 29, 2024, the likely duration of time between initial dosing and the onset of elevated liver enzymes, the design protocol requiring periodic testing of liver enzymes, and the number of trial participants BioAge contended experienced the transaminitis side effect.

110. This allegation is further supported by the combination of agents, the end points of the study, and the reasonable inference arising from the fact that BioAge, upon making its December 6, 2024

announcement regarding the halting of the STRIDES Study, did not state that the developed elevated liver enzymes – transaminitis – occurred in all the 11 participants only after the date of the Offering Documents.

111. Hence, not only was the incidence of such a side effect not a matter of "if" or "may," nor "unexpected" or "atypical," it was an existing one that had occurred prior to the IPO. Such an occurrence was material to investors, especially because BioAge used transaminitis, even absent clinically significant symptomatology, as the basis to halt the STRIDES trial and abandon its lead drug candidate for the treatment of obesity – azelaprag – within approximately only nine weeks of completing the IPO.

## VI. BIOAGE TERMINATES THE STRIDES TRIAL BASED ON THE OCCURRENCE OF TRANSAMINITIS, AN UNDISCLOSED RISK, VERY SOON AFTER SUCCESSFULLY CLOSING THE IPO

112. On December 6, 2024, only about 9 weeks after the IPO, BioAge suddenly announced in a Press Release that it was "discontinuing" the STRIDES Trial because 11 participants in the cohorts dosed with azelaprag developed transaminitis without clinically significant symptoms. It was noted that "no transaminase elevations were observed in the tirzepatide only treatment group." The December 6, 2024, adverse announcement did not definitively state whether the transaminitis was entirely caused by the combined tirzepatide and azelaprag, or drug candidate azelaprag alone, nor whether participants with transaminase could have developed transaminitis from other possible causes or conditions. BioAge did not disclose whether the cases of transaminitis were transient or permanent.

## VII. THE OFFERING DOCUMENTS FAILED TO DISCLOSE MATERIAL ADVERSE INFORMATION OF WHICH INVESTORS CANNOT BE CHARGED WITH KNOWLEDGE

113. Investors are not expected to know and cannot be charged with knowledge of information that is beyond the four corners of the Offering Documents. Indeed, BioAge specifically stated in the introduction to the Prospectus, in relevant part:

> We nor the underwriters have authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses prepared by or on behalf of us or to which we have referred you. ***We and the underwriters do not take responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you***.

(Emphasis supplied). This admonition was intended to and did confine investors to the information and

representations within the four corners of the Offering Documents. Given this admonition, Defendants are estopped from and cannot use it as a shield on the one hand while deploying information outside the Offering Documents as a sword to insulate themselves from liability for the materially false statements and omissions, including the inadequate and otherwise deficient risk disclosures of the Offering Documents.

114. Given the inadequacy and omissions of the Offering Documents, and risk factor disclosures, Lead Plaintiff and Class Member investors did not know, and were unaware that elevated liver enzymes – transaminitis – loomed as a typical or common side effect, or that it was not unexpected, given the combination of apelin and GLP-1 agents, and the recapitulation of physical exercise and rapid or significant weight loss endpoints, of the Study. Nor did they know or were aware that the occurrence of such a side effect looming over the Study was a basis to terminate the Study or the abandonment of the development of azelaprag as a weight loss treatment drug candidate.

## VIII. INVESTORS WERE HARMED BY THE FALSE AND MISLEADING OFFERING DOCUMENTS

115. The disclosure of the decision to terminate the STRIDES trial due to the observation of transaminitis without clinically significant symptomatology in some trial participants caused the trading price of BioAge common stock to plummet from $20.09 per share on December 6, 2024 to $4.65 per share on December 7, 2024. An initial class action complaint for violation of the Securities Act of 1933 was filed on January 7, 2025, on which date the trading price of BioAge common stock closed at $5.36 per share. On January 28, 2025, BioAge confirmed that it had abandoned the development of azelaprag.

## IX. CLASS ACTION ALLEGATIONS

116. Lead Plaintiff brings this action as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons and entities who purchased or otherwise acquired BioAge's publicly traded common stock pursuant and/or traceable to the IPO, and who were damaged thereby (the "Class").

117. Excluded from the Class are: (i) the Defendant, the Individual Defendants and their immediate family members; (ii) the officers, directors, control persons, and affiliates of BioAge, the Selling Stockholder Defendants and the Underwriter Defendants, at all relevant times, including BioAge's employee retirement and/or benefit plan(s) and their participants and/or beneficiaries to the extent they purchased or acquired BioAge's common stock through any such plan(s); (iii) any entity in which any Defendant has or had a controlling interest; and (iv) the legal representatives, heirs, successors, or assigns of any such excluded person or entity, in their capacities as such.

118. The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery. Lead Plaintiff believes there are at least thousands of members in the proposed Class as the Company offered 11 million shares of common stock in the IPO. Record owners and other members of the Class may be identified and ascertained from records maintained by BioAge or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

119. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Securities Act as set forth herein. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.

120. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether Defendants violated the Securities Act; (b) whether the Offering Documents contained inaccurate statements of material fact and/or omitted material information required to be stated therein; and (c) to what extent the members of the Class have sustained damages and the proper measure of damages.

121. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. CAUSES OF ACTION

### COUNT I
### FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT
### Against All Defendants

122. Lead Plaintiff repeats and realleges each allegation set forth above as if fully stated here.

123. This cause of action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Lead Plaintiff and the Class, against Defendant BioAge and each of the Individual Defendants.

124. This is a non-fraud claim, nor does it sound in fraud. Lead Plaintiff does not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This cause of action is asserted on strict liability grounds as to BioAge and on negligence grounds as to the Individual Defendants.

125. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated when made.

126. The Registration Statement, including the Prospectus, issued in connection with the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted material facts necessary to make the statements made within it not misleading, and omitted material facts required to be stated therein in accordance with the rules and regulations governing the Registration Statement's preparation.

127. Defendant BioAge is the registrant and issuer of the common stock sold pursuant to the Registration Statement. As such, Defendant BioAge is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate. By virtue of the Registration Statement containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, Defendant BioAge is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

128. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

129. The Individual Defendants each signed the Registration Statement, causing it to be issued, and are, therefore, statutorily liable to Lead Plaintiff and the Class under Section 11 of the Securities Act. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. The Individual Defendants each had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts necessary to be stated in order to prevent any statements made in the Registration statement from misleading investors. By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, each of the Individual Defendants is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

130. None of the untrue statements or omissions of material fact in the Registration Statement alleged herein was a forward-looking statement. Rather, each such statement concerned then existing facts. Moreover, the Registration Statement did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

131. Each of the Defendants named in this Count issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Registration Statement, which misrepresented and failed to disclose, inter alia, the facts set forth above. By reasons of the conduct herein alleged, each such Defendant violated Section 11 of the Securities Act.

132. Lead Plaintiff and the Class have sustained damages. The value of BioAge common stock has declined substantially due to violations by Defendants named in this Count.

133. At the time of their purchases of BioAge common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein.

134. Less than one year has elapsed from the time that Lead Plaintiff discovered, or reasonably could have discovered, the facts upon which this Complaint is based and the time that this action was commenced. Less than three years have elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time that this action was commenced.

**COUNT II**
**FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT**
**Against the Individual Defendants**

135. Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

136. This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff and the Class, against each of the Individual Defendants.

137. This cause of action does not sound in fraud. Lead Plaintiff does not allege that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim. This cause of action is based solely on negligence and/or strict liability. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims.

138. The Individual Defendants each were control persons of BioAge by virtue of their positions as directors and/or senior officers and/or major shareholders of BioAge. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of BioAge.

139. Each of the Individual Defendants participated in the preparation and dissemination of the Offering Documents and otherwise participated in the process necessary to conduct BioAge's IPO. Because of their positions of control and authority as senior officers, directors, and/or signers of the Registration Statement, each of the Individual Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue information or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

140. The Individual Defendants controlled BioAge. The Individual Defendants participated in the preparation and dissemination of the Offering Documents and otherwise participated in the process necessary to conduct the IPO. Because of their positions of control and authority, the Individual

Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue information or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

141. Each of the Individual Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged above, based on having signed the Registration Statement and/or having otherwise participated in the process that allowed the IPO to be completed.

142. As control persons of BioAge, each of the Selling Stockholder Defendants and each of the Individual Defendants is liable, jointly and severally, with and to the same extent as BioAge, whom they controlled, for its violations of Section 11 of the Securities Act.

143. As a result of the foregoing, Lead Plaintiff and other members of the Class have suffered damages.

## XI. PRAYER FOR RELIEF

144. WHEREFORE, Lead Plaintiff, on behalf of itself and all other members of the Class, prays for relief and judgment as follows:

(a) Determining that this action is a proper class action, certifying Lead Plaintiff as a Class Representative, and appointing Barrack, Rodos & Bacine as Class Counsel, under Rule 23(a), (b)(3), and (g) of the Federal Rules of Civil Procedure on behalf of the Class;

(b) Awarding all damages and other remedies set forth in the Securities Act in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including pre-judgment and post-judgment interest, as allowed by law;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, accountants' fees, experts' fees, and other costs and disbursements; and

(d) Awarding Lead Plaintiff and the Class such other relief as may be deemed just and proper by the Court.

**XII. JURY TRIAL DEMANDED**

145. Lead Plaintiff demands a trial by jury.

DATED: June 2, 2025

Respectfully submitted,

BARRACK, RODOS & BACINE

*/s/ STEPHEN R. BASSER*
STEPHEN R. BASSER (121590)
SAMUEL M. WARD (216562)
One America Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
sbasser@barrack.com
sward@barrack.com
Telephone: (619) 230-0800
Facsimile: (619) 230-1874

JEFFREY A. BARRACK*
DANIELLE M. WEISS*
ANDREW J. HEO*
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
jbarrack@barrack.com
aheo@barrack.com
dweiss@barrack.com
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

*Counsel for Lead Plaintiff and Lead Counsel for the Proposed Class*

*Admitted Pro Hac Vice*