Bruce G. Vanyo (SBN 60134)
bruce@katten.com
Christina L. Costley (SBN 227134)
christina.costley@katten.com
Paul S. Yong (SBN 303164)
paul.yong@katten.com
**KATTEN MUCHIN ROSENMAN LLP**
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
Tel: (310) 788-4400
Fax: (310) 788-4471

*Counsel for Defendants BioAge Labs, Inc., Kristen Fortney, Dov Goldstein, Eric Morgen, Shane Barton, Jean-Pierre Garnier, Michael Davidson, Patrick Enright, James Healy, Rekha Hemrajani, and Vijay Pande*

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

IN RE BIOAGE LABS, INC., SECURITIES LITIGATION

Case No. 3:25-CV-00196-RS

**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS LEAD PLAINTIFF'S CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES ACT OF 1933; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

The Honorable Richard Seeborg

Date: October 23, 2025

Time: 1:30 p.m.

Courtroom: 3

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on October 23, 2025, or as soon thereafter as this Motion may be heard in Courtroom 3 of the above-entitled court, located at 450 Golden Gate Avenue, San Francisco, California 94102, BioAge Labs, Inc. ("BioAge"), Kristen Fortney, Dov Goldstein, Eric Morgen, Shane Barton, Jean-Pierre Garnier, Michael Davidson, Patrick Enright, James Healy, Rekha Hemrajani, and Vijay Pande (collectively, "Defendants") will move to dismiss with prejudice all claims asserted against them in Lead Plaintiff's Class Action Compliant for Violation of the Securities Act of 1933 ("Complaint" or "¶") filed by Lead Plaintiff Southeastern Pennsylvania Transportation Authority ("Plaintiff").

Defendants' Motion is made pursuant to Federal Rules of Civil Procedure 12(b)(6), 8(a), and 9(b). The Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Defendants' Request for Consideration of Documents Incorporated by Reference and Judicial Notice filed concurrently herewith, the Declaration of Paul S. Yong and exhibits thereto (the "Exs.") filed concurrently herewith, all pleadings and papers on file in this action, and such other matters as may be presented to this Court at the hearing or otherwise.

## STATEMENT OF ISSUES TO BE DECIDED

1. Whether Plaintiff's claim under Section 11 of the Securities Act should be dismissed for failure to plead a materially false or misleading statement or omission.
2. Whether Plaintiff's Section 15 claim fails without a primary violation.

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

# TABLE OF CONTENTS


INTRODUCTION ....................1

BACKGROUND ....................2

- A. BioAge ....................2
- B. Azelaprag ....................2
- C. Preclinical Animal Studies Demonstrated a Favorable Safety Profile for Azelaprag. ....................3
- D. Azelaprag Showed a Favorable Safety Profile Across Eight Phase 1 Clinical Trials. ....................4
- E. BioAge Launches the STRIDES Phase 2 Clinical Trial in Conjunction with Eli Lilly. ....................6
- F. BioAge Goes Public and Warns Investors of the Risks Associated with Azelaprag. ....................7
- G. BioAge Discontinues the STRIDES Trial and Plaintiff Sues. ....................8

LEGAL STANDARD ....................9

ARGUMENT ....................10

I. THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 11. ....................10

- A. BioAge's Statements Concerning the Phase 1 Studies Were Not Materially False or Misleading (¶¶ 70-79). ....................12
- B. There Was No Material Omission Concerning the 27-Week Mouse Study (¶¶ 80-82). ....................15
- C. BioAge's Risk Disclosures Were Not False or Misleading (¶¶ 95-111). ....................16
- D. Plaintiff's Remaining Hindsight-Based Allegations Do Not Plead Materially False or Misleading Statement (¶¶ 64-69, 83-94). ....................18

II. THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 15. ....................20

CONCLUSION ....................20

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Peregrine Pharms.*,
2013 WL 12122423 (C.D. Cal. Aug. 23, 2013),
*aff'd*, 654 F. App'x 281 (9th Cir. 2016)....19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....9

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017)....15

*DeMarco v. DepoTech Corp.*,
149 F. Supp. 2d 1212 (S.D. Cal. 2001)....14, 19

*Dresner v. Silverback Therapeutics, Inc.*,
2022 WL 16716165 (W.D. Wash. Nov. 4, 2022)....12, 15

*Fernandes v. Centessa Pharms. PLC*,
2024 WL 3638254 (S.D.N.Y. Aug. 2, 2024)....15, 16, 17

*Golubowski v. Robinhood Markets, Inc.*,
2024 WL 269507 (N.D. Cal. Jan. 24, 2024)....12

*Immanuel Lake v. Zogenix, Inc.*,
2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) (Seeborg, J.)....11, 17

*In re AT&T/DirecTV Now Sec. Litig.*,
2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020),
*aff'd sub nom.* 2022 WL 17587853 (2d Cir. Dec. 13, 2022)....14

*In re Citigroup Sec. Litig.*,
2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023)....18

*In re Dropbox Sec. Litig.*,
2020 WL 6161502 (N.D. Cal. Oct. 21, 2020)....10

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022)....1, 11, 13

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010)....12

*In re Ocera Therapeutics Inc. Sec. Litig*,
2018 WL 7019481 (N.D. Cal. Oct. 16, 2018) (Seeborg, J.)....12

*In re ON24, Inc. Sec. Litig.*,
2023 WL 7449838 (N.D. Cal. July 7, 2023)....................9, 15, 17, 20

*In re Pivotal Sec. Litig.*,
2020 WL 4193384 (N.D. Cal. July 21, 2020)....................17

*In re Progenity, Inc. Sec. Litig.*,
2021 WL 3929708 (S.D. Cal. Sept. 1, 2021)....................13, 16, 19

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996)....................10

*In re Talis Biomedical Corp. Sec. Litig.*,
2022 WL 17551984 (N.D. Cal. Dec. 9, 2022)....................13, 18, 19

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994)....................20

*Jasin v. Vivus, Inc.*,
2016 WL 1570164 (N.D. Cal. Apr. 19, 2016),
*aff'd*, 721 F. App'x 665 (9th Cir. 2018)....................13

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)....................10

*Pirani v. Slack Techs., Inc.*,
127 F.4th 1183 (9th Cir. 2025)....................20

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 878 (9th Cir. 2012).................... *passim*

*Rubke v. Capitol Bancorp Ltd.*,
551 F.3d 1156 (9th Cir. 2009)....................9, 18

*Somaysoy v. Ow*,
536 F. Supp. 3d 634 (C.D. Cal. 2021)....................9

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998)....................20

*Strezsak v. Ardelyx Inc.*,
2024 WL 1160900 (N.D. Cal. Mar. 18, 2024)....................10

*Twinde v. Threshold Pharms. Inc.*,
2008 WL 2740457 (N.D. Cal. July 11, 2008)....................13, 14, 19

**Statutes**

15 U.S.C. § 77k.................... *passim*

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

15 U.S.C § 77k(a) ....... 9

15 U.S.C. § 78u–4(b)(1) ....... 18

**Regulations**

21 C.F.R. § 312.21 ....... 3, 5

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

This is an opportunistic action premised entirely on hindsight allegations that blatantly misstate the historic data. In December 2024, BioAge announced that it had halted its STRIDES trial of azelaprag because elevated liver enzymes had been observed in a small subset of participants (11 of 204 subjects). Following this news, its stock price fell. While disappointing, this was not remarkable. As the Ninth Circuit has explained: "Pharmaceutical companies often suffer setbacks in their clinical trials after earlier testing offered highly promising results. That is the nature of the industry, and—without more—it does not necessarily mean that a pharmaceutical company committed [a securities violation]." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 840 (9th Cir. 2022).

Plaintiff, however, is now attempting to turn these inherent risks into a securities class action by mischaracterizing results from two predecessor studies that, Plaintiff alleges, showed that STRIDES was "destined to fail from the beginning." (*See* ¶ 93.) First, Plaintiff argues that BioAge misled investors by stating there were not "any observed adverse events" during eight Phase 1 clinical trials when, Plaintiff claims, one of the Amgen trials actually showed "a serious adverse stage 1 side effect relating to the liver." (¶ 55; *see also* ¶ 9 (alleging there was an undisclosed "serious adverse safety event").) Later in the Complaint, though, Plaintiff quotes language from the Amgen report that reveals that this so-called "serious adverse" effect was actually just a single transient instance of "minimal" and "mild" liver enzyme elevation. (¶¶ 72, 75.) Plaintiff also omits language from the same paragraph of the Amgen report that explains the event was "nonserious," "did not require any treatment," and did not "suggest a trend or indicate a specific safety concern" and that azelaprag was "well tolerated." (Ex. 2, at 26-27.)

Second, Plaintiff argues that BioAge misled investors by failing to disclose that another study (the "27-week mice study") showed elevated liver enzymes in mice on a high-fat diet treated with azelaprag. (¶¶ 9, 81.) Again, Plaintiff's allegations are blatantly misleading. Later in the Complaint, Plaintiff acknowledges that, "as expected," *all* of the mice groups on a high-fat diet had elevated liver enzymes, but the azelaprag mice still had *lower liver enzymes* than those who

were not given azelaprag. (¶¶ 61, 81; Ex. 3, at 15.) Plaintiff's ill-advised attempt to selectively quote from these studies, while omitting language refuting its claim, should be rejected outright.

Plaintiff also throws out a hodgepodge of other hindsight-driven theories, none of which add up to even a single plausible claim. BioAge's Registration Statement contained detailed, specific risk warnings that novel, early-stage clinical trials, like STRIDES, carry high failure rates, that preclinical animal studies can have limited predictive value, and clinical trials may be discontinued based on emerging safety concerns related to additional side effects. These were not boilerplate disclaimers. Nor were they false by omission, as Plaintiff alleges, for not predicting the precise liver enzyme elevation safety issues that ultimately occurred. Plaintiff further alleges that BioAge should have disclosed that a variety of factors—including exercise, weight loss, use of over-the-counter medications like Tylenol and Aleve, and tirzepatide itself—could potentially cause liver enzyme elevations. But Plaintiff fails to tether these alleged omissions to any actual statements in the Registration Statement; let alone the actual issues that ultimately arose during STRIDES. In short, there was nothing materially false or misleading in the Registration Statement.

The Complaint should be dismissed with prejudice.

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

## BACKGROUND

### A. BioAge

BioAge Labs, Inc. ("BioAge") is a clinical-stage biopharmaceutical company headquartered in Richmond, California. (¶¶ 20, 39.) The company is focused on developing novel drug therapies to treat metabolic diseases associated with aging, including obesity and muscle atrophy. (*See* ¶¶ 39-42.)

### B. Azelaprag

Azelaprag (formerly AMG 986) is a small-molecule drug candidate originally developed by Amgen, Inc. ("Amgen"), one of the world's leading biotechnology companies, with over 25,000 employees in over 50 countries. (¶ 53; Ex. 4, at 24.) Amgen developed azelaprag as a potential treatment for heart failure (not the indication that BioAge is pursuing) over the course of several years but ultimately ceased development due to limited commercial potential for that specific disease. (*See* Ex. 5, at 743 (Amgen study publication finding that azelaprag was "well-tolerated,"

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

but that "clinically meaningful pharmacodynamic effects in HF [heart failure] patients were not observed").

BioAge became interested in azelaprag as a potential therapy for muscle atrophy, and later for obesity. (*See* ¶¶ 53-55; Ex. 1, at 122.) This was due to the drug's encouraging safety and pharmacokinetic profile in multiple preclinical and clinical studies conducted by Amgen, as well as preclinical studies run by BioAge that supported efficacy in those indications. (*See id.*) In 2021, in exchange for financial consideration, Amgen granted BioAge an exclusive license to research, develop, and commercialize azelaprag. (¶ 53; Ex. 1, at 122, 150-51.)

### C. Preclinical Animal Studies Demonstrated a Favorable Safety Profile for Azelaprag.

Before conducting human trials, Amgen conducted FDA-mandated preclinical safety studies on azelaprag in multiple species, consistent with Good Laboratory Practice (GLP) standards. (*See* ¶ 41; Ex. 1, at 122.) These animal studies were specifically designed to assess azelaprag's safety and toxicity over long periods of time, and the results were reviewed and cleared by the FDA before human clinical trials began (*i.e.*, Phase 1 clinical trials).[1] (*See* Ex. 1, at 157-58 (explaining FDA review process of preclinical results prior to initiating human clinical trials); Ex. 2, at 25.) All of the preclinical safety studies demonstrated that azelaprag had a favorable safety profile with no observed adverse effects across a wide range of doses. (*See* ¶ 41; Ex. 1, at 122 ("Azelaprag also has a favorable preclinical safety profile: the no observed adverse effect level (NOAEL) in good laboratory practice (GLP) toxicology studies was the highest dose tested in both species"); Ex. 2, at 25.)

Several years after the Amgen-sponsored preclinical safety studies were completed, BioAge sponsored various preclinical mouse studies to evaluate azelaprag's potential efficacy to

---

[1] Human clinical trials are generally conducted in three sequential phases, though these phases may overlap: **Phase 1 trials** involve the initial introduction of a new drug into human subjects where the drug is tested to "assess metabolism, pharmacokinetics, pharmacologic actions, *side effects associated with increased doses*, and, if possible, early evidence of effectiveness"; **Phase 2 trials** involve a limited patient population to determine "effectiveness of the drug for a particular indication, dosage tolerance and optimum dosage, and to *identify common adverse side effects and safety risks*"; and **Phase 3 trials** are undertaken to "obtain additional information about clinical efficacy and *safety in a larger number of patients*." (Ex. 1, at 158 (emphasis added); 21 C.F.R. § 312.21.)

preserve muscle mass and promote weight loss. (*See* ¶¶ 58-60; Ex. 1, at 135-41.) These efficacy studies were not FDA-mandated and were not primarily intended or designed to evaluate safety/toxicology endpoints. (*See* ¶ 59; Ex. 1, at 135 (preclinical mouse studies "evaluated the effects of azelaprag . . . to improve weight loss and other outcomes in a diet-induced obesity mouse model").) Results from some of these mouse studies were summarized in the Registration Statement (*see* ¶¶ 58-60; Ex. 1, at 135-41), and additional mouse data, including from a 27-week mouse study, was publicly presented at ObesityWeek several weeks after the IPO. (*See* ¶¶ 61-62; Ex. 3 (BioAge PowerPoint slides presented at ObesityWeek, incorporated by reference in the Complaint at ¶¶ 9, 61-62, 80-81).)

The Complaint argues that BioAge's Registration Statement was materially false and misleading for omitting results from a 27-week mouse study. (*See* ¶¶ 61-63, 80-82.) But even the face of the Complaint demonstrates this study did not identify any new safety concerns. To the contrary, the study simply reinforced what was already known: as Plaintiff concedes, mice fed a high-fat diet "as expected" exhibited higher liver enzymes, but among the high-fat diet mice, those treated with azelaprag had ***lower liver enzyme levels*** than the untreated mice. (¶¶ 61, 81 (admitting that "as expected, liver enzymes increased to elevated levels in both groups fed a high-fat diet"); ¶¶ 64-66 (citing "obesity" among the "causes of elevated liver enzymes"); Ex. 3, at 15 (ObesityWeek slide showing the same).) Nothing in the 27-week mouse study indicated that azelaprag caused liver enzyme elevations. In fact, the study suggested the opposite: it *mitigated* them.

### D. Azelaprag Showed a Favorable Safety Profile Across Eight Phase 1 Clinical Trials.

In addition to the preclinical animal studies, azelaprag underwent eight Phase 1 clinical trials involving a total of 265 human participants (with Amgen sponsoring five of the trials, involving 182 participants). (¶¶ 53-58, 70; Ex. 1, at 122; Ex. 5, at 743). These early-stage clinical trials in human participants were designed to evaluate, among other things, metabolism, pharmacokinetics, pharmacologic actions, side effects at various doses, and possible early evidence of efficacy. (*See* Ex. 1, at 158); 21 C.F.R. § 312.21.

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

The Registration Statement summarized the key endpoints and results from the Phase 1 clinical trials, stating that "azelaprag was well-tolerated," "[t]he overall adverse event profile of azelaprag was comparable to placebo, with no treatment-related events observed, with the exception of mild, self-limited headaches," and "[n]o serious adverse events have been reported." (¶ 70.) These statements were consistent with the underlying clinical trial results, which were publicly available on ClinicalTrials.gov and referenced in the Registration Statement. (*See* ¶ 70 & n.6; Ex. 2 (Amgen Phase 1 report available on ClinicalTrials.gov and incorporated by reference in Complaint at ¶¶ 9, 55, 74, 75 & n.5, 77, 79); Ex. 1, at 159-60 ("clinical trial information" is required to be disclosed by sponsors "on ClinicalTrials.gov").)

As with the 27-week mouse study, Plaintiff claims that the Registration Statement was materially false and misleading because it did not disclose that a transient liver enzyme elevation was observed in *one* participant (out of 265 total participants in Phase 1) in a 2018 Amgen-sponsored trial. (¶¶ 9, 75 (describing the event as "a CTCAE grade 2 event of asparate aminotransferase [AST] increased and a grade 1 event of alanine aminotransferase [ALT] increased").) But CTCAE Grade 1 and 2 events are, by definition, minimal: a Grade 2 event indicates "[m]oderate; minimal, local or noninvasive intervention," while a Grade 1 event is "asymptomatic" or associated with "mild symptoms . . . intervention not indicated." (¶ 72.)

Plaintiff also alleges that the participant experienced Grade 4 elevated muscle enzymes, or CPK (creatine phosphokinase), but this is irrelevant given that there are no allegations that azelaprag caused elevated muscle enzyme levels. (*Compare* ¶¶ 76-77 (allegations about the Grade 4 elevated CPK), *with* ¶ 63 (the trial was discontinued "after liver transaminitis" (*i.e.*, elevated liver enzymes)).)

As the Complaint concedes, this solitary event of liver enzyme elevation was "nonserious," "resulted in no action/change to the investigational product administration," "did not require any treatment," and "was reported as resolved [three weeks later]." (¶ 75.) Importantly, Plaintiff does not, and cannot, allege that this single 2018 event—from *six years* prior to the IPO—was linked to azelaprag, nor that the FDA or Amgen identified this event as evidencing a safety concern.

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

Indeed, as the Complaint admits, "elevated liver enzymes [are] considered a common health condition that affects as much as 23% of all Americans" and for which there "are a number of causes." (¶ 64 (listing causes including celiac disease, fatty liver, alcoholism, unhealthy diet, physical trauma, and caffeine consumption).) ALT and AST levels may be elevated for many reasons "even absent taking an anti-obesity drug," (¶ 66), including "[w]eight loss" (¶¶ 65, 89), "exercise" (¶¶ 67, 88), and "over-the-counter drugs like . . . Tylenol . . . [and] Aleve" (¶ 68). (*See also* ¶¶ 88-90.)

Consistent with this, the Amgen Phase 1 report (which Plaintiff repeatedly quotes, while omitting the following language) concluded that: "[t]he adverse event terms represented a variety of system organ classes and *did not suggest a trend or indicate a specific safety concern*," "the prevalence of adverse events was *comparable across all the cohorts* [*i.e.*, treatment and placebo] and did not show higher incidence with increasing doses," and there were "*no serious adverse events*." (Ex. 2 (Amgen Phase 1 report), at 26 (emphasis added).) Furthermore, the report concluded there was "*no safety concern* up to the doses tested," and the drug was "generally *well tolerated* and an *acceptable safety profile* was observed." (*Id.* at 27.)

BioAge's Registration Statement closely tracked this language when describing the safety results from the Phase 1 clinical trials. (*See* ¶ 70 (nearly identical language used).)

**E. BioAge Launches the STRIDES Phase 2 Clinical Trial in Conjunction with Eli Lilly.**

On July 29, 2024, BioAge announced the commencement of the STRIDES Phase 2 clinical trial. (¶ 45.) The STRIDES trial was a randomized, double-blind, placebo-controlled, parallel-arm Phase 2 trial that assessed azelaprag in combination with tirzepatide (marketed by Eli Lilly ("Lilly") as Zepbound®). (¶¶ 43-45, 48; Ex. 6, at 5.) The trial enrolled obese participants over 55 years old and was designed to assess whether azelaprag could safely enhance weight loss and preserve muscle mass when used alongside tirzepatide. (¶¶ 47-48; Ex. 6, at 5.)

STRIDES included multiple treatment arms: azelaprag alone, tirzepatide alone, and combination arms administering both azelaprag and tirzepatide. (¶ 48; Ex. 6, at 5.) The trial was conducted in close collaboration with Lilly, which supplied tirzepatide, contributed heavily to the clinical trial design, and played a central role in trial execution. (*See* ¶ 48; Ex. 1, at 142.)

Consistent with regulatory guidance and industry practice, investors understood that STRIDES would be "necessarily" monitoring standard safety signals, including liver enzymes, in participants. (*See* ¶ 108 ("In accordance with standard practice, the design protocol for the STRIDES trial necessarily included periodic testing of blood and enzyme levels . . . thereby providing information regarding elevated liver enzyme levels"); Ex. 7 (FDA nonbinding guidance on monitoring liver toxicity); Ex. 1, at 158 (noting FDA review of study protocols and safety monitoring).) As the Complaint acknowledges, it was also understood that tirzepatide had been previously linked to potential liver injury, but nonetheless achieved FDA approval and commercial success. (*See* ¶¶ 4, 84-85, 87.)

By the time of the IPO, BioAge had invested over $30 million in developing azelaprag and advancing STRIDES. (Ex. 1, at 95, 97 ($18.28 million spent from January 2022 through June 2024); Ex. 8, at 25 ($12.98 million spent from July through September 2024).)

**F. BioAge Goes Public and Warns Investors of the Risks Associated with Azelaprag.**

BioAge completed its initial public offering ("IPO") on September 26, 2024. (¶ 47.) In connection with the IPO, BioAge filed a Registration Statement and Prospectus, along with subsequent amendments (collectively, the "Registration Statement"). (*Id.*; Ex. 1.) The Registration Statement provided investors with nearly 60 pages of detailed risk disclosures, many of which spoke directly about the uncertainty of clinical development, the limitations of early data, and specific risks associated with azelaprag. (*See* ¶¶ 9, 97-102; Ex. 1, at 17-76.)

Among other things, the Registration Statement expressly warned investors that azelaprag was "in clinical development, and *the risk of failure is high*" and that it was "*impossible to predict when or if azelaprag . . . will prove effective and safe in humans*[,]" and "[f]ailure can occur *at any time* during the clinical process." (Ex. 1, at 22; ¶ 102.)

It further cautioned that results of earlier studies "may not be predictive of the results of later-stage clinical trials" (Ex. 1, at 21), "[d]ifferences in trial design between early-stage clinical trials and later-stage clinical trials *make it difficult to extrapolate the results of earlier clinical trials to later clinical trials*" (Ex. 1, at 23; ¶ 102), [t]here is typically a *high rate of failure* of product candidates proceeding through clinical trials, *particularly in the earlier stages of*



Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

*development*," and thus "there can be *no assurance* that any of our future clinical trials will ultimately be successful or support clinical development of azelaprag or any future product candidates." (Ex. 1, at 23; ¶ 102.)

In addition, BioAge specifically and repeatedly warned that adverse side effects could occur and lead to clinical trial discontinuation:

- "*Adverse side effects* or other safety risks associated with azelaprag . . . [could] *cause us to suspend or discontinue clinical trials*." (Ex. 1, at 66; ¶ 102.)
- "As is the case with small molecules generally, *it is likely that there may be adverse side effects* associated with the use of azelaprag." (Ex. 1, at 66; ¶ 102.)
- "Our clinical trials may reveal significant adverse events *not seen in our preclinical studies or prior clinical trials*." (Ex. 1, at 67; ¶ 102.)
- "*Undesirable or clinically unmanageable side effects* observed in our clinical trials for our product candidates could occur and cause us . . . to *interrupt, delay or halt our clinical trials*." (Ex. 1, at 67; ¶ 102.)
- "We . . . *may suspend clinical trials of a product candidate at any time* for various reasons, including a belief that participants in such trials are being exposed to *unacceptable health risks or adverse side effects*." (Ex. 1, at 67; ¶ 102.)
- "[I]t is possible that, as we test our product candidates in *larger, longer and more extensive clinical trials, including with different dosing regimens*, . . . illnesses, injuries, discomforts and other adverse events that were observed in earlier trials, as well as conditions that *did not occur or went undetected in previous trials*, will be reported by patients." (Ex. 1, at 67; ¶ 102.)
- "If additional adverse events, serious adverse events (SAEs) or other side effects are observed in any of our clinical trials that *are atypical of, or more severe than, the known side effects* of the respective class of agents . . . we may be required to abandon those trials or our development efforts." (Ex. 1, at 67; ¶ 102.)
- "[C]linical trials by their nature utilize a sample of the potential patient population. With a limited number of subjects and limited duration of exposure, rare and severe side effects of our product candidates . . . may only be uncovered with a significantly larger number of patients exposed to the drug." (Ex. 1, at 67; ¶ 102.)

**G. BioAge Discontinues the STRIDES Trial and Plaintiff Sues.**

On December 6, 2024, BioAge issued a press release announcing it had discontinued the STRIDES trial in light of interim safety data. (¶ 112; Ex. 9.) The announcement explained that 11 participants in the azelaprag treatment arms had been observed with liver enzyme elevations,

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

while no such elevations were observed in the tirzepatide-only arm. (*Id.*) At the time, approximately 204 patients had been enrolled in the trial. (*See* ¶ 109; Ex. 9.)

Although there was no clinical evidence of liver damage in any participant, the fact that all 11 elevations occurred in azelaprag treatment arms led BioAge to discontinue the STRIDES trial and cease dosing azelaprag. (*See* ¶ 112; Ex. 9.) This news was highly disappointing to BioAge, given the potential benefits to patients that azelaprag had shown. (*Id.*)

Following the announcement, BioAge's stock price declined. (*See* ¶ 12.) Shortly thereafter, this lawsuit was filed.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *Somaysoy v. Ow*, 536 F. Supp. 3d 634, 636 (C.D. Cal. 2021) ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).[2]

To state a claim under Section 11, a registration statement must contain an "untrue statement of a material fact or omit[] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C § 77k(a). "[A] plaintiff must prove (1) that the registration statement contained an omission or misrepresentation, *and* (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *In re ON24, Inc. Sec. Litig.*, 2023 WL 7449838, at *9

[2] Where a claim "sounds in fraud"—even if brought under Section 11 of the Securities Act—it must also satisfy the heightened pleading requirements of Rule 9(b). *Rubke*, 551 F.3d at 1161. Although Plaintiff expressly disclaims that "any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent (*see* ¶¶ 124, 137), the crux of the Complaint is that BioAge actively concealed the so-called "looming risk" of elevated liver enzyme elevations. (*See, e.g.*, ¶¶ 8, 9, 69, 94, 107, 109.) Regardless of the pleading standard, the result is the same: Plaintiff fails to state a Section 11 claim. *See In re ON24, Inc. Sec. Litig.*, 2023 WL 7449838, at *8 (N.D. Cal. July 7, 2023); *Rigel*, 697 F.3d at 886 n.15.

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

(N.D. Cal. July 7, 2023) (quoting *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009)) (emphasis added).

For an omission to be actionable under Section 11, disclosure must either be "mandated" under an SEC rule (which Plaintiff here does not allege), or necessary to render an affirmative statement not materially misleading. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 n.3 (2015). Section 11 "is not a general disclosure requirement; it affords a cause of action only when an issuer's failure to include a material fact has rendered a published statement misleading." *Id.* Put differently, the omission "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists' to be actionable." *In re Dropbox Sec. Litig.*, 2020 WL 6161502, at *6 (N.D. Cal. Oct. 21, 2020) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). Plaintiff fails to meet that standard here.

In evaluating whether a complaint plausibly alleges a Section 11 claim, courts must also consider documents incorporated by reference in the complaint, including the "full text of the [offering documents], including portions which were not mentioned in the complaint." *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405-06 n.4 (9th Cir. 1996); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 878-80 (9th Cir. 2012). Courts "need not accept as true conclusory allegations that are contradicted by documents referenced in the complaint." *Strezsak v. Ardelyx Inc.*, 2024 WL 1160900, at *3 (N.D. Cal. Mar. 18, 2024).

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

## ARGUMENT

### I. THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 11.

The Complaint should be dismissed because it fails to plead a materially false or misleading statement or omission as required under Section 11.

Plaintiff advances eight different theories of falsity—none of which, in combination, or alone, plausibly state a Section 11 violation. (*See* ¶¶ 64-111.) Plaintiff's theories can be broadly grouped into four buckets:

*First*, Plaintiff argues that BioAge should have disclosed that a single, transient liver enzyme elevation that was observed in a 2018 Amgen Phase 1 trial. (¶¶ 70-79.) But the

Registration Statement accurately described the Phase 1 safety data, and BioAge's statements were consistent with, and closely tracked, the Amgen report upon which Plaintiff relies.

*Second*, Plaintiff claims that BioAge misleadingly omitted data from a 27-week mouse study. (¶¶ 80-82.) The Complaint, however, concedes that the azelaprag-treated mice had *lower* liver enzyme levels than untreated mice on a high-fat diet. In other words, rather than suggest azelaprag caused elevations, the study suggested that it mitigated against them.

*Third*, Plaintiff argues that BioAge's risk disclosures were misleading because they did not expressly name liver enzyme elevations. (¶¶ 95-111.) But the Registration Statement included detailed warnings about the risk of adverse events, the limitations of early-stage data, and the possibility that STRIDES could be discontinued early based on emerging safety findings.

*Fourth*, Plaintiff advances a grab-bag of theories that essentially amount to a claim that STRIDES was "destined to fail from the beginning." (¶¶ 64-69, 83-94.) These are precisely the type of hindsight-based allegations that courts routinely reject.

In short, the Registration Statement did not contain any material misstatements or omissions. It accurately described azelaprag's preclinical and clinical results, warned of the risks that might arise in drug development, and did not promise success. Investors understood that early-stage clinical trials, like STRIDES, are inherently risky and setbacks are to be expected. *See Nektar*, 34 F.4th at 840; *Immanuel Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *9 (N.D. Cal. Jan. 27, 2020) (Seeborg, J.) ("[W]ere plaintiffs' version of falsity the law, a pharmaceutical company could be sued for securities fraud each and every time it received [a setback].").

Accordingly, BioAge repeatedly warned investors of the very uncertainties that led to the discontinuation of STRIDES: *i.e.*, that "significant adverse events not seen in [] preclinical studies or prior clinical trials" could arise, and with "larger, longer and more extensive clinical trials . . . other adverse events that were observed in earlier trials, as well as conditions that did not occur or went undetected in previous trials" could lead to termination "at any time." (Ex. 1, at 67; ¶ 102.)

The mere fact that STRIDES was later discontinued does not retroactively render BioAge's IPO statements materially false or misleading.

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

**A. BioAge's Statements Concerning the Phase 1 Studies Were Not Materially False or Misleading (¶¶ 70-79).**

Plaintiff's primary argument is that BioAge misled investors by stating that in the eight Phase 1 trials, "azelaprag was well-tolerated[,]" "[t]he overall adverse event profile of azelaprag was comparable to placebo, with no treatment-related trends in adverse events observed, with the exception of mild, self-limited headaches[,]" and "no serious adverse events have been reported." (¶ 70.) Plaintiff argues these statements were false and misleading because BioAge did not disclose that, six years prior, a *single* participant in an Amgen-sponsored Phase 1 trial experienced a transient, low-grade liver enzyme elevation. (*See* ¶¶ 71-79.)

This alleged omission in no way rendered BioAge's affirmative statements false. As an initial matter, a single participant (out of hundreds) does not constitute a "treatment-related trend" (¶ 70). *Cf. Golubowski v. Robinhood Markets, Inc.*, 2024 WL 269507, at *13 (N.D. Cal. Jan. 24, 2024) (alleged trends must be a "pattern" and "so persistent as to require disclosure"); *see also In re Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010) (no duty to disclose "isolated occurrences"). Moreover, although Plaintiff describes it as a "serious adverse safety event" in certain paragraphs of the Complaint (¶ 9), the language Plaintiff quotes from the study clarifies that the elevated liver enzymes were in fact "nonserious," "not associated with clinical symptoms," "did not require any treatment," and "was reported as resolved." (¶ 75.) Indeed, the language Plaintiff alleges is false and misleading appears to have been taken, nearly verbatim, from the Amgen Phase 1 report itself, which states: "***the prevalence of adverse events was comparable across all cohorts***," "there were ***no serious adverse events***," and "[t]he adverse event terms ***did not suggest a trend or indicate a specific safety concern***." (Ex. 2, at 26.)[3] Tellingly, Plaintiff omits this language (which is fatal to its claims) from the Complaint, even

[3] The Court may properly consider this document because it is incorporated by referenced in the Complaint (¶¶ 9, 55, 74, 75 & n.5, 77, 79) and it is publicly available on ClinicalTrials.gov. *See In re Ocera Therapeutics Inc. Sec. Litig*, 2018 WL 7019481, at *4 (N.D. Cal. Oct. 16, 2018) (Seeborg, J.) ("Incorporation by reference is a judicial doctrine that prevents plaintiffs from selecting only portions of documents support their claims, while omitting portions of those very documents that weaken or doom their claims." (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018)); *Dresner v. Silverback Therapeutics, Inc.*, 2022 WL 16716165, at *5 (W.D. Wash. Nov. 4, 2022) (considering clinical trial documentation available on ClinicalTrials.gov in dismissing Section 11 claim).

though it appears in the same paragraph of the Amgen report as the other quoted language in Paragraph 75. (*Compare* ¶¶ 70 & 75, *with* Ex. 2, at 26.)

Even if Plaintiff had not mischaracterized the data, it still would have failed to plead a Section 11 violation. The Ninth Circuit has held that "***as long as the omissions do not make the actual statements misleading, a company is not required to disclose every safety-related result from a clinical trial, even if the company discloses some safety-related results and even if investors would consider the omitted information significant***." *Rigel*, 697 F.3d at 880 n.8.

Thus, for example, in *Twinde*, the company's registration statement warned that the drug "may have undesirable side effects" and that other side effects "could be identified in the course of our clinical trials," but did not mention liver toxicity specifically. *See Twinde v. Threshold Pharms. Inc.*, 2008 WL 2740457 (N.D. Cal. July 11, 2008); *Twinde*, No. 4:07-CV-04972, Dkt. No. 57-1 (N.D. Cal. Nov. 14, 2008). In granting dismissal, the court held that there was no duty to disclose evidence of liver toxicity from prior human and animal studies since they "only demonstrate[d] that there is a chance that a drug is unsafe." *Id.* (when "a drug [is] under development, such disclosures likely would not aid investors in their evaluation of the total mix of information available to them"); *see also Jasin v. Vivus, Inc.*, 2016 WL 1570164, at *14 (N.D. Cal. Apr. 19, 2016), *aff'd*, 721 F. App'x 665 (9th Cir. 2018) ("though investors may have preferred to have more information regarding the reports," the laws "do not require such full disclosure").

The same applies here. BioAge's disclosures were accurate, consistent with the underlying study results, and qualified by robust risk disclosures that warned that "clinical trials may reveal significant adverse events not seen in our preclinical studies or prior clinical trials," and "it is possible that . . . other adverse events that were observed in earlier trials, as well as conditions that did not occur or went undetected in previous trials, will be reported by patients." (Ex. 1, at 67.) Thus, even if Plaintiff's characterization of the Amgen study was accurate (which it was not) "a reasonable investor reviewing the Registration Statement in its entirety would not be misled." *In re Progenity, Inc. Sec. Litig.*, 2021 WL 3929708, at *8 (S.D. Cal. Sept. 1, 2021); *see Nektar*, 34 F.4th at 837 (omission of a single "outlier" patient was not material to a reasonable investor); *In re Talis Biomedical Corp. Sec. Litig.*, 2022 WL 17551984, at *18 & n.14 (N.D. Cal. Dec. 9, 2022)

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

(refusing to "infer" that issues "existed at the time of the IPO," especially given defendant's "extensive risk disclosures").

Plaintiff also asserts that by disclosing "mild, self-limited headaches" as an observed "treatment-related trend," BioAge implied that no other side effects occurred (or would possibly occur in the future). (*See* ¶¶ 78-79.) But courts have repeatedly confirmed that disclosure of one side effect does not imply the absence of all others. *See Twinde*, 2008 WL 2740457, at *9 (rejecting argument that company was required to disclose evidence of liver toxicity in earlier studies); *Rigel*, 697 F.3d, 880-81; *see also* ¶ 102; Ex. 1, at 66-67 (disclosing that "*[f]or example*, we have experienced certain adverse events such as mild headaches and back pain and dizziness" (emphasis added)).

In any event, the information that Plaintiff alleges BioAge concealed was publicly available on ClinicalTrials.gov,[4] the study was run by Amgen (not BioAge), and there are no allegations that Amgen or the FDA viewed the event as clinically significant, let alone a safety concern. *See DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1225 (S.D. Cal. 2001) ("Plaintiffs offer no explanation as to why, despite its allegedly serious toxicity problems, the FDA subsequently approved [the drug] for treatment[.]"); *In re AT&T/DirecTV Now Sec. Litig.*, 2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020), *aff'd sub nom.* 2022 WL 17587853 (2d Cir. Dec. 13, 2022) (a "registration statement need not include publicly available data"); Ex. 2, at 26 & 27. Tellingly, the Complaint lacks any allegations from confidential witnesses, internal documents, or other contemporaneous sources suggesting that BioAge viewed this event as material at the time or otherwise rendered the Registration Statement misleading by omission. *See Rigel*, 697 F.3d, at 880-81 (rejecting omission theory absent showing that allegedly omitted data was inconsistent with statements at the time of IPO).

Finally, the challenged statements—that azelaprag was "well-tolerated" and "the overall adverse event profile was comparable to placebo with no treatment-related trends in adverse events

[4] Plaintiff also alleges that BioAge's statements may have also been misleading because it did not disclose that "several" participants "experienced toothaches" (¶ 73), but Plaintiff does not link the toothaches in any way to the discontinuation of the STRIDES trial.

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

observed"—are non-actionable opinions. (¶ 70.) Where, as here, plaintiff alleges falsity an omission-based theory, it "must allege 'facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (citing *Omnicare*, 575 U.S. at 1332). Plaintiff pleads no facts showing that BioAge lacked a reasonable basis to describe azelaprag as "well-tolerated," or that a reasonable investor would have been misled by omission of the single liver event in the Amgen report. *See ON24*, 2023 WL 7449838, at *9-10 ("lack of a factual foundation is fatal"); *Fernandes v. Centessa Pharms. PLC*, 2024 WL 3638254, at *19 (S.D.N.Y. Aug. 2, 2024) ("Registration Statement's opinion statements predicting [the drug's] safety profile on the basis of the [earlier simulations] did not need to include every single fact cutting the other way") (quotation marks and citation omitted).

In short, Plaintiff's theory would impose strict liability for omitting a single, transient liver enzyme elevation—an event deemed in the Amgen report as nonserious, clinically insignificant, and not indicative of safety concern. This is exactly the kind of hindsight pleading that the Ninth Circuit has rejected.

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

**B. There Was No Material Omission Concerning the 27-Week Mouse Study (¶¶ 80-82).**

Plaintiff next contends that BioAge's Registration Statement was misleading because it discussed data from other mouse studies without also disclosing that data from a 27-week mouse study showed that mice fed a *high-fat* diet and treated with azelaprag had higher liver enzymes than mice fed a *low-fat* diet. (¶¶ 80-82.)

As an initial matter, Plaintiff does not plead any facts explaining how this omission rendered an actual statement false or misleading. Instead, Plaintiff just refers generally to the Registration Statement's discussion of the mouse studies without identifying any language that mentioned the 27-week study, let alone the liver enzyme levels in the mouse studies. This is fatal to Plaintiff's claim. *See Rigel*, 697 F.3d at 880 n.8 (omission of "safety-related results" not actionable unless it "make[s] the actual statements misleading"); *Dresner*, 2022 WL 16716165, at *7 (no actionable omission where registration statement "fail[ed] to mention any false or

misleading statements that have to do with safety"); ¶¶ 80-82 (no affirmative statements identified).[5]

Plaintiff also resorts to grossly misstating the underlying data, which actually suggested that azelaprag had a protective effect on liver enzymes. (*But see* ¶ 62 (alleging data supported a "negative impact of azelaprag on liver health"); ¶ 80 (data "identified elevated liver enzymes in the cohort . . . receiving azelaprag").) As Plaintiff admits, it was "expected" that mice on a high-fat diet would have higher liver enzyme levels than those on a low-fat diet, but within the high-fat group, the azelaprag mice had *lower* liver enzyme levels than those not on azelaprag. (¶¶ 61, 81; *see supra* at 3-4; *see also* Ex. 3, at 15.) In fact, the levels were mitigated to such an extent that, in some instances, they came close to the enzyme levels in the lean-diet mice. (*See* Ex. 3, at 15.) In no way did this suggest that azelaprag *caused* elevated liver enzymes.

Moreover, even if the Court were to accept Plaintiff's mischaracterization of the results from the 27-week mouse study (which it should not), this claim also fails for the same reasons that the allegations about the Amgen Phase 1 studies fail. Discussion of prior studies does not trigger a duty to disclose every conceivable safety risk that may emerge (*see supra* at 14), especially where, as here, the company expressly warned that its preclinical animal data "may not be predictive" of later trials and that it was "difficult to extrapolate the results of earlier clinical trials to later clinical trials[.]" (Ex. 1, at 23; ¶ 102); *see Progenity*, 2021 WL 3929708, at *8; *Fernandes,* 2024 WL 3638254, at *20 (dismissing Section 11 claim where registration statement included substantially similar risk disclosures regarding clinical trials).

**C. BioAge's Risk Disclosures Were Not False or Misleading (¶¶ 95-111).**

Plaintiff alleges that BioAge's risk disclosures were false and misleading because they framed the risks as hypothetical, using terms like "if," "may," "unexpected," "atypical," and "not seen in prior studies"—when, in Plaintiff's view, the liver risk had already materialized such that "the STRIDES trial was destined to fail and would cause BioAge to abandon the development of

[5] To the extent that Plaintiff is claiming that BioAge's discussion the other mouse study data was false, this discussion relates to azelaprag's *efficacy* in promoting weight loss and preventing muscle atrophy—which Plaintiff does not contest were false. (*See* ¶¶ 58-60.)



Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

azelaprag." (*See* ¶¶ 103-104 (contending this "was not a question of 'if' or 'may,' but 'when' it would occur").) This theory relies primarily on the same flawed allegations about the Phase 1 human and 27-week mouse study discussed in the prior section and fails for the same reason—Plaintiff has failed to plead facts plausibly suggesting that the other studies linked azelaprag to elevated liver enzymes, let alone, that they proved STRIDES was "doomed to fail." (*See infra* at 12-16.)

Even if one were to accept Plaintiff's mischaracterization of the prior studies, though, they do not support the conclusion that the risks described in the IPO already had materialized, as is necessary to state a claim based on risk disclosures. *See In re Pivotal Sec. Litig.,* 2020 WL 4193384, at *7 (N.D. Cal. July 21, 2020) (rejecting claim that "risk factor disclosures amounted to framing risks as hypotheticals rather than current and past realities" where plaintiff failed to plead that the risk had already materialized at the time of the IPO). BioAge warned that STRIDES might not succeed (¶ 102); the trial could be halted if "'unexpected' or 'atypical' side effects were to occur" (¶¶ 96, 102); STRIDES could reveal and "significant adverse events not seen in our preclinical studies or prior clinical trials" (¶ 105); and adverse side effects could cause the discontinuation of the trial (¶¶ 102, 105). (*See supra* at 7-8 (listing key risk disclosures).) Plaintiff has not pled any facts explaining how a single transient instance of elevated liver enzymes in a third party's trial, or elevated liver enzymes in mice on a high fat diet, would have alerted anyone that STRIDES was "doomed." *See ON24*, 2023 WL 7449838, at *14 ("Because plaintiff has not put forth sufficient facts in support of [its omission] theory, its claims against these risk-factor statements also fail"); *cf. Lake,* 2020 WL 3820424, at *9-10 (Seeborg, J.) (rejecting plaintiff's theory that drug candidate was "doomed to fail" for omitting reference to two toxicity studies as improper "hindsight" pleading).

Nor is there any merit to the claim that BioAge's disclosures were misleading simply because they did not use the specific terms "liver enzymes" or "transaminitis." (¶¶ 95-96, 101, 104.) It is well-established that a company is not required to identify every possible manifestation of a disclosed risk (*i.e.*, every potential side effect), so long as the nature of the known risk is accurately disclosed. *See Fernandes*, 2024 WL 3638254, at *20 (substantially similar risk

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

disclosures adequately "warned that an adverse toxicity event may occur in the clinical trials, causing the Company to delay or terminate clinical development").

Plaintiff's "alternative" theory that BioAge's risk disclosures were false and misleading because some unidentified STRIDES participants "would have developed the elevated liver enzyme levels . . . prior to the date of the IPO" (¶¶ 10, 108) also fails. Plaintiff pleads this theory solely "[u]pon information and belief" (¶¶ 10, 108-111), but fails to identify the information on which that belief is based. *See Rubke*, 551 F.3d, at 1162 (rejecting Section 11 allegations pled on "information and belief" where the complaint filed to "indicate on what facts this belief [was] formed"); *cf.* 15 U.S.C. § 78u–4(b)(1). The allegation is also completely speculative: Plaintiff does not allege when the elevated liver events occurred, when researchers linked them to azelaprag, or when they communicated this to BioAge. *See Talis*, 2022 WL 17551984, at *18 (dismissing allegations that issues with COVID-19 test "existed at the time of the IPO" as conclusory). This is insufficient to state a Section 11 claim. *See Rigel*, 697 F.3d at 881 ("the subsequent release of more extensive information, such as few cases of mild hypertension or some cases of neutropenias that did not require dose reductions, was not inconsistent with the results that originally were reported"); *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *19 (S.D.N.Y. Mar. 24, 2023) ("[a]n increase in a risk does not mean the risk has already come to pass").

Because Plaintiff fails to plead facts showing that the risk of liver enzyme elevations and the ultimate discontinuation of STRIDES had come to fruition, it cannot establish that BioAge's risk disclosures were materially false or misleading.

### D. Plaintiff's Remaining Hindsight-Based Allegations Do Not Plead Materially False or Misleading Statement (¶¶ 64-69, 83-94).

Unable to identify any material misstatement or omission, Plaintiff resorts to a collection of loosely-articulated allegations that, at bottom, attempt to imply falsity from the mere fact that the safety committee later discontinued STRIDES. All of these theories rely on impermissible hindsight and speculation, and do not support a viable Section 11 claim.

*First*, Plaintiff asserts that the *entirety* of BioAge's 220-page Registration Statement was materially misleading because it did not include the terms "transaminitis" or "elevated liver enzymes." (¶¶ 64-69.) Courts routinely hold that such blanket claims that the "entire Registration

Statement" is false by omission is insufficient to state a Section 11 claim. *See Progenity*, 2021 WL 3929708, at *12 (rejecting claim that the omission of a negative trend "rendered the entire Registration Statement false and misleading," and instead was "the type of 'conclusory, unwarranted deduction[] of fact or unreasonable inference' that the Court must disregard") (quoting *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010)).[6]

*Second*, Plaintiff argues that BioAge failed to disclose that STRIDES was not excluding participants based on certain lifestyle factors like physical exercise, consuming alcohol, or taking over-the-counter drugs like Tylenol or Aleve. (¶ 83; Ex. 6, at 10-11 (exclusion criteria publicly-available on ClinicalTrials.gov).) But the Complaint does not allege that any of these lifestyle factors actually caused the 11 liver enzyme elevations that were observed in STRIDES. Nor does it allege that Lilly (the "pharmaceutical giant" that helped design STRIDES (¶ 83)) or the FDA ever viewed the exclusion criteria as problematic or material to the trial's success. In any event, at most, Plaintiff's theory amounts to a disagreement with how scientists designed STRIDES, not a false or misleading statement. *See Rigel*, 697 F.3d at 878 ("[D]isagreements with the statistical model adopted by doctors and scientists who designed and conducted the study" are insufficient); *Anderson v. Peregrine Pharms*., 2013 WL 12122423, at *9 (C.D. Cal. Aug. 23, 2013) ("a company cannot be held liable for securities fraud based on methodological flaws in a clinical study"), *aff'd*, 654 F. App'x 281 (9th Cir. 2016); *see also DeMarco*, 149 F. Supp. 2d at 1230 (dismissing plaintiff's patient exclusion theory as "wholly speculative").

*Third*, Plaintiff contends that the Registration Statement was misleading because it failed to disclose that tirzepatide (an FDA-approved drug that was developed by Lilly) had previously been "linked to liver damage," and that in combination with other factors like "exercise, rapid weight loss, . . . obesity itself, and/or fatty liver disease, alcohol consumption, or diet," this meant

[6] Moreover, BioAge had no duty to enumerate every possible adverse event or risk that an investor might find relevant. *See Rigel*, 697 F.3d at 880-81; *Twinde*, 2008 WL 2740457, at *9; *infra* at 13-14. Although Plaintiff lists several other causes of liver enzyme elevations—including weight loss (¶ 65), exercise (¶ 67), and over-the-counter drugs like Tylenol and Aleve (¶ 68)—the fact that elevated liver enzymes could be associated with factors *other than azelaprag* is insufficient to establish that the Registration Statement was false and misleading. *See Talis*, 2022 WL 17551984, at *17-18 (dismissing Section 11 claim where plaintiff failed to plausibly allege problems with COVID-19 testing platform "existed at the time of the IPO").

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

that STRIDES "was effectively destined to fail." (¶¶ 85-94.) But Plaintiff seemingly ignores the fact that there were no liver enzyme elevations observed in the tirzepatide-only arm. (*See* ¶ 112.) Thus, whether or not tirzepatide caused liver enzyme elevations is completely irrelevant. Moreover, this theory is untethered to any affirmative statement in the Registration Statement, and Section 11 does not require companies to predict hypothetical combinations of risks with "twenty-twenty vision." *ON24*, 2023 WL 7449838, at *9.

In sum, Plaintiff's allegations simply reflect dissatisfaction with the outcome of STRIDES, rather than any materially false or misleading statement in the Registration Statement. The Court should reject this hindsight pleading and dismiss Plaintiff's remaining theories. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (plaintiffs cannot base Section 11 claims on "20-20 hindsight").

**II. THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 15.**

Plaintiff's Section 15 claim should be dismissed because it has failed to plead a primary violation under Section 11. *Rigel*, 697 F.3d at 886; *Pirani v. Slack Techs., Inc.*, 127 F.4th 1183, 1193 (9th Cir. 2025).

## CONCLUSION

The Complaint should be dismissed in its entirety with prejudice. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998) (dismissal with prejudice is justified where amendment would be an "exercise in futility").

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax

Respectfully submitted,

Dated: July 9, 2025

**KATTEN MUCHIN ROSENMAN LLP**

By: /s/ Bruce G. Vanyo

Bruce G. Vanyo (SBN 60134)
bruce@katten.com
Christina L. Costley (SBN 227134)
christina.costley@katten.com
Paul S. Yong (SBN 303164)
paul.yong@katten.com
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
Tel: (310) 788-4400
Fax: (310) 788-4471

*Counsel for Defendants BioAge Labs, Inc., Kristen Fortney, Dov Goldstein, Eric Morgen, Shane Barton, Jean-Pierre Garnier, Michael Davidson, Patrick Enright, James Healy, Rekha Hemrajani, and Vijay Pande*

Katten
Katten Muchin Rosenman LLP
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067-5010
+1.310.788.4400 tel +1.310.788.4471 fax