STEPHEN R. BASSER (121590)
SAMUEL M. WARD (216562)
**BARRACK, RODOS & BACINE**
One America Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
Telephone: (619) 230-0800
Facsimile: (619) 230-1874
sbasser@barrack.com
sward@barrack.com

JEFFREY A. BARRACK*
DANIELLE M. WEISS*
ANDREW J. HEO*
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-0600
Facsimile: (215) 963-0838
jbarrack@barrack.com
dweiss@barrack.com
aheo@barrack.com

**Admitted Pro Hac Vice*

*Counsel for Lead Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE BIOAGE LABS, INC., SECURITIES LITIGATION | CASE NO. 3:25-CV-00196-RS<br><br>**LEAD PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933** |

Lead Plaintiff, the Southeastern Pennsylvania Transportation Authority ("SEPTA" or "Lead Plaintiff"), alleges the following upon information and belief, except as to those allegations concerning itself, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based on the investigation of their undersigned counsel, which included, among other things: (a) review and analysis of public statements made by or on behalf of BioAge Labs, Inc. ("BioAge" or the "Company"), including its public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of Company press releases; and (c) review and analysis of scientific and other source materials pertaining to the drug study at issue in this action. The causes of action brought herein are asserted on strict liability grounds as to BioAge and on negligence grounds as to the Individual Defendants. Lead Plaintiff does not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.

## I. INTRODUCTION AND OVERVIEW OF THE ACTION

1. Lead Plaintiff brings this action pursuant to Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77(k) and 77(o), on behalf of itself and all other persons or entities that purchased or otherwise acquired BioAge stock pursuant and/or traceable to BioAge's Registration Statement and Prospectus for its Initial Public Offering of common stock (the "IPO") held on or about September 26, 2024 and closing September 27, 2024.

2. On September 26, 2024, BioAge, a development stage pharmaceutical company, commenced the IPO at $18 per share. As set forth in BioAge's Registration Statement and Prospectus (the "Offering Documents"), the proceeds of the IPO were principally meant to fund the continued development and Phase 2 clinical study of BioAge's lead candidate, azelaprag, "in combination with tirzepatide" and in combination with "semaglutide" for the treatment of obesity (the "STRIDES Study" or the "Study"). The Company hoped that the combination therapy would induce weight loss while also maintaining muscle composition (*i.e.* "muscle mass"). Losing muscle mass is a downside effect of current United States Food & Drug Administration ("FDA") approved obesity therapies. Azelaprag ostensibly recapitulates the

metabolic benefits of exercise, effectively mimicking it.[1] Hence, such a therapy, if developed, could provide a significant benefit in the treatment of obesity, distinguishing azelaprag as a weight loss drug and conferring a "blockbuster" potential for BioAge to dominate a market estimated to be worth $150 billion by 2031.[2]

3. Almost one year prior to the IPO, on October 26, 2023, BioAge had announced its plan to undertake the Phase 2 Study of azelaprag in combination with tirzepatide, noting that "[p]reclinical data show that drug co-administration significantly increases total weight loss and improves body composition vs. tirzepatide alone."

4. At present, there are several GLP-1 receptor agonists ("GLP-1R agonists") approved by the FDA for the treatment of obesity, including, among others, tirzepatide (marketed by Eli Lilly & Co. as Zepbound and Mounjaro), semaglutide (marketed by Novo Nordisk as Wegovy and Ozempic), and liraglutide (marketed by Novo Nordisk as Saxenda). These obesity drugs induce rapid weight loss but also may significantly reduce muscle mass. Obesity drugs have been linked to potential liver related side effects, as more fully discussed below. According to the Offering Documents, BioAge ultimately intended to create an oral therapy for the treatment of obesity: an oral treatment would be more appealing than currently available GLP-1R agonists, like tirzepatide (Zepbound), or semaglutide (Wegovy), both of which are injectables.

5. Patient dosing in the STRIDES Study began on July 29, 2024, almost 8 weeks before the IPO. The Study targeted obese individuals age 55 years and older and was designed to include 220 participants to be randomly assigned to one of four study arms, including one cohort receiving azelaprag only, two receiving azelaprag and tirzepatide dosing regimens, and one receiving tirzepatide and placebos in place of azelaprag. Participants in the Study were subject to regular doctor visits, which necessarily

---

[1] Azelaprag is part of a class of agents known as "apelin receptor agonists." Tirzepatide and semaglutide are part of a class of agents known as "GLP-1R agonists."

[2] Obesity is a serious health condition that dramatically increases the risk of developing serious cardiovascular, metabolic, musculoskeletal, and/or respiratory diseases, including, among other things, heart disease, stroke, hypertension, dangerously high cholesterol type 2 diabetes, insulin resistance, metabolic syndrome, gallstones, kidney disease, fatty liver, liver disease, and some forms of cancer. Most seriously, obesity increases the risk of premature death.

included tests, every two weeks for the first eight weeks of the Study, followed by regular doctor exams every four weeks for the remainder of the twenty-four week treatment period. Thus, participants who received doses on or near July 29, 2024, would have had four periodic visits and tests by the date of the IPO.

6. Azelaprag was licensed to BioAge in 2021 by Amgen, Inc. ("Amgen"), its developer. Between 2016 and 2019, Amgen conducted a Phase 1 study of azelaprag on healthy human subjects and heart failure patients that was not related to weight loss (the "Amgen Study"). One group of patients consisted of 50 participants, forty-five of whom completed the study and who were dosed with azelaprag daily for seven days. Of that group, only one cohort of six healthy participants received azelaprag in a 650mg daily dose for seven days, an amount that is comparable to two cohorts of the later STRIDES Study who received a 600mg daily dose of azelaprag, alone or in combination with tirzepatide, for seven days. Of the six participants in this cohort, all of whom were healthy, one experienced a Grade 2 elevated liver enzyme side effect (aspartate aminotransferase – AST) concurrently with a Grade 1 event of elevated liver enzymes (alanine aminotransferase – ALT) on the fifth day of dosing.

7. Elevated liver enzymes are common. They are often transient – especially medication-induced transaminitis – and have been traced to a variety of causes, including but not limited to over-the-counter prescription and herbal weight loss drugs, and certain FDA-approved drugs. Numerous factors present in the STRIDES Study population are connected to or cause elevated liver enzymes, or even liver injury, including: FDA-approved GLP-1R agonists (including tirzepatide); apelin-receptor agonists (including azelaprag); obesity; rapid weight loss; and unhealthy diet. The Study did not preclude or control for the use of over-the-counter products such as acetaminophen, Tylenol, Naproxen, or Aleve, consumption of alcohol, or physical exercise, all of which can also cause elevated liver enzymes.

8. Transaminitis, which can include, as here, elevated liver enzymes presenting without clinically significant symptoms and no reported liver damage, was neither an atypical nor an unexpected side effect of the STRIDES Study given the study population and agents relied on in the Study. Transaminitis had presented itself in the cohort of six people who were dosed with 650 mg of azelaprag daily for seven days in the Amgen Study, a study with a population of healthy individuals rather than the more transaminitis-vulnerable obese patients in the STRIDES Study. It was a foreseeable side effect that

was not atypical of GLP-1R agonists and apelin receptor agonist agents used in the STRIDES Study and not one that was unexpected given its obese study patient pool, dosing with tirzepatide, a GLP-1R agonist, and an apelin receptor agonist like azelaprag, along with the two endpoints of rapid weight loss and mimicking exercise. Indeed, it was an expected side effect and one that is the type of side effect that is not more severe than those associated with the agents used in the STRIDES Study.

9. Beyond it having occurred in the Amgen study, upon information and belief, transaminitis was occurring in the STRIDES Study even before the IPO.[3] The 5-day period between initial dosing and manifestation of transaminitis in the Amgen Study was well within the nearly two-month time frame between the date of first patient dosing in the STRIDES Study and the date of the IPO. This side effect also occurred in the Amgen Study with an occurrence rate of 1:6 among those Amgen Study participants (all healthy) receiving 650mg of azelaprag per day for seven days, which cohort is similar to the daily dosage of a total of 600mg per day in the STRIDES Study. The STRIDES Study population was comprised of obese individuals aged 55 and older, presenting a far greater likelihood of elevated liver enzymes occurring multiple times in the Study. Rapid presentation of elevated liver enzymes is consistent with, for example, direct exposure to hepatotoxins, which can cause abrupt increases in liver enzymes ALT and AST within days of use. Both the rapid onset of transaminitis in the Amgen Study and the generally short period of onset of drug-induced elevated liver enzymes support the reasonable inference that transaminitis manifested in more than one STRIDES Study patient dosed with azelaprag prior to the IPO, since dosing commenced on July 29, 2024, and the IPO occurred on September 26, 2024. Study patients who began dosing with azelaprag on or near July 29, 2024, would have had doctor visits every other week, for a total of four visits prior to the IPO, which would have revealed such manifested elevated liver enzyme levels.[4]

---

[3] Prior to the IPO, BioAge conducted a mouse study (the "Mouse Study") that tracked liver enzyme levels of mice dosed with azelaprag. Liver enzymes increased to elevated high levels in ***both cohorts*** fed a high-fat diet when compared to the "lean diet" mouse-controlled group without azelaprag. This mouse study showed that elevated liver enzymes was an issue of concern and a side effect linked to obesity. Human studies are a more reliable indicator of potential drug effects.

[4] Defendants and their agents are in exclusive possession, custody, and/or control of the information addressing pre-IPO manifestation of the transaminitis side effect. BioAge did not disclose any specifics regarding onset dates and occurrence of transaminitis pre-IPO. Any notion that all 11 of the 204 STRIDES Study patients only manifested transaminitis after the IPO is unreasonable.

10. Transaminitis without clinically significant symptoms and no reported liver damage is not uncommon, nor is it unexpected, as it occurs in approximately 23% of the adult population at some point in their lives, with prevalence estimates of 13% in general cohorts and 18–22% in obese or diabetic populations. Under the circumstances, because of this prevalence, a reasonable investor would not have anticipated that elevated liver enzymes without clinically significant symptomatology and no reported liver damage would be the basis for cessation of the STRIDES Study and total abandonment of azelaprag development by BioAge. This is especially so given that the Grade 2 and Grade 1 level occurrence of transaminitis in the Amgen trial was represented by BioAge as ***not a serious*** side effect, and BioAge proceeded with the STRIDES Study despite previous linkage of azelaprag to transaminitis.

11. The risk factor disclosures in the Offering Documents fueled a false and misleading understanding of the true investment risk that purchasers of BioAge stock in and traceable to the IPO were undertaking. The risk factor disclosures in the Offering Documents warned that "our business could be harmed ***if*** results of our ongoing or planned clinical trials of azelaprag show ***unexpected*** adverse events …" and "[w]e also ***may*** experience numerous ***unforeseen*** events during, or as a result of, any future clinical trials that we ***could*** conduct that could delay or prevent our ability to receive regulatory approval or commercialize azelaprag or any future product candidates."[5] Regarding "adverse side effects or other safety risk," the risk factor disclosures stated:

> As is the case with small molecules generally, it is likely that there **may** be ***adverse side effects*** associated with the use of azelaprag or any future product candidates. For example, ***we have observed certain adverse events such as mild headaches and back pain and dizziness***, which were higher in our placebo patients than in our active patients, in our clinical trials of azelaprag. Our clinical trials ***may reveal significant adverse events not seen in our preclinical studies or prior clinical trials*** and may result in a safety or tolerability profile that could delay or prevent regulatory approval or market acceptance of azelaprag or any future product candidates. ***Undesirable or clinically unmanageable side effects*** observed in our clinical trials for our product candidates ***could occur*** and cause us or regulatory authorities to interrupt, delay or halt our clinical trials … ***If additional adverse events, serious adverse events (SAEs) or other side effects are observed in any of our clinical trials that are atypical of, or more severe than, the known side effects of the respective class of agents*** that each of our product candidates are a part of, … we may be required to abandon those trials or our development efforts of one or more product candidates altogether. …With a limited number of subjects and limited duration of

[5] Unless stated otherwise, emphasis is added throughout.

> exposure, ***rare and severe*** side effects of our product candidates or those of our competitors may only be uncovered with a significantly larger number of patients exposed to the drug. … Moreover, if our product candidates are associated with undesirable side effects in clinical trial or have characteristics that are ***unexpected***, we may elect to abandon or limit their development to more narrow uses … in which the undesirable side effects or other characteristics are less prevalent, less severe or more acceptable from a risk-benefit perspective." Adding "[A] suspension or termination may be imposed due to a number of factors, including … ***unforeseen safety issues or adverse side effects*** …."

12. The risk disclosures included in the Offering Documents did not adequately warn or reveal that the presentation of a common side effect could trigger cessation of the Study. Instead, the Offering Documents misled investors by stating the opposite with respect to the type or character of "adverse side effect" related investment risk, referring to the presentation of ***"significant adverse events"*** or ***"[u]ndesirable or clinically unmanageable side effects," "unexpected adverse events"*** or side effects that are ***"rare and severe" or "atypical of, or more severe than, the known side effects of the respective class of agents."*** The words "if," "may," "could", "unexpected," "atypical," "more severe than," "not seen in our preclinical studies," "rare and severe," and "unforeseen" rendered the Offering Documents false and misleading. Transaminitis was not a hypothetical risk: it was the type of side effect that has been associated with agents relied on in the Study and was typical and expected to occur in the STRIDES Study given its components and, upon information and belief based on the facts alleged herein, was already occurring in the STRIDES Study prior to the IPO. The risk factor disclosures in the Offering Documents misled investors with respect to the type of consequential side effect that presented investment risk regarding the Study and development of azelaprag in combination with tirzepatide as an oral obesity drug. Owing to the representations and material omissions of the risk factor disclosures of the Offering Documents, a reasonable investor would be misled regarding the fact that a side effect such as transaminitis with no clinically significant symptoms and with no reported liver damage – similar to, and not "more severe than," the transient transaminitis that occurred in the Amgen Study – and represented in the Offering Documents as not a serious side effect, the type of side effect that presented consequential investment risk.

13. Adding to the misleading impression created by the Offering Documents, they also referenced "gastrointestinal" side effects including "nausea" and "vomiting" linked to FDA-approved obesity drugs tirzepatide (Zepbound) and semaglutide (Wegovy). These side effects also happen to be

symptoms of transaminitis or liver injury. The Offering Documents suggested that the combination of azelaprag with tirzepatide or semaglutide might create a more tolerable weight loss product compared to the intolerability rates of Wegovy and Zepbound, while acknowledging that the side effects, including nausea, of those injectable obesity drugs caused 15% of users of tirzepatide (Zepbound) and 17% of users of semaglutide (Wegovy) to cease use of those products. Given that BioAge was combining azelaprag with these FDA-approved obesity drug drugs amid their respective side effects and tolerability profiles, these disclosures created a false impression that a side effect that presented neither clinically significant symptoms nor reported liver damage was ***not*** the type of side effect that would cause cancellation of the Study and consequent investment risk.

14. Defendants' halting the STRIDES Study and abandoning the development of azelaprag due to the manifestation of elevated liver enzymes with no clinically significant symptoms and no reported liver damage was entirely inconsistent with the representations of, and impression created by, the Offering Documents regarding the type of adverse or serious side effect that threatened cessation of the Study. It was inconsistent with having proceeded with the Study in the face of the transaminitis side effect occurring in the Amgen Phase 1 trial in one of six patients in a healthy cohort dosed with 650mg of azelaprag. Halting the STRIDES Study and abandoning development of azelaprag was also inconsistent with having proceeded with the STRIDES Study in the face of the represented adverse side effects of nausea, vomiting, and abdominal pain, and consequent high intolerability rates of obesity drugs based on tirzepatide and semaglutide in which high intolerability rates and symptomatic side effects such as nausea, vomiting, and abdominal pain – all of which can be experienced when elevated liver enzymes are present.

15. If the reality and truth about side effect-related investment risk that could doom the Study had been adequately stated and not misrepresented – that the occurrence in some patients of even a common side effect like transaminitis producing no clinically significant symptoms and no reported liver injury could doom the Study – a reasonable investor would not have invested in the BioAge IPO, or would have paid far less money per share as the true risk. This was material information that significantly altered the total mix of information upon which to make an investment decision.

16. The IPO, which closed on September 27, 2024, was a resounding success. BioAge sold 12.65 million shares of its common stock at $18 per share, including the full exercise by the underwriters

of their option to purchase 1.6 million additional shares, raising $198 million. In October 2024, BioAge's stock rose to over $25 per share.

17. However, just nine weeks later, on December 6, 2024, much to the surprise of investors, BioAge announced that it was discontinuing the Study. This discontinuation was not because of a serious adverse event, a side effect like a heart attack, stroke, or cancer or one more serious than a typical risk associated with GLP-1R agonists or apelin receptor agents, but rather because of "liver transaminitis, without clinically significant symptoms in some subjects on azelaprag," and no reported liver damage. The Company disclosed that 11 of 204 study participants experienced transaminitis, resulting in cancellation of the Study. On January 28, 2025, BioAge reported that it was ending its development of azelaprag.

18. On the news of the discontinuation of the STRIDES Study, the price of BioAge stock plummeted more than 76%, from $20 per share on December 6, 2024, to $4.65 per share on December 7, 2024, significantly below the $18 per share offering price. The stock price has remained gravely depressed – signaling the importance of the development of azelaprag to investors and the materiality of information falsely represented and/or omitted about the true investment risks associated with the development of azelaprag in the Offering Documents:



## II. JURISDICTION AND VENUE

19. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, respectively.

20. This Court has subject matter jurisdiction over this action under Section 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1331.

21. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

22. Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in this District.

## III. THE PARTIES

### A. Plaintiff

23. Lead Plaintiff SEPTA is one of the largest transit systems in the United States, providing public transportation services, including regional rail, buses, trolleys, subways, and a high-speed line in five counties in the greater Philadelphia, Pennsylvania area. SEPTA purchased BioAge common stock traceable to the September 26, 2024 IPO, as set forth in the certification filed with its lead plaintiff papers (ECF No. 18-2), and was damaged thereby.

### B. Defendants

***The Company***

24. Defendant BioAge, founded in 2015, is a Delaware corporation with its principal executive offices located at 1445 A South 50th Street, Richmond, California 94804. BioAge's common stock trades on the NASDAQ under the ticker symbol "BIOA." BioAge held its IPO on September 26, 2024.

***Individual Defendants***

25. Defendant Kristen Fortney, Ph.D., ("Fortney") is a co-founder of BioAge and has served as its Chief Executive Officer, President, and a member of its board of directors since the Company's founding

in April 2015. Dr. Fortney holds a Ph.D. in Medical Biophysics. Dr. Fortney signed the Registration Statement of the Offering on September 25, 2024.

26. Defendant Dov Goldstein, M.D., M.B.A., ("Goldstein") has served as the Company's Chief Financial Officer since November 2021. Prior to the IPO, Dr. Goldstein received a B.S. in Biological Sciences, an M.B.A., and an M.D. degree. Dr. Goldstein signed the Registration Statement of the Offering on September 25, 2024.

27. Defendant Eric Morgen, M.D., ("Morgen") is a co-founder of BioAge, and has served as its Chief Operating Officer since May 2018, and as a member of its board of directors since June 2017. From 2018 to April 2020, Morgen served as the Company's Chief Medical Officer. Prior to the IPO, Dr. Morgen received a Bachelor of Science degree, a Master of Public Health degree, and a Medical Doctorate. Dr. Morgan signed the Registration Statement of the Offering on September 25, 2024.

28. Defendant Shane Barton ("Barton") is, and at all relevant times was, the Company's Vice President of Finance. Barton signed the Registration Statement of the Offering on September 25, 2024.

29. Defendant Jean-Pierre Garnier, Ph.D. ("Garnier") is, and at all relevant times was, the Chairman of the Company's Board of Directors. Dr. Garnier signed the Registration Statement of the Offerings on September 25, 2024.

30. Defendant Michael Davidson, M.D. ("Davidson") has served as a member of the Company's Board of Directors since March 2024. Dr. Davidson signed the Registration Statement of the Offering on September 25, 2024.

31. Defendant Patrick Enright ("Enright") has served as a member of the Company's Board of Directors since February 2024 and is a member of its Audit Committee. Enright signed the Registration Statement of the Offering on September 25, 2024.

32. Defendant James Healy, M.D., Ph.D. served as the Chairman of the Company's Board of Directors until August 2024 and continues to serve on its Board. Dr. Healy executed the Registration Statement of the Offering on September 25, 2024.

33. Defendant Rekha Hemrajani ("Hemrajani") has served on the Company's Board of Directors since August 2021 and is a member of its Audit Committee. Hemrajani executed the Registration Statement of the Offering on September 25, 2024.

34. Defendant Vijay Pande, Ph.D. ("Pande") has served as a member of the Company's Board of Directors since June 2017. Dr. Pande executed the Registration Statement of the Offering on September 25, 2024.

35. Defendants Fortney, Goldstein, Barton, Garnier, Davidson, Enright, Healy, Hemrajani, Morgen, and Pande are collectively referred to herein as the "Individual Defendants."

36. The Individual Defendants, as signatories of the Offering Documents, were required to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation, to ensure that the Offering Documents were free of any materially inaccurate or misleading statements and free of any omissions of material fact or other matters that were required to be disclosed therein. During the course of their "due diligence," the Individual Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

37. In addition to having access to internal corporate documents, the Individual Defendants had access to all of the Company's other top executives, directors, and advisors to determine: (a) the strategy to best accomplish the September 26, 2024 IPO; (b) the terms of the IPO, including the price at which the Company's common shares would be sold; (c) the language to be used in the Offering Documents; and (d) what disclosures about the Company, the STRIDES Study, and prior studies would be made in the Offering Documents.

## IV. STATEMENT OF FACTS

### A. Obesity: A Serious Health Condition That Increases the Risk of Chronic Diseases

38. Obesity increases the risk of several chronic diseases or health conditions affecting almost every major organ system, including: heart disease, stroke, hypertension, hyperlipidemia, high cholesterol, type-2 diabetes, insulin resistance, metabolic syndrome, osteoarthritis, joint pain, back pain, sleep apnea, asthma, bronchitis, infertility, pregnancy complications, kidney disease, liver disease, gallstones, increased risk of depression and anxiety, and has been associated with an increased risk of several cancers.

39. There is a high degree of scientific, medical, and commercial interest in understanding obesity as a medical condition and finding therapies and/or drugs to reduce the incidence of obesity or to ameliorate its adverse effects. Currently available FDA-approved medications for the treatment of obesity

may have a significant side effect – a reduction in muscle mass, which can lead to loss of strength or physical impairment, particularly in older adults. Development of a drug that can help an obese patient achieve significant weight loss while maintaining muscle mass or reducing muscle loss or deterioration during treatment would be a blockbuster feat that could dominate the market for the treatment of diabetes and obesity, which BioAge claimed was expected to reach $150 billion by 2031.

40. Notably, many of the conditions linked to obesity can affect the liver, either directly or through the daily medications needed for treatment of hypertension, high cholesterol, or type-2 diabetes. Obesity significantly increases the risk of developing non-alcoholic fatty liver disease ("NAFLD" and sometimes called "NASH" or "MASH," which also denote advanced subtypes of NALFD, which includes inflammation and fibrosis), in which fat builds up in the liver causing a disruption to optimal liver function and an **elevation of liver enzymes**.[6] NAFLD is the most common chronic liver disease in the United States.[7] Although the exact cause of NAFLD is unknown, scientists have determined that the condition is most prevalent in middle-aged or older people who have type 2 diabetes, obesity, high blood pressure, metabolic disorders or metabolic syndrome, certain infections such as hepatitis C, high cholesterol and/or triglycerides, take corticosteroids or some cancer drugs, or have been exposed to certain toxins.

41. As more fully alleged below, elevated liver enzymes have various causes including: viral hepatitis, hemochromatosis, certain medications, including cholesterol lowering drugs (statins), acetaminophen, vitamins, herbal supplements, fatty liver disease (both alcohol related and non-alcohol related), cancer, celiac disease, thyroid disease, Wilson's disease, cirrhosis, metabolic syndrome, and polymyositis. Obesity can cause elevated liver enzymes, as can physical exercise, and significant or rapid weight loss. In many instances, once the cause is identified and treated, if necessary, the condition will reverse and liver enzymes will return to normal levels. In such cases, it is said that the patient suffered transient transaminitis. Medication-induced transaminitis is often transient.

---

[6] Liver enzymes include alanine transaminase (ALT), aspartate transaminase (AST), alkaline phosphatase (ALP), and gamma-glutamyl transferase (GGT).

[7] NAFLD is distinguishable from alcoholic fatty liver disease, or alcoholic steatohepatitis, which similarly is a condition affecting liver health, but is caused by excessive alcohol consumption.

42. Several factors have spurred the biopharmaceutical industry to develop new product candidates for treatment of obesity, including the large and rapidly growing market created by FDA-approval and subsequent marketing of injectable GLP-1R agonists for obesity treatment; the high prevalence of the disease; the impact of obesity on overall health and healthcare spending; and the limitations of currently prescribed drugs.

### B. BioAge: Clinical Stage Pharmaceutical Company Developing a Therapeutic Product Candidate for Obesity

43. BioAge is a clinical-stage biopharmaceutical company that, as set forth in the Offering Documents, was "developing therapeutic product candidates for metabolic diseases, such as obesity, by targeting the biology of human aging." At all material times, BioAge's lead product candidate, azelaprag, an orally available small molecule apelin receptor agonist, was being advanced "as a treatment for obesity." The Offering Documents, in describing the market for azelaprag, stated that "over 875 million adults age 20+ are obese," "[a]mong obese patients, the prevalence of cardiometabolic morbidities is high," and "[o]besity itself … increases the risk of both morbidity and mortality from age-related chronic disease." The Offering Documents represented that BioAge had "discovered key pathways and targets, such as apelin signaling, which is targeted by our lead product candidate azelaprag, with the potential to preserve metabolic health over the course of aging."

44. Apelin receptor agents, like azelaprag, are linked to, *inter alia*, metabolic function. As explained in the Offering Documents, "apelin is a peptide hormone referred to as an exerkine, a signaling molecule released by skeletal muscle in response to exercise that mediates many of the beneficial metabolic and functional adaptations to physical activity." The Offering Documents further explained that "[t]his striking congruence between the actions of apelin and exercise suggests that this peptide acts as a key molecular transducer of the systemic exercise response, and that targeting the apelin/APJ axis may be able to mimic many of the benefits of physical activity sometimes referred to as 'exercise in a pill,'" and later stated that "exercise ameliorates many of the negative health outcomes associated with aging. Circulating apelin levels increase acutely after exercise, with the magnitude of this response strongly predicting physical performance in older adults." As further noted in the Offering Documents, "subjects with higher apelin levels lived longer, with improved health[.]"

45. BioAge represented that its ultimate "goal" was to produce a safe, well-tolerated, "highly competitive oral product [that] would achieve weight loss of approximately 20% after one year of treatment," "***on par with injectables***," like "Zepbound (tirzepatide 15 mg), which is a dual GIP-1R and GIP, agonist and has the highest percentage of weight loss among approved injectables." BioAge further noted that "[c]ertain injectable GLP-1R agonists have recently been approved for the treatment of diabetes and obesity. However, there continues to be significant interest by pharmaceutical companies in oral obesity medications given strong patient preference and fewer supply chain challenges compared to injectables, including cold-chain requirements and high manufacturing costs;" adding, "[d]espite the recent approvals of such injectable GLP-1R agonists, there remain important unmet needs for people struggling with obesity, including improved oral efficacy, tolerability and body composition."

46. According to BioAge, in a series of preclinical Phase 1 and Phase 1b studies on humans, "azelaprag demonstrated the ability to more than double the weight loss induced by a glucagon-like-peptide-1 receptor (GLP-1R) agonist while also restoring healthy body composition and improving muscle function," with "older adults on bed rest" treated with azelaprag over a 10-day period demonstrating "decreased muscle atrophy, preservation of muscle quality and improved metabolism.…"

**C. Elevated Liver Enzymes – A Common Side Effect with Various Causes**

48. Elevated liver enzymes are a common health condition in the general population, presenting in approximately 23% of all adults at some point in their lives, and with prevalence estimates of 13% in general cohorts and 18–22% in obese or diabetic populations.[8] Elevated liver enzymes are especially common among obese adults aged 45-79 due to metabolic dysfunction and comorbidities.[9] Drug-induced elevations in liver enzymes (transaminitis) can present rapidly, within days with direct hepatoxic agents,

---

[8] A systematic review of the prevalence of mildly abnormal liver function tests and associated health outcomes, Sven Radke, John F. Dillon, *et al.*, National Library of Medicine, (2015, Jan. 27). doi: 10.1097/MEG.0000000000000233; Tirzepatide for Obesity Treatment and Diabetes Prevention. Jastreboff AM, le Roux CW, Stefanski A, *et al*. The New England Journal of Medicine. 2025;392(10):958-971. doi:10.1056/NEJMoa2410819.

[9] *Id.* and Association of Obesity Profiles and Metabolic Health Status With Liver Injury Among US Adult Population in NHANES 1999-2016. Huang J, Gao T, Zhang H, Wang X. Scientific Reports. 2023;13(1):15958. doi:10.1038/s41598-023-43028-7.

such as acetaminophen.[10] These elevations are often transient, especially with medication-induced transaminitis.[11] Elevated liver enzymes have been traced to a variety of causes, including: celiac disease;[12] viral infections which affect the liver, including hepatitis C, B, and A;[13] physical trauma;[14] metabolic syndrome;[15] cirrhosis;[16] hemochromatosis (genetic condition causing absorption of excess amounts of iron); [17] heart failure (leading to decreased blood flow to the liver),[18] and over-the-counter, prescription,

---

[10] Jay H. Hoofnagle, M.D., and Einar S. Björnsson, M.D, Drug-Induced Liver Injury — Types and Phenotypes. The New England Journal of Medicine. (2019, July 17); 381(3):264-273. doi:10.1056/NEJMra1816149.

[11] Li, M., *Pharmacotherapies for Drug-Induced Liver Injury: A Current Literature Review*, Frontiers in Pharmacology, (2022, Jan. 5), available at: https://www.frontiersin.org/journals/pharmacology/articles/10.3389/fphar.2021.806249/full ("small elevations in liver parameters induced by drugs may be transient in nature and may revert to baseline even when therapy is continued (such as antituberculosis drug and statin).").

[12] Jena, A., *Liver abnormalities in celiac disease and response to gluten free diet: A systematic review and meta-analysis*, Journal of Gastroenterology and Hepatology, 2022, Nov. 9, available at: https://pubmed.ncbi.nlm.nih.gov/36300634/ (an analysis of 8976 patients and 42 studies reveals that approximately 21.4% of patients with celiac disease report elevated transaminases.).

[13] Wolffram, I., Prevalence of elevated ALT values, HBsAG, and anti-HCV in the primary care setting and evaluation of guideline defined hepatitis risk scenarios, Journal of Hepatology, 2015, Jan. 21, available at: https://www.journal-of-hepatology.eu/article/S0168-8278(15)00017-3/abstract (Using ELE to diagnose hepatitis infections).

[14] Prasad, P. *Evaluating the role of liver enzymes as predictors of severity of liver injury in patients with blunt abdominal trauma*, International Journal of Research in Medical Sciences, (2017, May 27), available at: https://www.msjonline.org/index.php/ijrms/article/view/2925? ("The rise in transaminases is directly proportional to grade of liver injury.").

[15] Raya-Cano, E., *Metabolic syndrome and transaminases: systematic review and meta-analysis*, Diabetology and Metabolic Syndrome, (2023, Oct. 30), available at: https://dmsjournal.biomedcentral.com/articles/10.1186/s13098-023-01200-z (an analysis of 17 studies and 248,541 patients reveals that the concentration of ELE was significantly higher in patients with metabolic syndrome).

[16] Natarajan, Y., *Risk of Cirrhosis and Hepatocellular Cancer in Patients with NALFD and Normal Liver Enzymes*, Hepatology, (2020, Oct. 7), available at: https://journals.lww.com/hep/abstract/2020/10000/risk_of_cirrhosis_and_hepatocellular_cancer_in.13.aspx (finding that patients with elevated ALT had a higher risk of developing cirrhosis).

[17] Kölmel S., *Iron overload associated symptoms and laboratory changes in the Swiss Haemochromatosis Cohort – when a clinician should become attentive*, Swiss Med. Wkly., (2020, July. 13), available at: https://smw.ch/index.php/smw/article/view/2834/4608 ("Elevated liver enzymes, especially elevated alanine aminotransferase (ALT) levels, were associated with a 10.1-fold" increase for the risk of serum ferritin levels.).

[18] Alvarez, A. *Liver abnormalities in Cardiac Diseases and Heart Failure*, International Journal of Angiology, (2011), available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC3331650/pdf/ija20135.pdf ("elevated liver enzymes with negative viral serology should make the clinician suspect [heart failure].").

and herbal weight loss drugs,[19] including naltrexone-bupropion (marketed as Contrave) and liraglutide (marketed as Saxenda) (both of which are FDA-approved).[20],[21]

49. The following factors that have been reported to cause elevated liver enzymes were each either present or not controlled for in STRIDES Study participants:

a. GLP-1R agonists (for example FDA-approved tirzepatide), which was previously linked to transaminitis;

b. Apelin-receptor agonists;[22]

c. Physical exercise;[23]

d. Obesity and older obese patient populations;[24]

---

[19] Zheng, E., *Liver Injury from Herbal, Dietary, and Weight Loss Supplements: a Review*, Journal of Clinical and Translational Hepatology (2015, Jun. 15), available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC4548352/ ("[herbal dietary supplements'] are a common cause of liver injury and, relative to prescribed drugs, HDS-related hepatotoxicity is on the rise.").

[20] The "Important Safety Information" disclosures for Contrave states that: "Contrave may cause serious side effects, including: …Liver damage or hepatitis. Stop taking Contrave and tell your healthcare provider if you have any of the following symptoms of liver problems: stomach area pain lasting more than a few days, dark urine, yellowing of the whites of your eyes, or tiredness. https://contrave.com/?utm_term=contrave&utm_campaign=Branded_US_%28SEM%29&utm_source=adwords&utm_medium=ppc&hsa_acc=9744504260&hsa_cam=1496144637&hsa_grp=57450612213&hsa_ad=766714741431&hsa_src=g&hsa_tgt=kwd-301081551828&hsa_kw=contrave&hsa_mt=e&hsa_net=adwords&hsa_ver=3&gad_source=1&gad_campaignid=1496144637&gbraid=0AAAAAC-GljRRebupBeBeDhBq8ylpOVq4n, last visited on November19, 2025.

[21] The documentation reflecting the "Postmarketing Experience" of Saxenda states that "[t]he following adverse reactions have been reported during post-approval use of liraglutide, the active ingredient of SAXENDA…. *Hepatobiliary*. Hyperbilirubinemia, **elevations of liver enzymes,** cholestasis and hepatitis…." https://www.novo-pi.com/saxenda.pdf#guide, last visited on November 19, 2025.

[22] Lv, S., Apelin/APJ system: A key therapeutic target for liver disease, Oncotarget (2017, Dec. 1), available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC5762386/ (noting that "***activation of APJ receptor seems to promote development of liver disease***."

[23] Tiller, N., *Exercise-induced increases in "liver function tests" in a healthy adult male: Is there a knowledge gap in primary care*?", Journal of Family Medicine and Primary Care, (2023, Feb. 15), available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC10071916/ (concluding that exercise-induced muscle damages led to an abnormal liver panel after which patient abstained from exercise for seven days and his liver levels returned to normal levels).

[24] Huang, J., *Association of obesity profiles and metabolic health status with liver injury among US adult population in NHANES 1999-2016*, (2025, Sept. 23 Nature: Scientific Reports, available at: https://www.nature.com/articles/s41598-023-43028-7 (association of general obesity and abdominal obesity" to levels of liver enzymes and the prevalence of abnormal liver enzymes).

e. Rapid weight loss;[25]

f. Unhealthy diet;[26]

g. Use of over-the-counter products such as acetaminophen (Tylenol)[27] or Naproxen (Aleve), [28] which are FDA-approved;

h. Consumption of alcohol;[29] and

i. Unknown or undiagnosed fatty liver disease.[30]

50. Importantly, several FDA-approved GLP-1R agonist and non-GLP-1R agonist obesity drugs carry a risk of elevated liver enzymes – transaminitis – and even drug-induced liver injury. For example, two non GLP-1R drugs approved for weight loss Orlistat (marketed as Xenical; Alli)[31] and Naltrexone-bupropion (marketed as Contrave),[32] each carry serious risk of liver damage, and GLP-1R

---

[25] Tsai, J., *Aggressive non-alcoholic steatohepatitis following rapid weight loss and/or malnutrition*, Modern Pathology, (2017, June), available at: https://www.modernpathology.org/article/S0893-3952(22)01179-6/fulltext (study focusing on patients who developed severe hepatic dysfunction following rapid weight loss and had increased liver enzyme levels of 42:1).

[26] Mirmiran, P., *Elevated serum levels of aminotransferases in relation to unhealthy foods intake: Tehran lipid and glucose study* (2019, Oct. 15), BMC Endocrine Disorders, available at: https://bmcendocrdisord.biomedcentral.com/articles/10.1186/s12902-019-0437-5 ("higher consumption of fast foods . . . was associated with elevated [liver enzymes]").

[27] Monte, A., *A Multi-Omic Mosaic Model of Acetaminophen Induced Alanine Aminotransferase Elevation*, Journal of Medical Toxicology, (2023, May 25), available at: https://pubmed.ncbi.nlm.nih.gov/37231244/ (concluding that "Acetaminophen (APAP) is the most common cause liver injury following alcohol in US patients").

[28] Shell, W., *A double-blind controlled trial of a single dose naproxen and an amino acid medical food theramine for the treatment of low back pain*, American Journal of Therapeutics, (2012, Mar. 19), available at: https://pubmed.ncbi.nlm.nih.gov/20861716/ ("the naproxen-alone group showed significant elevations in [liver enzyme levels] when compared with the other groups.").

[29] Agarwal, S., *Assessing alcohol intake & its dose-dependent effects on liver enzymes by 24-h recall and questionnaire using NHANES 2001-2010 data* (2016, Jun. 22), available at: https://nutritionj.biomedcentral.com/articles/10.1186/s12937-016-0180-y? ("even very modest levels of alcohol intake can significantly affect liver enzymes…").

[30] Natarajan, T., *Assessment of Liver Enzymes and the Risk of Non-alcoholic Fatty Liver Disease (NAFLD) Among Information Technology (IT) Professionals*, Cureus Journal of Medical Science (2025, Jul. 25), available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC12375908/ ("A significantly greater proportion of individuals with NAFLD had elevated ALT . . . compared to those without NAFLD").

[31] "Orlistat, (oral route)," https://www.mayoclinic.org/drugs-supplements/orlistat-oral-route/description/drg-20065184, last visited November 19, 2025.

[32] *See* fn 20, *supra*.

agonists liraglutide (Saxenda)[33] and tirzepatide (Zepbound) have been linked to drug-induced transaminitis. Tirzepatide was linked to transaminitis prior to the IPO).[34]

51. The presence of, or failure to control for, each of the factors identified in ¶ 49 within the STRIDES Study participants carried the risk that elevated liver enzymes would present as a side effect, which, in turn, supports the allegation that elevated liver enzymes had presented in the Study population at the time of the IPO, as more fully discussed in section G below.

### D. Amgen's Phase 1 Studies Do Not Characterize a CTCAE Grade 1 or 2 Transaminitis Side Effect Linked to Azelaprag as "Adverse" or "Serious"

52. Azelaprag was first developed by Amgen. On April 5, 2021, BioAge entered into an exclusive license agreement with Amgen to research, develop, and commercialize AMG 986 (azelaprag) in all diagnostic, preventative, or therapeutic uses. BioAge reported in the Offering Documents that "across eight Phase 1 clinical trials conducted between us and Amgen, Azelaprag has been well-tolerated in 265 individuals, with an adverse event rate similar to placebo." Some of these Phase 1 and Phase 1b studies were performed by Amgen and some by BioAge, and the Offering Documents identify which company undertook each study. Thus, BioAge's development of azelaprag was built or premised on the earlier Amgen research.

53. As part of the IPO, the Offering Documents stated in relevant part:

> **Completed Clinical Trials**
>
> In the eight Phase 1 clinical trials of azelaprag completed to date by us and Amgen, azelaprag was well-tolerated in 265 individuals who received a daily dose of up to 1,440 mg for up to 21 days. Below is a summary of clinical trials completed to date:

---

33 *See* fn. 21, *supra*.

34 Page, Sam, How do GLP-1 weight loss drugs affect the liver?, Michigan Medicine of Michigan University, (2024, Aug. 14) available at https://www.michiganmedicine.org/health-lab/how-do-glp-1-weight-loss-drugs-affect-liver, last visited November 19, 2025.

**Azelaprag has been studied in eight Phase 1 trials**

| Sponsor | Study goal | Participants | Years conducted | Admin | Azelaprag dosing | Primary endpoint | Secondary endpoints | Publication (PMID) |
|---|---|---|---|---|---|---|---|---|
| BioAge | Evaluate the effect of azelaprag on midazolam pharmacokinetics (PK) | HVs | 2024 | Oral | 300 mg BID x 14 days (N=22) | Midazolam PK | Safety & tolerability | - |
| | Characterize safety & PK after oral administration | Older HVs | 2023 - 2024 | | Part 1: Single dose crossover (N=16)<br>• 300 mg, 600 mg<br>Part 2: Multiple dose (N=9 – all subjects also participated in Part 1)<br>• 300 mg oral BID x 14 days | PK | | - |
| | Characterize safety, PK, and pharmacodynamics (PD) after IV administration | | 2022 | IV | Part A: Single ascending dose<br>• 60 mg LD + 360 mg MD (N=6)<br>• 120 mg LD + 720 mg MD (N=6)<br>• 240 mg LD + 1440 mg MD (N=6)<br>Part B: Multiple Dose<br>• 240 mg x 10 days (N=11) | Safety & tolerability | PK, PD | - |
| Amgen | Characterize safety, PK, PD | HVs<br>Heart failure patients | 2016 - 2019 | Oral, IV | Part A: Single ascending dose in healthy volunteers<br>• Oral: 5, 30, 100, 200, 400, or 650 mg (N=36)<br>• IV: 0.5 mg LD, 3 mg LD, 6 mg LD + 36 mg MD, 20 mg LD + 120 mg MD, 60 mg LD + 360 mg MD (N=30)<br>Part B: Multiple dose in healthy volunteers<br>• Oral: 5, 30, 100, 200, 400, or 650 mg x 7 days (N=37)<br>• IV: 6 mg LD + 36/38 mg MD or 60 mg LD + 360/376 mg MD (N=13)<br>Part C: Subjects with heart failure<br>• 21 days of PO QD treatment: 10 mg × 7 days >> 30 mg × 7 days >> 100 mg × 7 days (N=19) | Safety & tolerability | PK, PD | 35460392 |
| | Compare oral tablet and capsule formulations | HVs | 2018 | Oral | 200 mg (N=12) | PK | Safety & tolerability | 35412220 |
| | Characterize PK with renal impairment | HVs<br>Subjects with severe renal impairment | 2017 - 2018 | | 200 mg (N=12) | | | 35092583 |
| | Characterize safety, tolerability, and PK in Japanese subjects | HVs | 2017 - 2018 | | 200 mg (N=6)<br>400 mg (N=6) | | | 35279815 |
| | Characterize effect of food and itraconazole on PK | | 2017 | | Food effect crossover (N=12)<br>• 2x 200 mg<br>Itraconazole (N=15)<br>• 2x 10 mg | | | 35247290 |

*Azelaprag has been studied in eight Phase 1 trials to date, conducted by BioAge and Amgen. HVs = healthy volunteers. LD = loading dose & MD = maintenance dose, used in the IV administration setting. In all trials, primary and secondary objectives were met.*

54. The Offering Documents touted the general safety and tolerability of the Phase 1 protocols across the studies, reporting that "[t]he overall adverse event profile of azelaprag was comparable to placebo, with no treatment-related trends in adverse events observed, with the exception of mild, self-limited headaches. ***No serious adverse events have been reported***." The Offering Documents did not disclose any observed adverse events in either the BioAge or Amgen Phase 1 clinical tests even though, in 2018, Amgen conducted a series of studies of Azelaprag on humans that observed a serious adverse

CTCAE stage 4 side effect accompanying stage 2 and stage 1 side effects relating to the liver.[35,36] Amgen's clinical trial NCT03276728 contained a narrative of its Phase 1 Trial, which was not expressly stated in the Offering Documents, that stated, in relevant part:

> One CTCAE grade 4 event was reported; this event (blood creatine phosphokinase increased as high as 9927 U/L) occurred in a [ ]-year-old subject in the 650 mg PO multiple dose cohort on study day 5, was nonserious, resulted in no action/change to the investigational product administration, was not associated with clinical symptoms (e.g., myalgia) or worsening renal function tests, ***occurred concurrently with a CTCAE grade 2 event of aspartate aminotransferase*** [AST] ***increased and a grade 1 event of alanine aminotransferase*** [ALT] ***increased, did not require any treatment, and was reported as resolved on study day 29*** (22 days after the last dose of investigational product).

55. The ***Amgen narrative*** above reveals that one patient dosed with azelaprag experienced a CTCAE grade 4 event with a blood creatine phosphokinase of 9927 U/L, alongside a CTCAE grade 2 event of AST, and a grade 1 event of ALT. Blood creatine phosphokinase is an enzyme that indicates muscle tissue damage or injury. AST and ALT are both liver enzymes which increase when the liver is injured.[37] While the patient who presented with elevated liver enzymes was one of a cohort of 45 patients who received daily doses of azelaprag for seven days, ***this individual was just one of 6 patients receiving a dosage of 650mg of azelaprag every day for seven days, similar to the highest dosage (600mg) used in the STRIDES Study***.

56. In the Amgen study, one cohort had a total of six healthy participants, who each received 650mg of azelaprag per day, an amount close to the 600mg dosage per day of azelaprag received by two of the four cohorts in the STRIDES Study. Of those six healthy and non-obese participants in the seven-

[35] Side effects observed in drug clinical trials are designated with a Common Terminology for Adverse Events ("CTCAE") grade level, ranging in severity from Grade 1 (causes mild effects) to Grade 5 (caused death). A CTCAE grade 4 event is the second most serious level of adverse event and indicates "life-threatening consequences; urgent intervention indicated." A CTCAE grade 5 event typically indicates that a death occurred related to the adverse event. However, if a CTCAE grade 5 event is not listed on the CTCAE chart, the U.S. Department of Health and Human Services has determined that "Grade 5 (Death) is not appropriate for some AEs and therefore is not an option." This would mean that a CTCAE Grade 4 event is the highest level of danger for that adverse event as defined by the United States. A CTCAE grade 1 event includes "Mild, asymptomatic or mild symptoms; clinical or diagnostic observations only; intervention not indicated" and a CTCAE grade 2 event as "Moderate; minimal, local or noninvasive intervention … indicated."

[36] Among the side effects occurring in the Phase 1 trial study of azelaprag that Amgen had conducted in 2018, seven study participants experienced CTCAE grade 2 events, with several experiencing toothaches as a result of the treatment.

[37] During the Amgen study, 7.9% of the total study participants who received azelaprag – 21 out of 265 persons – suffered headaches.

day daily high-dosage arm of the Amgen Study, one developed elevated liver enzymes—or transient transaminitis—within five days of beginning dosing with azelaprag.

57. The Amgen Study linked azelaprag to, and provided an additional basis for, the expectation of liver enzymes as a side effect of persons receiving azelaprag. It further demonstrated that elevated liver enzymes occurring in even healthy, non-obese individuals dosed with an apelin receptor agonist agent – here, azelaprag – is a type of side effect linked to azelaprag, an apelin receptor agonist. Given that the Amgen Study that was not confined to an obese and older human cohort like the STRIDES Study, the incidence of an azelaprag-associated elevated liver enzyme side effect could be expected in at least 1 of 6 Study participants receiving the highest doses of azelaprag every day. Using the same rate of occurrence of transaminitis would translate to multiple such incidents if applied to the 204 persons dosed in the STRIDES Study. This supports the fact that transaminitis was an expected side effect in the STRIDES Study population, and even more so since the STRIDES Study consisted not of healthy individuals, including younger patients, but involved an obese population aged 55 or older, including a cohort being dosed with both azelaprag and tirzepatide – the latter also having been linked to a transaminitis side effect and its end points.[38]

58. Importantly, when describing the side effects observed in the Amgen Study, the Offering Documents represented that "all events were mild[,]" consistent with the representation that "***no serious adverse events have been reported***." Nowhere did the Offering Documents characterize the transaminitis side effect as adverse or serious. Nor did the Offering Documents characterize the occurrence of this side effect in one of the six healthy patients in the Amgen Study cohort of receiving high doses of azelaprag for seven days, as serious, despite it portending broader presentation of elevated liver enzymes in the larger, far riskier population of obese, older participants in the STRIDES Study. And nowhere did the Offering Documents warn that should a common, non-serious type of side effect like transaminitis without clinically significant symptoms or liver damage present in multiple Study participants, it could stop BioAge from proceeding with the STRIDES Study.

---

[38] https://www.michiganmedicine.org/health-lab/how-do-glp-1-weight-loss-drugs-affect-liver, last visited on November 19, 2025.

59. Similarly, in asserting that "[w]ith a limited number of subjects and limited duration of exposure [in clinical trials], ***rare and severe*** side effects of our product candidates or those of our competitors may only be uncovered with a significantly larger number of patients exposed to the drug[,]" the Offering Documents reinforced the impression that the side effect of the type that occurred in the STRIDES Study and brought about its demise did not present an investment risk: it was not "rare and severe," especially where, as here, it presented without clinically significant symptoms and with no reported liver damage.[39]

**E. The STRIDES Study**

60. On October 26, 2023, BioAge issued a press release announcing plans, in collaboration with Eli Lilly's Chorus Organization, to initiate a Phase 2 clinical trial in mid-2024 of azelaprag as a combination therapy with GLP-1R agonist tirzepatide as an enhanced treatment for obesity. In addition to information stated in the the press release, details of the STRIDES Study were published on www.clinicaltrials.gov.[40]

61. The STRIDES Study scheduled study participants visits with clinicians every other week for the first eight weeks of dosing, then every 4 weeks, ensuring frequent monitoring.[41] This approach aligns with standard clinical trial monitoring for drugs with hepatotoxic potential.[42]

---

[39] The Amgen study referred to in the Offering Documents prevails over any mouse study because it involved the study of humans. In a mouse study wherein BioAge tracked, among other things, liver enzyme levels of a lean control group, a cohort of mice fed a high-fat diet, and group of mice fed a high-fat diet while taking azelaprag as a monotherapy, the high fat diet cohort that received azelaprag had an ALT elevated level of 184.6, an ALP elevated level of 88.5, and an AST liver enzyme level of 172.8. The high fat diet cohort without azelaprag had an ALT elevated level of 263.1, an ALP elevated level of 109.8, and an AST level of 235.8. The lean control mouse cohort levels of ALT, ALP, and AST were all materially lower than the high fat diet cohorts. The tests results on these various mouse cohorts demonstrated that elevated liver enzymes can be an expected side effect of obese mice, whether or not dosed with azelaprag. The Amgen Study results on humans demonstrates that such a side effect can be expected.

[40] Efficacy and Safety of Oral Azelaprag Plus Once Weekly Tirzepatide Compared with Tirzepatide Alone in Participants with Obesity Aged 55 Years and Over (STRIDES) available at https://clinicaltrials.gov/study/NCT06515418, last visited November 19, 2025.

[41] *Id.*

[42] Jay H. Hoofnagle, M.D., and Einar S. Björnsson, M.D, Drug-Induced Liver Injury — Types and Phenotypes. The New England Journal of Medicine. (2019, July 17); 381(3):264-273. doi:10.1056/NEJMra1816149.

62. On July 29, 2024, BioAge issued a press release announcing that the STRIDES Study was underway and patient dosing had begun. Among other things, the press release quoted Defendant Fortney as stating:

> We believe combining azelaprag, an exercise mimetic, with tirzepatide, a GLP-1/GIP receptor agonist that decreases food intake, could provide a powerful pharmacological parallel to the exercise and diet interventions that form the foundation of obesity management… The STRIDES trial aims to demonstrate that activating apelin signaling with azelaprag is a potent complementary mechanism that can deliver increased weight loss efficacy in patients on incretins. In addition, this trial will provide a direct read-through to azelaprag's potential as an orally available small molecule to achieve efficacy on par with injectable weight loss drugs when combined with incretins in an all-oral regimen.

63. The press releases issued on October 26, 2023, and July 29, 2024, both described the structure of the STRIDES Study.

64. On September 26, 2024, BioAge filed its Form 424B4 Prospectus for the Company's IPO, which was incorporated into the Form S-1/A registration statement Defendants filed after the market closed on September 25, 2024, listing 11 million shares of BioAge common stock for sale at an offering price of $18 per share. The Offering Documents detailed the STRIDES Study as follows:

> *Our azelaprag clinical development strategy*
>
> We are initiating two Phase 2 clinical trials of azelaprag in combination with GLP-1R agonists. The first of these trials, STRIDES, is an ongoing clinical trial of azelaprag in combination with tirzepatide in approximately 220 obese individuals aged 55 and over, an age group that represents 35-40% of the adult obese population in the U.S. We are initially focusing on these older patients because the muscle and metabolic benefits of azelaprag observed in our Phase 1b clinical trial were achieved in older patients. The goal of the STRIDES clinical trial is to establish proof of concept for enhanced weight loss. The primary endpoint of this trial will be weight loss at 24 weeks. In addition, biomarkers, changes in body composition and glucose control will be assessed as exploratory endpoints. We anticipate topline results in the third quarter of 2025.
>
> We have a material transfer agreement with Lilly, under which Lilly has agreed to provide us with tirzepatide in connection with our STRIDES clinical trial of azelaprag in obesity. Lilly's Chorus clinical development organization is advising and assisting on all aspects of the Phase 2 STRIDES clinical trial design and execution, enabling us to benefit from Lilly's extensive clinical experience in this space, while retaining all rights to azelaprag.
>
> The goals of our second Phase 2 clinical trial are to demonstrate:
>
> • A GLP-1R-like agonist class effect.
>
> • Efficacy in a wider population that includes younger patients.

> • Overall weight loss achieved after 52 weeks of treatment.
>
> To that end, we intend to combine azelaprag with semaglutide in our second Phase 2 clinical trial and enroll approximately 300 obese individuals ages 18 and older. Trial initiation is anticipated in the first half of 2025 with topline results expected in the second half of 2026. The primary endpoint of this Phase 2 clinical trial will be weight loss at 52 weeks, with similar exploratory endpoints to the tirzepatide combination trial.
>
> While we are currently planning Phase 2 clinical trials with azelaprag in combination with injectable GLP-1R agonists, as these drugs are already approved, our ultimate objective is to develop an all-oral weight loss combination with an oral incretin.
>
> In parallel, we intend to initiate an insulin sensitivity proof-of-concept trial of azelaprag monotherapy in the first half of 2025 to support potential indication expansion. We expect to report topline results from this proof-of-concept trial in the second half of 2025. The goal of this clinical trial is to assess the potential direct benefits of azelaprag, informing potential subsequent development for treatment of obesity with comorbid type 2 diabetes in combination with a GLP-1R agonist.
>
> *Our Strategy*
>
> • Efficiently advance the clinical development of azelaprag as a novel exercise mimetic for the treatment of obesity.
>
> • Establish azelaprag as a key component of all-oral obesity therapy.
>
> • Maximize the potential of azelaprag in adjacent indications, including diabetes.

65. The Offering Documents also provided additional details regarding dosing, the research-driven reasons for selecting such doses, and some expected outcomes:

> We plan to investigate two doses of azelaprag, 300 mg QD and 300 mg BID (which has potential for 600 mg QD dose formulation) in combination with tirzepatide as compared to tirzepatide alone. The doses were selected based on a completed Phase 1 oral pharmacokinetic trial; they are intended to result in azelaprag exposures (area under the curve) that bracket the similar exposure achieved in the Phase 1b bed rest trial and diet-induced obesity preclinical studies. These doses will be administered orally in combination with weekly subcutaneous tirzepatide. We are collaborating with Lilly's Chorus clinical development organization, which will provide clinical trial design and execution expertise, and Lilly, which is supplying tirzepatide. We retain all rights to azelaprag.
>
> The primary endpoint of the STRIDES clinical trial is mean percent weight loss at 24 weeks with exploratory endpoints focused on body composition, glycemic control, patient-reported outcomes / quality of life, biomarkers, and rebound weight gain. We set the primary endpoint at 24 weeks because there is lower variability in tirzepatide monotherapy weight loss compared to later time points in clinical trials, and because Lilly has found weight loss at 24 weeks to be predictive for weight loss at 72 weeks (one year of treatment once the maintenance dose is reached). The trial has 90% power to detect a 3.3% difference between treatment groups (azelaprag plus tirzepatide versus tirzepatide alone) in weight loss at 24 weeks of treatment, which is expected to correspond to 5% at one year of treatment. FDA's 2007 draft guidance for development of weight management products states that a 5% treatment difference compared to placebo can be evidence of effectiveness in Phase 3 trials. A 5%+ benefit in weight loss

> for azelaprag could also translate into potential 20%+ overall weight loss in an oral combination, a competitive efficacy benchmark; for reference, the most advanced oral incretin in development, oral semaglutide, achieves 15.1% overall weight loss at 68 weeks.
>
> We anticipate topline results from this trial in the third quarter of 2025.

66. The Prospectus represented the significance and benefits of azelaprag for the treatment of obesity by itself and as a combination therapy. In pertinent part, the Company detailed the underlying research studies that led into the initiation of the STRIDES Study, the expected contribution of the STRIDES Study to this growing canon of obesity treatment knowledge, and the ultimate commercial goals BioAge hoped to achieve:

> Azelaprag, our lead product candidate, is an orally available small molecule that has been well-tolerated in 265 individuals across eight Phase 1 clinical trials. In preclinical obesity models, azelaprag demonstrated the ability to more than double the weight loss induced by a glucagon-like-peptide-1 receptor (GLP-1R) agonist while also restoring healthy body composition and improving muscle function. These preclinical results are supported by our Phase 1b clinical trial in older adults on bed rest where we observed decreased muscle atrophy, preservation of muscle quality and improved metabolism in subjects treated with azelaprag over a 10-day period. We plan to assess azelaprag's potential to drive significant improvements in weight loss when combined with a GLP-1R agonist in two Phase 2 clinical trials. While the results of these preclinical studies and early clinical trials have demonstrated the potential use of azelaprag for the treatment of metabolic disease, they may not be predictive of the results of later-stage clinical trials. The ongoing STRIDES clinical trial will assess azelaprag in combination with tirzepatide, marketed as Zepbound® by Eli Lilly (Lilly), with topline results anticipated in the third quarter of 2025.
>
> We are building a pipeline of platform-derived therapeutics targeting chronic metabolic disease. Our lead product candidate, azelaprag, is an orally available small molecule agonist of the apelin receptor (APJ) where activation has the potential to recapitulate many of the benefits of exercise. We are developing azelaprag for the treatment of obesity in combination with GLP-1R agonists with the goal of increasing overall weight loss, with the potential to also improve tolerability and body composition. We have initiated one Phase 2 clinical trial of azelaprag in combination with tirzepatide and plan to initiate a second Phase 2 clinical trial of azelaprag in combination with semaglutide in the first half of 2025 and topline results expected in the second half of 2026.
>
> ***
>
> Ultimately, the treatment goal for patients is to achieve not just weight loss – but also a healthy body composition and physical function. As a result, there is substantial interest from both physicians and pharmaceutical companies in mechanisms that improve the quality of body composition in connection with weight loss in addition to the quantity of weight loss.

67. In discussing "Key unmet needs for weight loss regimens," the Prospectus focused on the potential for "*improved gastrointestinal (GI) tolerability*" over "current GLP-1R agonists" which it noted

were "not well-tolerated by all patients." The Prospectus highlighted the fact that "[a]cross obesity trials of injectable semaglutide and tirzepatide, **up to 44% of subjects experienced gastrointestinal side effects such as nausea, diarrhea, and vomiting**, which contributed to a **discontinuation rate of up to 17%**. As the Prospectus further acknowledged, "[t]he incidence of gastrointestinal adverse events is ***even higher*** with other oral GLP-1R agonists in ***late-stage third-party clinical trials***."

68. Referring to the "Goal" of "improved tolerability," the Prospectus acknowledged that drugs based on tirzepatide or semaglutide experienced very high rates of side effects:

> Injectable GLP-1R agonists are peptides that are associated with a high rate of gastrointestinal side effects such as **nausea**, diarrhea, **vomiting**, constipation, and **abdominal pain**. For example, in the STEP-1 and SURMOUNT-1 clinical trials, 44% of patients treated with semaglutide (2.4 mg) and 31% of patients treated with tirzepatide (15 mg) experienced nausea, respectively. These side effects contributed to **discontinuation rates of 17%** for patients on **semaglutide** (2.4 mg) and **15%** for patients on **tirzepatide** (15 mg) in these clinical trials. ***In the real world, discontinuation has been reported at up to 68% at one year, of which up to 64% has been ascribed to tolerability based on patient reports***.

69. The Prospectus further noted that development stage oral GLP-1R agonists fared even worse than those already approved:

> Oral GLP-1R agonists in development have generally reported an ***equivalent or inferior tolerability profile*** compared to injectable agonists, with higher rates of gastrointestinal side effects and subsequent trial discontinuation. In Phase 2–3 obesity trials of oral GLP-1R agonists, 58% (orforglipron, 24 mg) to 87% (GSBR-1290, 120 mg) of patients reported gastrointestinal side effects such as **nausea**, diarrhea, **vomiting**, constipation, and **abdominal pain**; by contrast, 31% (tirzepatide, 15 mg) to 44% (semaglutide, 2.4 mg) reported such adverse events with approved injectable agonists.

70. The Prospectus informed investors that "[c]ombination approaches that limit incretin doses required to achieve target weight loss have the potential to substantially improve tolerability, which has clear potential downstream benefits," among them being "improved patient compliance and reduced discontinuation, the majority of which is currently ascribed to tolerability in the real-world setting."

71. These statements conveyed a message to investors that while an oral regimen using azelaprag in combination with tirzepatide (Zepbound) or semaglutide (Wegovy) could have high levels of side effect intolerability, BioAge would proceed if its oral obesity drug candidate showed certain improvements in the STRIDES Study compared to existing injectable or oral drug products or candidates, even if it caused symptoms such as abdominal pain, nausea, and vomiting to occur. It also created the

impression that an asymptomatic side effect that did not produce serious damage or harm did not present investment risk or threaten the development of azelaprag in combination with tirzepatide or semaglutide as an obesity drug.

72. Symptoms characterized as "gastrointestinal" side effects, such as nausea, abdominal pain, and vomiting, can be consistent with the onset of elevated liver enzymes, or drug-induced liver injury from liver-related conditions. Both tirzepatide and semaglutide have been linked to such symptoms. Combining azelaprag with tirzepatide made the occurrence of elevated liver enzyme symptoms typical and expected.

73. The Offering Documents made clear that the Company was "planning Phase 2 clinical trials with azelaprag in combination with injectable GLP-1R agonists, as ***these drugs are approved,"*** however "***our ultimate objective***" [elsewhere described as a "***key therapeutic goal***"] ***is to develop an all-oral weight loss combination with an oral incretin***." "Dosing oral incretin drugs in combination with orally administered azelaprag could provide well-tolerated weight loss in line with that achieved by injectable agonists alone, as well as superior body composition." To that end, BioAge stated, "[w]e have selected a 5 mg dose of tirzepatide in the STRIDES clinical trial given it approximates oral efficacy. Our ultimate goal is to develop azelaprag as part of an all-oral obesity combination therapy. The 5 mg dose of tirzepatide achieves similar weight loss as the most advanced oral in development, oral semaglutide. Tirzepatide 5 mg achieved 15.0% overall weight loss at 72 weeks; oral semaglutide 50 mg, achieved 15.1% weight loss after 68 weeks."

74. The Offering Documents further noted that "combination therapies" are an important trend in obesity drug development because "[c]ombining multiple therapeutics with different mechanisms of action has the potential to improve weight loss while reducing side effects, improving body composition, and/or improving comorbidities."

### F. The Components of the STRIDES Study Further Support an Expectation of the Occurrence of Elevated Liver Enzymes within the Study Population

75. The STRIDES Study elements, Study population, endpoints, and agents each presented the risk of the occurrence of elevated liver enzymes within the obese, older Study population receiving

azelaprag, alone or in combination with tirzepatide.[43] Thus the presentation of elevated liver enzymes was not atypical, unexpected, or unforeseen. Neither is it the type of side effect that is atypical of those associated with the agents relied on, or more severe than, such associated side effects.

76. The Offering Documents referred to the fact that azelaprag was being studied in combination with an FDA-approved drug called tirzepatide. Defendants' Offering Documents referenced agents such as "apelin receptor agonists," GLP-1R agonists, and incretins. Prior to the IPO, obesity drug products and GLP-1R agonists, including tirzepatide, were linked to liver injury, or elevated liver enzymes, sometimes in pre-approval clinical trials, or as reported in patients post-marketing, or as disclosed in drug package inserts, or by independent research. Certain weight loss medications, including some GLP-1R agonists, are marketed with cautionary language not to use the drug in patients with known advanced liver disease, cirrhosis, or liver failure, given their potential liver toxicity side effect. *See*, e.g. footnotes 20-21. Other GLP-1R agonists, like tirzepatide, have been linked to elevated liver enzymes. Yet, the Offering Documents did not disclose that the occurrence of a common or expected side effect, or one that is a type consistent with the agents relied upon, would doom the STRIDES Study and further development of azelaprag by BioAge, thus posing investment risk.

77. The Offering Documents referred to the intended endpoints of the STRIDES Study: achievement of weight loss and the maintenance of muscle mass. To that end, in its July 29, 2024 press release, BioAge represented that azelaprag was an "exercise-induced signaling molecule (exerkine)" and "agonist of the apelin receptor APJ," with the "potential to recapitulate many of the metabolic benefits of exercise." Exercise itself can also cause elevated liver enzymes.

78. The Offering Documents referred to the STRIDES Study of azelaprag in combination with tirzepatide in order to achieve weight loss and referred to GLP-1R agonists. Significant or rapid weight

[43] The participant criteria of the STRIDES Study addressed only two liver-specific exclusions: those with "biopsy-confirmed nonalcoholic steatohepatitis" (NASH), also known as metabolic dysfunction-associated steatohepatitis (MASH), and patients who "[h]ave a known history or presence of severe active acute or chronic livers disease..." These exclusions in the design of the Study reflects that there could be a side effect associated with the Study that may impact the liver. However, the exclusion criteria did not require participants to refrain from physical exercise, taking over-the-counter products such as acetaminophen (Tylenol) or naproxen (Aleve), or consuming alcohol, all of which can result in elevated liver enzymes. This heightened the expectation of an elevated liver enzyme side effect occurring among the STRIDES Study population. https://clinicaltrials.gov/study/NCT06515418, last visited November 19, 2025.

loss can also elevate liver enzymes. The combination of azelaprag with tirzepatide in order to achieve both significant and rapid weight loss – while mimicking exercise and thereby maintaining muscle mass by virtue of exercise recapitulation – also harbored the risk of elevated liver enzymes.

79. Despite touching on elevated liver enzyme symptoms in the Offering Documents like abdominal pain, nausea, and vomiting – albeit referred to as "gastrointestinal" side effects associated with combination partner drugs tirzepatide and semaglutide – nowhere did the Offering Documents expressly or adequately discuss, mention, or otherwise disclose or reference human liver-related side effects arising from exercise, rapid weight loss, tirzepatide alone or in combination with azelaprag, incretins, GLP-1R or apelin receptor agonist agents relied upon in the STRIDES Study, or those arising from the condition of obesity itself, and/or fatty liver disease, alcohol consumption, or diet.

80. The STRIDES Study components, with a combination of tirzepatide with azelaprag to mimic exercise and cause significant or rapid weight loss, were a consequential combination given the risk each carried of inducing elevated liver enzymes. The language of the Offering Documents, when read as a whole and in context, created the false impression that there was no consequent investment risk presented by the presentation of a common, expected side effect that was typical of the agents relied on in the STRIDES Study and was not "rare and severe" or "more severe than" side effects associated with those agents.

81. Since the occurrence of elevated liver enzymes without clinically significant symptomatology and without liver damage was a known risk of the agents involved in the STRIDES Study, the manifestation of which could cause termination of the STRIDES Study, it was a consequential investment risk that potentially doomed the Study from the beginning, including at the time of the IPO. However, no adequate warning was given, nor was the risk otherwise adequately imparted to investors in the common stock issued in the IPO about the type of foreseeable, common side effect posing the type of side effect-related risk that threatened their investment.

### G. Elevated Liver Enzymes Occurred in the STRIDES Study Before the IPO

82. Upon information and belief, and as alleged more fully below, a transaminitis side effect occurred within the trial participants receiving azelaprag alone or in combination with tirzepatide prior to

the Offering. In accordance with standard practice, the design protocol for the STRIDES Study necessarily included periodic testing of blood and enzyme levels from commencement of the STRIDES Study, thereby providing information regarding elevated liver enzyme levels – transaminitis – prior to the Offering. Some of the Study participants reportedly developing transaminitis would have developed elevated liver enzyme levels soon after the first dosing, and prior to the date of the IPO. The occurrence of elevated liver enzymes in the STRIDES Study prior to the IPO renders multiple statements in the Prospectus, specifically statements that prefaced Study results with "if" or "may[,]" including what the Company "may experience" in clinical trials, or that clinical trials "may . . . produce negative or inconclusive results" are rendered false and misleading by the presentation of elevated liver enzymes in STRIDES Study participants prior to the IPO.

83. In the Amgen Phase 1 study, elevated liver enzymes appeared in one of six healthy patients receiving 650mg daily doses of azelaprag by the fifth of seven days of dosing, demonstrating that rapid onset of elevated liver enzymes is consistent with dosage of azelaprag. This rapid presentation of elevated liver enzymes is consistent with direct exposure to hepatotoxins, which can cause abrupt increases in liver enzymes ALT and AST within days.[44] Given the rapid onset observed in the Amgen Phase 1 study, and the STRIDES Study monitoring schedule, elevated liver enzymes would have both presented and have been detected in cohort populations receiving daily dosing totaling 600mg of azelaprag, alone or in combination with tirzepatide, prior to the IPO. This allegation made on information and belief is further based on the heightened risk of transaminitis, the proximity to the commencement of the IPO of BioAge's disclosure of the occurrence of elevated liver enzymes in Study participants, the sheer number of trial participants, the commencement of trial dosing no later than July 29, 2024, the design protocol requiring patient visits every other week during the first eight weeks of treatment, a total of four visits prior to the IPO, a testing regime consistent with standard clinical trial monitoring for drugs with hepatotoxic potential, periodic testing of liver enzymes, and the number of trial participants BioAge contended experienced the transaminitis side effect.[45]

---

[44] Drug-Induced Liver Injury — Types and Phenotypes. Hoofnagle JH, Björnsson ES. The New England Journal of Medicine. 2019;381(3):264-273. doi:10.1056/NEJMra1816149.

[45] *Id.*

84. This allegation is further supported by the combination of agents, the end points of the Study, and the reasonable inference arising from the fact that BioAge, upon making its December 6, 2024 announcement regarding the halting of the STRIDES Study, did not state that the developed elevated liver enzymes – transaminitis – occurred in all the 11 participants only after the date of the Offering Documents.

85. Hence, not only was the incidence of such a side effect not a matter of "if" or "may," it was neither "unexpected" nor "atypical." Upon information and belief, based on all of the facts stated above, transaminitis was an existing risk that had occurred prior to the IPO. In addition to the false and misleading risk warnings that were contained in the Offering Documents, such an occurrence of elevated enzyme levels in STRIDES Study participants would have been material to investors, especially because BioAge used transaminitis absent clinically significant symptoms and without reported liver damage as the basis to halt the STRIDES Study within just about nine weeks of completing the IPO.[46]

## V. THE OFFERING DOCUMENTS WERE MATERIALLY FALSE AND MISLEADING

### A. Inadequate, False, and Misleading Risk Factor Disclosures

86. Although the Offering Documents warned that success of the ongoing STRIDES Study was not guaranteed, the Offering Documents misrepresented the type or character of side effect-related investment risk. The Offering Documents largely either gave boilerplate warnings associated with the general risks that face the pharmaceutical industry or falsely represented and omitted information regarding the type or nature of side effects that posed investment risk and would be significant and material to a reasonable investor.

87. The risk warnings stated in the Offering Documents misled investors by creating the false impression that the STRIDES Study would be discontinued by reason of an "unexpected" or "atypical" or "rare and severe" side effect, not a common, typical, expected side effect that did not occasion clinically significant symptoms or reported liver damage and had not been characterized as "serious" when the

[46] A reasonable inference arises that elevated liver enzymes had presented in the STRIDES Study before the IPO. Defendants are in exclusive possession, custody, and control of the information addressing the allegation, which they have not disclosed, raising a reasonable inference that had they disclosed such information, it would be adverse to Defendants regarding the onset of transaminitis in the Study prior to the IPO. Indeed, it would be unreasonable to infer that none of the 11 Study participants who presented transaminitis suffered onset only after the Offering Documents were filed.

substantially equivalent side effect occurred in the Amgen study. In the context of obesity, and the effort to lose significant weight, whether by diet and exercise or with medication, transaminitis was clearly a common and typical risk. Hence, Defendants created a false impression about the true type and nature of side effects that constituted risks of investing in BioAge. The failure is starker yet, when the utter lack of any mention of harm to the liver is compared with some of the more specific risk warnings or discussion of side effects contained in the Offering Documents.

88. For example, the Offering Documents warned that "[c]urrent **GLP-1R agonists** are not well-tolerated by all patients. Across obesity trials of injectable **semaglutide** and **tirzepatide**, up to 44% of **subjects experienced gastrointestinal side effects such as nausea, diarrhea, and vomiting**, which contributed to a discontinuation rate of up to 17%. The incidence of **gastrointestinal adverse events** is even higher with other oral GLP-1R agonists in late-stage third-party clinical trials. Because these adverse effects appear to be dose-dependent, we believe combination approaches with APJ agonists may provide an opportunity to achieve weight reduction goals using a lower and therefore potentially more tolerable dose of GLP-1R agonists."

89. BioAge also disclosed that "[i]njectable GLP-1R agonists are peptides that are associated with a high rate of gastrointestinal side effects such as nausea, diarrhea, vomiting, constipation, and abdominal pain. For example, in the STEP-1 and SURMOUNT-1 clinical trials, 44% of patients treated with semaglutide (2.4 mg) and 31% of patients treated with tirzepatide (15 mg) experienced nausea, respectively. These side effects contributed to discontinuation rates of 17% for patients on semaglutide (2.4 mg) and 15% for patients on tirzepatide (15 mg) in these clinical trials. In the real world, discontinuation has been reported at up to 68% at one year, of which up to 64% has been ascribed to tolerability based on patient reports."

90. The Offering Documents further disclosed that "[O]ral GLP-1R agonists in development have generally reported an equivalent or inferior tolerability profile compared to injectable agonists, with higher rates of gastrointestinal side effects and subsequent trial discontinuation. In Phase 2–3 obesity trials of oral GLP-1R agonists, 58% (orforglipron, 24 mg) to 87% (GSBR-1290, 120 mg) of patients reported gastrointestinal side effects such as nausea, diarrhea, vomiting, constipation, and abdominal pain; by

contrast, 31% (tirzepatide, 15 mg) to 44% (semaglutide, 2.4 mg) reported such adverse events with approved injectable agonists."

91. The Offering Documents further informed investors that "*Suboptimal body composition can be a key limitation of incretins currently used to treat obesity*."

92. In all of this, there is a notable lack of any mention of an expected, common, or typical risk being the type of side effect that could lead to discontinuation of the STRIDES Study and/or total abandonment of azelaprag's development. The focus of these warnings is on gastrointestinal side effects, some of which touch on elevated liver enzyme-related side effects. As such, the risk disclosures set forth in the Offering Documents created a false impression of the true adverse side effect related risk and risks of investing in BioAge in the IPO.

93. The "risk disclosures" of the Offering Documents included, in salient part, the following discussions:

**Risks Associated with Our Business**

*******

- Drug development is a lengthy and expensive process, the outcome of clinical testing is inherently uncertain, and results of earlier studies and trials may not be predictive of future trial results. We may incur additional costs or experience delays in completing, or ultimately be unable to complete, the development and commercialization of azelaprag and any future product candidates for many reasons, including a failure to replicate positive results from earlier preclinical studies or clinical trials in ongoing or future preclinical studies or clinical trials.
- We are developing our lead product candidate, azelaprag, and may develop future product candidates, in combination with other therapies, which would expose us to additional risks.

*******

**Risk Related to Research, Discovery, Development, Regulatory Approval and Commercialization of our Product Candidates**

***We are substantially dependent on the success of our lead product candidate, azelaprag, which is currently in clinical development, and for which we have not completed a Phase 2 efficacy trial and any future product candidates we may develop. If we are unable to advance the development of, receive regulatory approval for and ultimately successfully commercialize azelaprag or any future product candidates we may develop, or experience significant delays in doing so, our business will be materially harmed.***

Our future success is highly dependent on our ability to timely complete successful clinical trials, obtain regulatory approval for, and then successfully commercialize our lead product candidate azelaprag and any future product candidates, which may never occur. We are early in our development efforts with respect to azelaprag, for which we recently completed our Phase 1 and Phase 1b clinical trials … There can be no assurance that azelaprag … will achieve success in its respective clinical trials or obtain regulatory approval … our early stage of development, it may be several years, if at all, before we have demonstrated the safety and efficacy of a product candidate sufficient to warrant approval for commercialization.

***

The success of azelaprag … will be dependent on several factors, including the following:

***

demonstration of safety, efficacy and acceptable risk-benefit profiles of our product candidates to the satisfaction of the FDA and other comparable foreign regulatory agencies;

***

- demonstration of product characteristics attractive to physicians, patients, advocates, payors and caregivers;
- acceptance of our products, if and when approved, by patients, the medical community and third-party payors underpinned by adequate health economic data and a meaningful value proposition;
- effectively competing with other therapies, including those that have not yet entered the market;

***

- maintaining a continued acceptable safety profile of the products following approval.

Many of these factors are beyond our control, and it is possible that none of our product candidates will ever obtain regulatory approval even if we expend substantial time and resources seeking such approval. If we do not achieve one or more of these factors in a timely manner or at all, we could experience significant delays or an inability to successfully commercialize our product candidates, which would materially harm our business. For example, our business could be harmed if results of our ongoing or planned clinical trials of azelaprag show ***unexpected*** adverse events or a lack of efficacy in the indications we intend to treat or do not meet the clinical endpoints, or if we experience other regulatory or developmental issues.

***

***Drug development is a lengthy and expensive process, the outcome of clinical testing is inherently uncertain, and results of earlier studies and trials may not be predictive of future trial results. We may incur additional costs or experience delays in completing, or ultimately be unable to complete, the development and commercialization of azelaprag and any future product candidates for many reasons, including a failure to replicate positive results from earlier preclinical studies or clinical trials in ongoing or future preclinical studies or clinical trials.***

***

Our lead product candidate, azelaprag, is in clinical development, and the risk of failure is high. It is impossible to predict when or if azelaprag or any future product candidates will prove effective and safe in humans or will receive regulatory approval. To obtain the requisite regulatory approvals to commercialize any product candidate, we must demonstrate through extensive preclinical studies and lengthy, complex and expensive clinical trials that our product candidates are safe and effective in humans … outcome is inherently uncertain. Failure can occur at any time during the clinical trial process. The results of preclinical studies and early clinical trials of azelaprag … or a competitor's product candidate in the same class, may not be predictive of the results of later-stage clinical trials. For example, as is common in early-stage clinical trials, our Phase 1b bed rest atrophy clinical trial of azelaprag, conducted in a small number of healthy older

individuals, evaluated a number of pharmacodynamic endpoints and biomarkers without correction for multiplicity. These results on measures of muscle size, quality and metabolism may not be replicated in later-stage clinical trials with different trial designs and patient populations … a clinical trial can fail at any stage of testing. Differences in trial design between early-stage clinical trials and later-stage clinical trials make it difficult to extrapolate the results of earlier clinical trials to later clinical trials.

***

We may experience delays in initiating or completing clinical trials. We also may experience numerous unforeseen events during, or as a result of, any future clinical trials that we could conduct that could delay or prevent our ability to receive regulatory approval or commercialize Azelaprag or any future product candidates, including:

***

- clinical trials of any product candidates may fail to show safety or efficacy, produce negative or inconclusive results and we may decide, or regulators may require us, to conduct additional preclinical studies or clinical trials or we may decide to abandon product development programs;

***

- reports from clinical testing of other therapies may raise safety or efficacy concerns about azelaprag…

***

- our failure to establish an appropriate safety profile for a product candidate based on clinical or preclinical data for such product candidate as well as data emerging from other molecules in the same class as azelaprag…

***

A suspension or termination may be imposed due to a number of factors, including … unforeseen safety issues or adverse side effects, failure to demonstrate a benefit from using a product or treatment, failure to establish or achieve clinically meaningful trial endpoints …

***

Additionally, if the results of our clinical trials are inconclusive or if there are safety concerns or serious adverse events associated with our product candidates, we may:

- be delayed in obtaining regulatory approval, if at all;
- obtain approval for indications or patient populations that are not as broad as intended or desired or may have restricted duration expectations or guidance;
- obtain approval with labeling that includes significant use or distribution restrictions or safety warnings;
- be subject to additional post-marketing testing requirements;
- be required to perform additional clinical trials to support approval or be subject to additional post-marketing testing requirements;
- have regulatory authorities withdraw, or suspend, their approval of the drug or impose restrictions on its distribution in the form of a Risk Evaluation and Mitigation Strategy (REMS);
- be subject to the addition of labeling statements, such as warnings or contraindications.

***We are developing our lead product candidate, azelaprag, and may develop future product candidates, in combination with other therapies, which would expose us to additional risks.***

We are currently developing our lead product candidate, azelaprag, for use in combination with certain incretins for the treatment of obesity, … For example, our

ongoing and planned Phase 2 trials of azelaprag are in combination with tirzepatide and semaglutide. The development of product candidates for use in combination with another product may present challenges that are not faced for single agent product candidates. Each of our Phase 2 trials of azelaprag in combination with tirzepatide and semaglutide, respectively, are designed to evaluate efficacy and it is possible that the results of these trials or future trials of azelaprag in combination with tirzepatide or semaglutide could show that azelaprag does not sufficiently contribute to the observed effects of individuals who participate in these trials …

***

***We face substantial competition, which may result in others discovering, developing or commercializing products before or more successfully than we do, if at all.***

***

Our lead product candidate, azelaprag, initially under development as a combination therapy for the treatment of obesity, if approved, would face competition from other approved treatments, some of which have already achieved commercial success. To compete successfully, we will need to differentiate our combination therapy, if approved, from currently marketed drugs as well as those that may be approved in the future, meaning that we will have to demonstrate that the relative cost, method of administration, safety, tolerability or efficacy of our combination therapy provides a better alternative or complement to existing and new therapies. Our commercial opportunity and likelihood of success will be reduced or eliminated if our azelaprag combination therapy is not ultimately demonstrated to be safer, more effective, more conveniently administered, or less expensive than the current standards of care.

… Competing products could present superior treatment alternatives, including by being more effective, safer, less expensive or marketed and sold more effectively than any products we may develop. Competitive products may make any products we develop obsolete or noncompetitive before we recover the expense of developing and commercializing our current or any future product candidates…

***

***Negative results or publicity for one obesity drug could have a substantial impact on all drugs and product candidates for the treatment of obesity, including ours.***

Our business can be affected by adverse publicity or negative public perception about us, our competitors, our product candidates or products, if approved, or our industry or competitors generally. Adverse publicity may include publicity about metabolic disease treatments or GLP-1R agonists generally, the efficacy, safety and quality of azelaprag, as well as of the broader category of obesity products, including any products that azelaprag are intended to be used in combination with, … Any adverse publicity or negative public perception could have a material adverse effect on our business, financial condition and results of operations. Further, any adverse effects in our clinical trials, even if not ultimately attributable to our product candidates, and the resulting publicity could result in withdrawal of clinical trial participants, and a decrease in demand for any such product candidates. Our business, financial condition and results of operations could be adversely affected if any of our product candidates or products, if approved, or any similar products distributed by other companies are alleged to be or are proved to be harmful to consumers or to have ***unanticipated*** and unwanted health consequences.

***Adverse side effects or other safety risks associated with azelaprag or any future product candidates we may develop could delay or preclude approval, cause us to suspend or discontinue clinical trials or abandon further development, change the design of our clinical trials, limit the commercial profile of an approved product, or result in significant negative consequences following regulatory approval, if any.***

As is the case with small molecules generally, it is **likely** that there may **be adverse side effects** associated with the use of azelaprag or any future product candidates. ***For example, we have observed certain adverse events such as mild headaches and back pain and dizziness, which were higher in our placebo patients than in our active patients, in***

> ***our clinical trials of azelaprag*. *Our clinical trials may reveal significant adverse events not seen in our preclinical studies or prior clinical trials and may result in a safety or tolerability profile that could delay or prevent regulatory approval or market acceptance of azelaprag or any future product candidates. Undesirable or clinically unmanageable side effects observed in our clinical trials for our product candidates could occur and cause us or regulatory authorities to interrupt, delay or halt our clinical trials*** and could result in more restrictive labeling than anticipated or the delay or denial of regulatory approval by the FDA or other regulatory authorities. ***If additional adverse events, serious adverse events (SAEs) or other side effects are observed in any of our clinical trials that are atypical of, or more severe than, the known side effects of the respective class of agents that each of our product candidates are a part of, we may have difficulty recruiting participants to our clinical trials, participants may drop out of our trials, or we may be required to abandon those trials or our development efforts of one or more product candidates altogether***. Furthermore, clinical trials by their nature utilize a sample of the potential patient population. With a limited number of subjects and limited duration of exposure, ***rare and severe*** side effects of our product candidates or those of our competitors may only be uncovered with a significantly larger number of patients exposed to the drug. … If such effects are more severe, less reversible than we expect or not reversible at all, we may decide or be required to perform additional studies or to halt or delay further clinical development of azelaprag, which could result in the delay or denial of regulatory approval by the FDA or other regulatory authorities. Adverse events and SAEs that emerge during clinical investigation of or treatment with azelaprag or any future product candidates may be deemed to be related to our product candidates. Moreover, if our product candidates are associated with ***undesirable side effects*** in clinical trials or ***have characteristics that are unexpected***, we may elect to abandon or limit their development to more narrow uses or subpopulations in which the undesirable side effects or other characteristics are less prevalent, less severe or more acceptable from a risk-benefit perspective, which may limit the commercial expectations for our product candidates, if approved. … could result in warnings and precautions in our product labeling or a restrictive REMS. This may also result in an inability to obtain approval of azelaprag or any future product candidates. We, the FDA or other regulatory authorities or an IRB or ethics committee may suspend clinical trials of a product candidate at any time for various reasons, including a belief that participants in such trials are being exposed to unacceptable health risks or adverse side effects. Even if the side effects do not preclude the product candidate from obtaining or maintaining regulatory approval, undesirable side effects may inhibit market acceptance of the approved product due to its tolerability versus other therapies … Any of these developments could materially harm our business, financial condition, results of operations and prospects.
>
> ***
>
> We may elect, or regulators, IRBs, or ethics committees may require, that we or our investigators suspend or terminate clinical research or trials for various reasons, including noncompliance with regulatory requirements or a finding that the ***participants in our trials are being exposed to unacceptable health risks***;
>
> ***
>
> We could also encounter delays if a ***clinical trial is suspended or terminated by us***, the IRBs of the institutions in which such trials are being conducted, or the FDA or other regulatory authorities, or if a clinical trial is recommended for suspension or termination by the Data Safety Monitoring Board for such trial. ***A suspension or termination may be imposed due to a number of factors***, including failure to conduct the clinical trial in accordance with regulatory requirements, including the FDA's Good Clinical Practice (GCP) regulations, or our clinical protocols, inspection of the clinical trial operations or trial site by the FDA or other regulatory authorities resulting in the imposition of a clinical hold, ***unforeseen safety issues or adverse side effects***.…

94. The use of the words "if," "may," "unexpected," "atypical," "not seen in our preclinical studies," and "rare and severe," or "unforeseen" instead of "has," "will," or "when" it would occur – rendered the Offering Documents false and misleading. The foregoing risk disclosures were wholly inadequate and misleading given that transaminitis was a common, expected, and consequential side effect of the Study's brew, and one that was typical of the agents relied on and not "more severe than" side effects associated with them.

95. The Offering Documents' references to "observed certain adverse side effects such as mild headaches and back pain, and dizziness, which were higher in our placebo patients than in our active patients" and "significant adverse events not seen in our preclinical studies or prior clinical trials" and reference to "undesirable or clinically unmanageable side effects observed in our clinical trials" that "could occur" "cause us" to "interrupt, delay, or halt" the STRIDES Study, did not adequately warn investors that the common, expected side effect such as transaminitis presented consequential investment risk.

96. The aforesaid risk disclosure was rendered even more false and misleading by stating that, with respect to "additional adverse events, serious adverse events (SAEs) or other side effects are observed" that are "atypical of, or more severe than, the known side effects of the respective class of agents that each of our product candidates are a part of," we "may be required to abandon" the "trials" or "our development efforts." This warning in no way alerted investors to the risk of abandonment of azelaprag in the event a common, expected, or typical side effect such as transaminitis, which was ***not characterized as serious*** when it occurred in the Amgen Study as a CTCAE grade 2 side effect and, upon information and belief, was observed in STRIDES Study participants prior to the IPO. Indeed, this warning created the opposite market impression because elevated liver enzymes are not "atypical" or "more severe than" the "side effects" that have been associated with the respective class of agents that "each of our product candidates are a part of," nor is it a side effect that is "rare and severe," as discussed above.

97. The Offering Documents' risk warning and disclosures never warned that a common, expected side effect, or one typical of the agents relied upon in the Study, or less severe than the type of side effects that have been associated with the agents relied upon, or even side effects that BioAge had not previously represented as "serious" with regard to the Amgen Phase 1 clinical trial study, was the type of side effect that could doom the Study and/or BioAge's development of azelaprag as an obesity drug.

98. Additionally, the risk disclosures, when read in context, were misleading because they failed to disclose that the occurrence of a side effect that was superior to (less undesirable than) the side effect associated with FDA-approved Zepbound's (tirzepatide) and/or Wegovy's (semaglutide) as stated in the Offering Documents, could doom the Study or development of azelaprag in combination with tirzepatide or semaglutide as an obesity drug.

99. Finally, the Offering Documents are false and misleading because they premise the risk disclosures with "if," "may," "could", "unexpected," "rare and severe," " and "unforeseen" when, as set forth in detail in section IV. G., above, elevated liver enzymes had presented in STRIDES Study participants prior to the IPO.

100. At bottom, the Offering Documents materially misrepresented the type of side effects that presented investment risk, misled investors, and failed to adequately warn of or alert investors to the truth about side effect related investment risk – even though elevated liver enzymes, even without clinically significant symptomatology – was an expected side effect that had already occurred among the Study participants which destined the termination of both the STRIDES Study and the development of azelaprag as an obesity drug. As such, the risk factor disclosures themselves were false and misleading.

**B. BioAge Terminates the STRIDES Study Based on the Occurrence of Transaminitis Absent Clinically Significant Symptoms and No Reported Liver Damage Nine Weeks After Completion of the IPO**

101. On December 6, 2024, only about 9 weeks after completion of the IPO, BioAge suddenly announced in a Press Release that it was "discontinuing" the STRIDES Study because 11 participants in the azelaprag dosed cohorts developed transaminitis without clinically significant symptoms. As of December 6, 2024, there were 204 patients enrolled in the STRIDES Study. There was no reported liver damage. There were three azelaprag cohorts, including cohorts also dosed with tirzepatide. All cohorts consisted of obese individuals 55 years or older, and all such cohorts had study endpoints of achieving rapid weight loss while maintaining muscle mass. BioAge did not disclose specifics. However, it reported

that the transaminitis presented with no clinically significant symptoms. There was no reported liver damage.[47]

102. On January 28, 2025, the Company announced that the development of azelaprag as an obesity drug was abandoned, noting that some participants in the "**azelaprag arms**" developed transaminitis without clinically significant symptoms. Again, no liver damage was reported. The side effect was not limited to just the drug-dosed cohort receiving only azelaprag, thus demonstrating that transaminitis, without clinically significant symptoms and no reported liver damage, was a consequential investment risk, even if it was not definitively due to the dosage of azelaprag alone or in combination with tirzepatide.

103. Defendants' halting of the STRIDES Study, as well as their abandoning the development of azelaprag in combination with tirzepatide as an oral obesity treatment due to elevated liver enzymes with no clinically significant symptoms and no reported liver damage, was entirely inconsistent with the representations of, and impression created by, the Offering Documents regarding the type of adverse side effect, or serious side effect, that threatened a halt of the Study.

104. Defendants' halting the STRIDES Study because of elevated liver enzymes without clinically significant symptoms and no reported liver damage was also inconsistent with having proceeded with the Study in the face of the transaminitis side effect occurring in the Amgen Phase 1 trial on a healthy cohort dosed with azelaprag.

105. Further, Defendants' halting of the STRIDES Study and then abandoning the development of azelaprag was inconsistent with having proceeded with the STRIDES Study in the face of the represented adverse side effects of obesity drugs based on tirzepatide and semaglutide in which high intolerability rates and symptomatic side effects such as nausea, vomiting, and abdominal pain – all of which can occur with elevated liver enzymes.

106. At bottom, the Offering Documents were materially false and misleading because they failed to inform investors that a **common, expected** type of side effect like elevated liver enzymes without

---

[47] Defendants and their agents are in exclusive possession, custody, and/or control of the STRIDES Study results and information relating to the presentation of elevated liver enzymes in STRIDES Study participants.

clinically significant symptomatology and no reported liver damage – one that is **not atypical** of side effects linked to the agents of the Study and **not "more severe than"** other associated side effects of such agents, and was not "Rare and severe" – presented a consequential investment risk. This is information that would have significantly altered the total mix of information to investors. It was an omission that made Defendants' other statements and risk warnings in the Offering Documents, as identified above, untrue and materially misleading.

## VI. INVESTORS WERE HARMED BY THE UNTRUE AND MISLEADING OFFERING DOCUMENTS

107. The disclosure of the decision to terminate the STRIDES Study due to the observation of transaminitis without clinically significant symptomatology in some trial participants caused the trading price of BioAge common stock to plummet from $20.09 per share on December 6, 2024, to $4.65 per share on December 7, 2024. An initial class action complaint for violation of the Securities Act of 1933 was filed on January 7, 2025, on which date the trading price of BioAge common stock closed at $5.36 per share. On January 28, 2025, BioAge confirmed that it had abandoned the development of azelaprag.

## VII. CLASS ACTION ALLEGATIONS

108. Lead Plaintiff brings this action as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons and entities who purchased or otherwise acquired BioAge's publicly traded common stock pursuant and/or traceable to the IPO, and who were damaged thereby (the "Class").

109. Excluded from the Class are: (i) the Defendant BioAge; (ii) the Individual Defendants and their immediate family members; (iii) the officers, directors, control persons, and affiliates of BioAge, including all underwriters of the IPO and any persons who sold stock in the IPO, as well as BioAge's employee retirement and/or benefit plan(s) and their participants and/or beneficiaries to the extent they purchased or acquired BioAge's common stock through any such plan(s); (iv) any entity in which any Defendant has or had a controlling interest; and (v) the legal representatives, heirs, successors, or assigns of any such excluded person or entity, in their capacities as such.

110. The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery. Lead Plaintiff believes there are at least thousands of members in the proposed Class as the Company offered 11 million shares of common stock in the IPO. Record owners and other members of the Class may be identified and ascertained from records maintained by BioAge or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

111. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Securities Act as set forth herein. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.

112. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether Defendants violated the Securities Act; (b) whether the Offering Documents contained inaccurate statements of material fact and/or omitted material information required to be stated therein; and (c) to what extent the members of the Class have sustained damages and the proper measure of damages.

113. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII. CAUSES OF ACTION

**COUNT I**
**FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT**
***Against All Defendants***

114. Lead Plaintiff repeats and realleges each allegation set forth above as if fully stated here.

115. This cause of action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Lead Plaintiff and the Class, against Defendant BioAge and each of the Individual Defendants.

116. This is a non-fraud claim, nor does it sound in fraud. Lead Plaintiff does not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This cause of action is asserted on strict liability grounds as to BioAge and on negligence grounds as to the Individual Defendants.

117. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated when made.

118. The Registration Statement, including the Prospectus, issued in connection with the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted material facts necessary to make the statements made within it not misleading, and omitted material facts required to be stated therein in accordance with the rules and regulations governing the Registration Statement's preparation.

119. Defendant BioAge is the registrant and issuer of the common stock sold pursuant to the Registration Statement. As such, Defendant BioAge is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate. By virtue of the Registration Statement containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, Defendant BioAge is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

120. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

121. The Individual Defendants each signed the Registration Statement, causing it to be issued, and are, therefore, statutorily liable to Lead Plaintiff and the Class under Section 11 of the Securities Act. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. The Individual

Defendants each had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts necessary to be stated in order to prevent any statements made in the Registration Statement from misleading investors. By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, each of the Individual Defendants is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

122. None of the untrue statements or omissions of material fact in the Registration Statement alleged herein was a forward-looking statement. Rather, each such statement concerned then existing facts. Moreover, the Registration Statement did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

123. Each of the Defendants named in this Count issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Registration Statement, which misrepresented and failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct herein alleged, each such Defendant violated Section 11 of the Securities Act.

124. Lead Plaintiff and the Class have sustained damages. The value of BioAge common stock has declined substantially due to violations by Defendants named in this Count.

125. At the time of their purchases of BioAge common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein.

126. Less than one year has elapsed from the time that Lead Plaintiff discovered, or reasonably could have discovered, the facts upon which this Complaint is based and the time that this action was commenced. Less than three years have elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time that this action was commenced.

///

///

///

**COUNT II**
**FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT**
**Against the Individual Defendants**

127. Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

128. This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff and the Class, against each of the Individual Defendants.

129. This cause of action does not sound in fraud. Lead Plaintiff does not allege that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim. This cause of action is based solely on negligence and/or strict liability. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims.

130. The Individual Defendants each were control persons of BioAge by virtue of their positions as directors and/or senior officers and/or major shareholders of BioAge. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of BioAge.

131. Each of the Individual Defendants participated in the preparation and dissemination of the Offering Documents and otherwise participated in the process necessary to conduct BioAge's IPO. Because of their positions of control and authority as senior officers, directors, and/or signers of the Registration Statement, each of the Individual Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue information or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

132. The Individual Defendants controlled BioAge. The Individual Defendants participated in the preparation and dissemination of the Offering Documents and otherwise participated in the process necessary to conduct the IPO. Because of their positions of control and authority, the Individual Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue information or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

133. Each of the Individual Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged above, based on having signed the Registration Statement and/or having otherwise participated in the process that allowed the IPO to be completed.

134. As control persons of BioAge, each of the Individual Defendants is liable, jointly and severally, with and to the same extent as BioAge, whom they controlled, for its violations of Section 11 of the Securities Act.

135. As a result of the foregoing, Lead Plaintiff and other members of the Class have suffered damages.

## IX. PRAYER FOR RELIEF

136. WHEREFORE, Lead Plaintiff, on behalf of itself and all other members of the Class, prays for relief and judgment as follows:

(a) Determining that this action is a proper class action, certifying Lead Plaintiff as a Class Representative, and appointing Barrack, Rodos & Bacine as Class Counsel, under Rule 23(a), (b)(3), and (g) of the Federal Rules of Civil Procedure on behalf of the Class;

(b) Awarding all damages and other remedies set forth in the Securities Act in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including pre-judgment and post-judgment interest, as allowed by law;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, accountants' fees, experts' fees, and other costs and disbursements; and

(d) Awarding Lead Plaintiff and the Class such other relief as may be deemed just and proper by the Court.

///

///

///

///

## X. JURY TRIAL DEMANDED

137. Lead Plaintiff demands a trial by jury.

DATED: November 20, 2025

Respectfully submitted,

BARRACK, RODOS & BACINE

*/s/ STEPHEN R. BASSER*
STEPHEN R. BASSER (121590)
SAMUEL M. WARD (216562)
One America Plaza
600 West Broadway, Suite 900
San Diego, CA 92101
sbasser@barrack.com
sward@barrack.com
Telephone: (619) 230-0800
Facsimile: (619) 230-1874

JEFFREY A. BARRACK*
DANIELLE M. WEISS*
ANDREW J. HEO*
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
jbarrack@barrack.com
aheo@barrack.com
dweiss@barrack.com
Telephone: (215) 963-0600
Facsimile: (215) 963-0838

*Counsel for Lead Plaintiff and Lead Counsel for the Proposed Class*

**Admitted Pro Hac Vice*