UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE BIOAGE LABS, INC.,
SECURITIES LITIGATION

Case No.  25-cv-00196-RS

**ORDER GRANTING MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT WITH PREJUDICE**

In this putative securities class action, the Southeastern Pennsylvania Transportation Authority (SEPTA) sued BioAge Labs, averring that the offering documents BioAge issued in connection with its initial public offering were misleading. Specifically, SEPTA claims that BioAge's offering documents failed adequately to disclose the risk that transaminitis—a condition characterized by elevated liver enzymes in the blood—posed to the development of its leading drug candidate, azelaprag.

SEPTA's amended complaint presents two theories. The first theory avers that BioAge did not do enough. SEPTA contends that, by failing to discuss expressly the risk of transaminitis, the offering documents created the false impression that transaminitis did not pose a substantial risk to the clinical trial for azelaprag. The second theory avers that BioAge did too much. SEPTA contends that when the offering documents spoke about the risk from side effects, it used qualifiers such as "if," "may," or "could," even though transaminitis had already presented in participants in BioAge's latest clinical trial.

Neither theory is enough to state a claim for relief. The first theory is a repackaging of the

argument rejected in the order granting BioAge's motion to dismiss the original complaint. *See* Dkt. 65 (MTD). SEPTA has failed to acknowledge, much less grapple with, the analysis in that order. The second theory is entirely inconsistent with the arguments SEPTA has made throughout this litigation as well as with the facts as averred in the amended complaint. Therefore, BioAge's motion to dismiss is granted with prejudice.

### I. BACKGROUND

A fulsome recitation of the factual background can be found in the order dismissing Plaintiff's original complaint. *See* MTD, at 1–3. In brief, BioAge is a clinical-stage biopharmaceutical company that, until recently, was pursuing a drug called azelaprag as its lead product candidate. BioAge hoped azelaprag would be able to treat obesity and its associated conditions by mimicking the human body's physiological response to exercise. *See* Dkt. 70 (FACAC) ¶ 2.

Testing of azelaprag proceeded in several phases. After successful testing on mice, Amgen—azelaprag's original developer—put it through eight Phase 1 clinical trials. Those Phase 1 trials were conducted across 265 patients, and BioAge reported in its offering documents that azelaprag was "well-tolerated" and exhibited an "overall adverse event profile . . . comparable to placebo, with no treatment-related trends in adverse events observed, with the exception of mild, self-limited headaches." FACAC ¶¶ 52, 54. In July 2024, BioAge began patient dosing in its STRIDES phase 2 clinical trial. The objective of the STRIDES trial was to test azelaprag in combination with another drug, tirzepatide, in obese individuals over the age of 55. *See* FACAC ¶ 5. The trial included 220 participants and was expected to include a treatment period of 24 weeks. *See id.*

Approximately eight weeks after the commencement of the STRIDES phrase 2 clinical trial, BioAge went public, raising roughly $198 million from investors. *See* FACAC ¶ 16. Within a month of the offering date, BioAge's common stock had risen from $18 per share to more than $25 per share. *See id.*

The offering documents issued in connection with the IPO discussed the risks BioAge

United States District Court
Northern District of California

faced in its development of azelaprag. It noted that the "success of azelaprag will be dependent on several factors" and the "risk of failure is high." FACAC ¶ 93. Specifically, BioAge warned that "[its] business could be harmed if results of [its] ongoing or planned clinical trials of azelaprag show unexpected adverse events or a lack of efficacy in the indications [it] intend[s] to treat or do not meet the clinical endpoints, or if [it] experience[s] other regulatory or developmental issues." *Id.* As to the risk of side effects, the offering documents cautioned that "[i]f additional adverse events, serious adverse events (SAEs) or other side effects are observed in any of [its] clinical trials that are atypical of, or more severe than, the known side effects of the respective class of agents that each of [its] product candidates are a part of, [it] may have difficulty recruiting participants to [its] clinical trials, participants may drop out of [its] trials, or [it] may be required to abandon those trials or [its] development efforts of one or more product candidates altogether." *Id.*

On December 6, 2024—about nine weeks after the completion of the IPO—BioAge announced that it was discontinuing the STRIDES trial because 11 participants dosed with azelaprag developed transaminitis. *See* FACAC ¶ 101. Transaminitis is a condition characterized by elevated liver enzymes in the blood. Though transaminitis is not itself harmful, it can be a sign of liver inflammation or injury. The day after BioAge announced the discontinuation of the STRIDES trial, its stock price dropped more than 76%. *See id.* ¶ 18. In January 2025, BioAge confirmed it was abandoning further development of azelaprag. *See id.* ¶ 17.

SEPTA purchased BioAge's common stock during the IPO and held it through the discontinuation of the STRIDES trial. It brought this suit on behalf of itself and a putative class of similarly situated investors against BioAge and certain of its corporate officers. Its first complaint was dismissed for failure to state a claim with leave to amend. *See* MTD. In its amended complaint, SEPTA avers that BioAge's offering documents were false and misleading because they created the impression that the STRIDES trial would only be discontinued if *severe, unexpected* risks materialized among the trial's participants. They did not warn that "a common, typical, [and] expected side effect" of weight-loss drugs, like transaminitis, could also doom the trial. *See* FACAC ¶ 87. SEPTA further avers that the offering documents were false because they

spoke about the risk of certain side effects in hypothetical terms, even though transaminitis had already manifested in the STRIDES trial's participants at the time BioAge went public. BioAge moves to dismiss.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the complaint must allege sufficient facts which, if accepted as true, "state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

SEPTA brings claims under Sections 11 and 15 of the Securities Act of 1933. To state a claim under Section 11, SEPTA must plausibly aver that the offering documents "contained an untrue statement of material fact [or omission of] a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *see Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009). Importantly, Section 11 does not create liability whenever an issuer withholds material information from the market. *Cf. Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011). Rather, it compels disclosure only where the information is necessary to make the other statements in the offering documents not misleading. *Cf. id.* To state a claim for relief under Section 11, the plaintiff need not prove that the defendants acted with any intent to deceive or defraud. *See Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 179 (2015). Section 15 is a derivative provision which "makes controlling persons jointly and severally liable for violations of the Securities Act." *Pirani v. Slack Technologies, Inc.*, 127 F.4th 1183, 1187 (9th Cir. 2025); *see* 15 U.S.C. § 77o.

# III. DISCUSSION

SEPTA's amended complaint presents two theories under which BioAge's offering documents were false or misleading. First, it asserts that by discussing severe, unexpected, or atypical risks to the STRIDES trial, the offering documents *implied* that benign, expected, or typical risks—like transaminitis—did not exist. Second, it contends that BioAge was not permitted to talk about the risk to the STRIDES trial posed by side effects of azelaprag—like transaminitis—in hypothetical terms because, in fact, transaminitis had already manifested among the trial's participants when BioAge went public.

SEPTA's first theory has already been considered and rejected. As the order granting the motion to dismiss SEPTA's original class action complaint explained, SEPTA's theory relies on an impermissible negative inference. It posits that by choosing to discuss certain risks—namely, those that were unexpected, atypical, or more severe than side effects observed in agents being used in the trial—BioAge implied that more conventional side effects posed no risk to the success of the trial. Under the Ninth Circuit's decision in *In re Rigel Pharmaceuticals*, that inference is not viable. *See* 697 F.3d 869, 880 (9th Cir. 2012) (rejecting plaintiff's argument that "[d]efendants should have reported more information related to blood pressure or liver enzyme levels" because its decision to release "key safety results" did not suggest that it released "all of the safety results or that these results included every occurrence of every possible side effect").

SEPTA has basically reasserted this defective theory without so much as acknowledging it has already been rejected. The only difference in its amended complaint seems to be the addition of two statements in the offering documents which, it contends, imply that transaminitis did not pose a risk to the STRIDES trial. First, it flags BioAge's representation that one of the goals of azelaprag was to improve tolerability of oral weight-loss medication. Those weight-loss drugs, known as GLP-1 agonists, experienced high discontinuation rates from side effects such as nausea, diarrhea, and vomiting. *See* FACAC ¶ 67. In SEPTA's view, this disclosure conveyed to investors that BioAge was okay with some side effects, making it reasonable for those investors to have thought BioAge would have pushed through incidences of non-clinically significant transaminitis.

*See* Dkt. 77 (Opp.), at 14.

The inference undergirding this argument is exceptionally specious. The excerpts of the risk disclosures that SEPTA points to do not discuss transaminitis or, indeed, any risks to the development of azelaprag—they discuss the BioAge's goals for azelaprag. Nor do they imply that BioAge was tolerant of significant incidences of nausea, diarrhea, or vomiting. To the contrary, the offering documents explained that the frequency of those side effects led to unfavorable discontinuation rates for GLP-1 agonists as a monotherapy and that BioAge hoped to solve that problem by using azelaprag in combination with other drugs. *See* FACAC ¶ 70 ("The Prospectus informed investors that '[c]ombination approaches that limit incretin doses required to achieve target weight loss have the potential to substantially improve tolerability, which has clear potential downstream benefits,' among them being 'improved patient compliance and reduced discontinuation, the majority of which is currently ascribed to tolerability in the real-world setting.'"). If anything, a reasonable investor would have understood from these disclosures that BioAge was concerned about, not tolerant of, the impact that side effects of weight-loss drugs could have on uptake.

Second, SEPTA points to certain disclosures regarding the Phase 1 clinical trials of azelaprag. On the fifth day after initial dosing, one of the six participants that received a 650mg daily dose of azelaprag developed transaminitis. *See* FACAC ¶ 57. The offering documents characterized this episode as "mild" and indicated that "no serious adverse events ha[d] been reported." *Id.* ¶ 58. According to SEPTA, "[t]his was thus a further indication to investors that the presentation of transaminitis, without clinically significant symptoms, did not present an investment risk." Opp., at 28.

This argument is hard to make sense of. It appears as though SEPTA is arguing that BioAge ought to have represented that this episode was a "serious adverse event," even though the remainder of its submission is premised on transaminitis being a common, expected, and mild side effect of azelaprag. If SEPTA is instead arguing that this statement implies that only "serious adverse events" presented investment risk, it is merely a repackaging of the same impermissible

ORDER GRANTING MOTION TO DISMISS WITH PREJUDICE
CASE NO. 25-cv-00196-RS

inference that has now been twice rejected. Nothing in that statement suggests that only "serious adverse events" posed a risk to the commercialization of azelaprag.

That leaves SEPTA's second theory. It asserts that BioAge misled investors by discussing the risk posed by side effects of azelaprag in purely hypothetical terms when, in fact, transaminitis had manifested among the STRIDES trial's participants at the time of the IPO. Although SEPTA does not identify with particularity which risk disclosures it considered misleading, it is most likely referring to the following statement:

- "*If* additional adverse events, serious adverse events (SAEs) or other side effects are observed in any of our clinical trials that are atypical of, or more severe than, the known side effects of the respective class of agents that each of our product candidates are a part of, we *may* have difficulty recruiting participants to our clinical trials, participants *may* drop out of our trials, or we *may* be required to abandon those trials or our development efforts of one or more product candidates altogether." FACAC ¶ 93 (emphasis added).

There are (at least) two problems with this argument. First, this risk disclosure only speaks in hypothetical terms about the class of side effects that are "serious . . . atypical of, or more severe than the known side effects" of the class of agents to which azelaprag belongs. *Id.* Throughout this litigation, SEPTA has maintained that transaminitis is not within that class. Its view has been that transaminitis is a common, expected, and mild side effect of weight-loss drugs. That view is the basis of SEPTA's leading theory in its amended complaint. *See* FACAC ¶ 8 ("[Transaminitis] was a foreseeable side effect that was not atypical of GLP-1R agonists and apelin receptor agonist agents used in the STRIDES Study and not one that was unexpected given its obese study patient pool, dosing with tirzepatide, a GLP-1R agonist, and an apelin receptor agonist like azelaprag, along with the two endpoints of rapid weight loss and mimicking exercise."); *see also* Opp., at 6–7 ("But in truth, inconsistent with and contrary to what the Offering Documents stated, a 'common' adverse side effect—elevated liver enzymes without clinically significant symptoms and no reported liver damage—that was not unforeseen or unexpected, not atypical of or more serious than side effects associated with the agents relied on in the study, and not rare and severe, was a material, undisclosed, consequential adverse side effect-related investment risk with respect to the STRIDES Study.") That concession is fatal to this theory of liability. If transaminitis is not

United States District Court
Northern District of California

"atypical of, or more severe than the known side effects" of the class of agents to which azelaprag belongs, FACAC ¶ 93, then the hypothetical language in those risk disclosures simply did not apply to the risk posed by transaminitis. Whether transaminitis had manifested at the time of the IPO is, therefore, irrelevant.

Even if it were relevant, SEPTA has not plausibly averred that transaminitis manifested among the STRIDES trial's participants at the time of the IPO. The order granting BioAge's motion to dismiss the original class action complaint described this assertion as "entirely conclusory." MTD, at 10. SEPTA has tried to add some more meat to the bone in its amended complaint. It avers, for instance, that in the Phase 1 trial of azelaprag, the participant that developed transaminitis did so within five days of the initial dosing. *See* FACAC ¶ 56. That, on balance, makes it more likely that the eleven STRIDES trial participants that developed transaminitis did so in the two months after dosing began but before BioAge went public. SEPTA also avers that participants in the STRIDES trial had doctor's visits every other week after their initial dosing, making it more likely that asymptomatic transaminitis would have been discovered and conveyed to BioAge before the IPO. *See id.* ¶ 83. SEPTA further avers that by constructing a participant pool of obese individuals over the age of 55, the STRIDES trial was especially susceptible to the manifestation of transaminitis. *See id.* ¶ 8. Finally, it correctly notes that the precise point at which transaminitis manifested is information exclusively within the control of BioAge.

Still, these averments do not get SEPTA across the threshold of plausibility. The fact that a single individual developed transaminitis in a separate study five days after the initial dose was administered does not establish that transaminitis typically manifests early in the dosing cycle. Similarly, while it may be true that the type of participants in the STRIDES trial made the manifestation of transaminitis more likely, SEPTA has not shown that this class of individuals reliably develops transaminitis at a particular time after starting dosing of a drug like azelaprag. Absent more specific averments, it is not plausible that transaminitis manifested among those in

the STRIDES trial by the time of the IPO.[1]

## IV. CONCLUSION

For the foregoing reasons, BioAge's motion to dismiss is granted without leave to amend.

**IT IS SO ORDERED**.

Dated: March 2, 2026

_____
RICHARD SEEBORG
Chief United States District Judge

United States District Court
Northern District of California

---

[1] Judicial notice is not required to resolve Defendant's motion to dismiss, so Defendant's request for judicial notice, Dkt. 75, is denied.

ORDER GRANTING MOTION TO DISMISS WITH PREJUDICE
CASE NO. 25-cv-00196-RS